# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

RACHEL WELTY; AFTYN BEHN,

*Plaintiffs-Appellees-*
*Cross-Appellants,*

v.

BRYANT C. DUNAWAY; JASON LAWSON; JENNINGS HUTSON JONES; ROBERT J. CARTER; RAY WHITLEY; ROBERT J. NASH; GLENN R. FUNK; STACEY EDMONSON; BRENT COOPER; RAY CROUCH; HANS SCHWENDIMANN,

*Defendants-Appellants-*
*Cross-Appellees.*

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:24-cv-768

## DEFENDANTS' FIRST BRIEF

Jonathan Skrmetti
  *Attorney General & Reporter*

J. Matthew Rice
  *Solicitor General*

Steven J. Griffin
  *Deputy Attorney General*

Matthew D. Cloutier
Aaron L. Bernard
  *Assistant Solicitors General*

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 532-6026
Matt.Rice@ag.tn.gov

# TABLE OF CONTENTS

Statement Regarding Oral Argument ....................................................xiii

Statement of Jurisdiction...............................................................xiv

Statement of the Issues................................................................ xv

Introduction................................................................................ 1

Statement of the Case ................................................................... 4

    A.    The Underage Abortion-Trafficking Act...............................4

    B.    Procedural History ................................................8

Standard of Review ...................................................................15

Argument...............................................................................16

I.  Plaintiffs Lack Article III Standing. ............................................16

    A.  Plaintiffs presented no evidence that they intend to violate the Act's "recruiting" restriction................................17

    B.  Plaintiffs presented no evidence establishing a certain threat of prosecution under the Act. ..........................28

II.  The Recruiting Restriction Is Not Unconstitutionally Overbroad. ......................................................................36

    A.  Plaintiffs failed to prove real-world unconstitutional applications of the Act's "recruiting" provision.........................38

    B.  The Act has numerous constitutional applications. ................39

        1.  Speech integral to criminal actvity. ....................................39

        2.  Speech interfering with parents' rights ...............................44

    C.  Plaintiffs failed to prove that any unconstitutional applications substantially outweigh the constitutional applications..................................................................49

III.  The District Court Granted Improper Relief. ................................53

    A.  Any injunction must be limited to the "recruiting" provision's allegedly unconstitutional applications.................53

    B.  Any injunction must be party-specific.....................................54

Conclusion .............................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Allied Delivery Sys., Inc. v. I.C.C.,*
  908 F.2d 972 (6th Cir. 1990) ............................................................. 32

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................ 53

*Ariz. Christian Sch. Tuition Org. v. Winn,*
  563 U.S. 125 (2011) ............................................................................ 55

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ............................................................. 65

*Ayotte v. Planned Parenthood,*
  546 U.S. 320 (2006) ............................................................................ 54

*Brockett v. Spokane Arcades, Inc.,*
  472 U.S. 491 (1985) ............................................................................ 54

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ...................................................................... 45, 46

*Burson v. Freeman,*
  504 U.S. 191 (1992) ...................................................................... 47, 48

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) .............................................................. 56, 59, 65

*California v. Texas,*
  593 U.S. 659 (2021) ............................................................................ 57

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................................ 53

*Christian Healthcare Ctrs., Inc. v. Nessel,*
  117 F.4th 826 (6th Cir. 2024) ........................................... 2, 30, 31, 36

*Commonwealth v. Biden,*
  57 F.4th 545 (6th Cir. 2023) ............................................................ 55

*Connection Distrib. Co. v. Holder,*
  557 F.3d 321 (6th Cir. 2009) ..................................................... *passim*

*Corum v. Holston Health & Rehab. Ctr.,*
  104 S.W.3d 451 (Tenn. 2003) ............................................................ 18

*Crawford v. U.S. Dep't of Treasury,*
  868 F.3d 438 (6th Cir. 2017) ............................................. 13, 17, 28, 36

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ................................................................. 56, 57

*Davis v. Colerain Twp.,*
  51 F.4th 164 (6th Cir. 2022) ............................................................ 31

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.,*
  No. 23-3630, 2025 WL 3102072 (6th Cir. Nov. 6, 2025) .................... 45

*DeVore v. Univ. of Ky. Bd. of Trs.,*
  118 F.4th 839 (6th Cir. 2024) ............................................................ 16

*DHS v. New York,*
  589 U.S. 1173 (2020) ........................................................................ 58

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ................................................................. *passim*

*Doran v. Salem Inn,*
  422 U.S. 922 (1975) ............................................................... 3, 58, 59

*Ent. Prods., Inc. v. Shelby Cnty.,*
  721 F.3d 729 (6th Cir. 2013) ............................................................ 15

*Etienne v. Ferguson,*
  791 F. Supp. 3d 1226 (W.D. Wash. 2025) ......................................... 62

*FEC v. Colo. Republican Fed. Campaign Comm.,*
  533 U.S. 431 (2001) ........................................................................ 51

*FEC v. Cruz,*
    596 U.S. 289 (2022) ................................................................ 16

*Fla. Decides Healthcare, Inc. v. Byrd,*
    790 F. Supp. 3d 1335 (N.D. Fla. 2025) ............................... 62

*Flade v. City of Shelbyville,*
    699 S.W.3d 272 (Tenn. 2024) ............................................... 19

*Frazier ex rel. Frazier v. Winn,*
    535 F.3d 1279 (11th Cir. 2008) ........................................... 48

*Free Speech Coal. v. Paxton,*
    606 U.S. 461 (2025) ................................................................ 46

*Free Speech Coal., Inc. v. Skrmetti,*
    2025 WL 512049 (6th Cir. Jan. 13, 2025) ......................... 66

*Friends of George's, Inc. v. Mulroy,*
    108 F.4th 431 (6th Cir. 2024) ................................... *passim*

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490 (1949) .......................................................... 39, 40

*Ginsberg v. New York,*
    390 U.S. 629 (1968) .......................................................... 45, 47

*Griffin v. HM Fla.-ORL, LLC,*
    144 S. Ct. 1 (2023) .................................................................. 61

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund,*
    527 U.S. 308 (1999) ................................................................ 60

*Hinman v. ValleyCrest Landscaping Dev., Inc.,*
    89 F.4th 572 (6th Cir. 2024) ............................................... 15

*Huff v. TeleCheck Servs., Inc.,*
    923 F.3d 458 (6th Cir. 2019) ............................................... 17

*Hutto v. Davis,*
    454 U.S. 370 (1982) ................................................................ 56

*In re Pro. Home Health Care, Inc.*,
  159 F. App'x 32 (10th Cir. 2005).........................................18

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002)..............................................46

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*,
  121 F.4th 604 (7th Cir. 2024) .......................................41, 42

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
  927 F.3d 396 (6th Cir. 2019)...............................4, 46, 47, 48

*Kasper v. Brittain*,
  245 F.2d 92 (6th Cir. 1957)................................................40

*Kiser v. Reitz*,
  765 F.3d 601 (6th Cir. 2014)..............................................30

*L.E. v. Lee*,
  728 F. Supp. 3d 806 (M.D. Tenn. 2024)..............................65

*L.W. ex rel. Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) .....................................*passim*

*Labrador v. Poe*,
  144 S. Ct. 921 (2024)................................................59, 61

*Lewis v. Casey*,
  518 U.S. 343 (1996)..................................................55, 56

*Mahmoud v. Taylor*,
  145 S. Ct. 2332 (2025).....................................................47

*Maracich v. Spears*,
  570 U.S. 48 (2013)..........................................................19

*Matsumoto v. Labrador*,
  122 F.4th 787 (9th Cir. 2024) ...........................................41

*McKay v. Federspiel*,
  823 F.3d 862 (6th Cir. 2016).....................................*passim*

*McLemore v. Gumucio,*
  149 F.4th 859 (6th Cir. 2025) ............................................................ 45

*Members of City Council v. Taxpayers for Vincent,*
  466 U.S. 789 (1984) ............................................................ 37

*Mirando v. U.S. Dep't of Treasury,*
  766 F.3d 540 (6th Cir. 2014) ............................................................ 32

*Missouri v. Hunter,*
  459 U.S. 359 (1983) ............................................................ 44

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ............................................................ *passim*

*Nat'l Educ. Ass'n-N.H. v. N.H. Att'y Gen.,*
  No. 25-CV-293, 2025 WL 2807652 (D.N.H. Oct. 2, 2025) ....... 54, 61, 62

*NetChoice v. Bonta,*
  152 F.4th 1002 (9th Cir. 2025) ............................................................ 38, 49

*NIH v. Am. Pub. Health Ass'n,*
  145 S. Ct. 2658 (2025) ............................................................ 63

*Nussbaumer v. Sec'y, Fla. Dep't of Children, & Fams.,*
  150 F.4th 1371 (11th Cir. 2025) ............................................................ 62

*Online Merchs. Guild v. Cameron,*
  995 F.3d 540 (6th Cir. 2021) ............................................................ 29, 30, 31

*Parham v. J.R.,*
  442 U.S. 584 (1979) ............................................................ 4, 47

*Pavia v. NCAA,*
  154 F.4th 407 (6th Cir. 2025) ............................................................ 32

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) ............................................................ 19

*Pierce v. Soc'y of the Sisters,*
  268 U.S. 510 (1925) ............................................................ 4, 47

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
  413 U.S. 376 (1973) ............................................................. 40

*Planned Parenthood v. Sundquist*,
  38 S.W.3d 1 (Tenn. 2000) ................................................... 20

*Republican Party of Minn. v. Klobuchar*,
  381 F.3d 785 (8th Cir. 2004) ............................................. 29

*Richland Bookmart, Inc. v. Knox Cnty.*,
  555 F.3d 512 (6th Cir. 2009) ............................................. 50

*Rizzo v. Goode*,
  423 U.S. 362 (1976) ............................................................. 54

*Schall v. Martin*,
  467 U.S. 253 (1984) ............................................................. 46

*Scott v. Donald*,
  165 U.S. 107 (1897) ............................................................. 61

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) ............................................................... 56

*Sheldon v. Sill*,
  49 U.S. 441 (1850) ............................................................... 60

*State v. Ducker*,
  27 S.W.3d 889 (Tenn. 2000) ...................................... 25, 26

*State v. Mateyko*,
  53 S.W.3d 666 (Tenn. 2001) ...................................... 25, 26

*State v. Spradlin*,
  12 S.W.3d 432 (Tenn. 2000) ............................................. 34

*Sullivan v. Benningfield*,
  920 F.3d 401 (6th Cir. 2019) ............................................. 15

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .............................................. 17, 30, 34

*Tenn. Conf. of the NAACP v. Lee,*
    105 F.4th 888 (6th Cir. 2024) ............................................. 66

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ....................................................... 56

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ................................................. *passim*

*United States v. Gillispie,*
    929 F.3d 788 (6th Cir. 2019) ............................................. 18

*United States v. Grace,*
    461 U.S. 171 (1983) ....................................................... 54

*United States v. Hansen,*
    599 U.S. 762 (2023) ................................................. *passim*

*United States v. Rahimi,*
    602 U.S. 680 (2024) ....................................................... 38

*United States v. Raines,*
    362 U.S. 17 (1960) ........................................................ 55

*United States v. Simpson,*
    520 F.3d 531 (6th Cir. 2008) ............................................. 20

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020) ....................................................... 59

*United States v. Stevens,*
    559 U.S. 460 (2010) ....................................................... 40

*United States v. Williams,*
    553 U.S. 285 (2008) ................................................. *passim*

*Vidal v. Elster,*
    602 U.S. 286 (2024) ................................................... 45, 46

*Viet v. Le,*
    951 F.3d 818 (6th Cir. 2020) ......................................... 16, 53

*Virginia v. Hicks,*
   539 U.S. 113 (2003) ..................................................... 49, 58

*Warth v. Seldin,*
   422 U.S. 490 (1975) ..................................................... 55, 57

*Welty v. Dunaway,*
   145 F.4th 628 (6th Cir. 2025) ........................................... 10

*White v. Howes,*
   586 F.3d 1025 (6th Cir. 2009) ........................................... 44

*Whole Woman's Health v. Jackson,*
   595 U.S. 30 (2021) ....................................................... 64

*Williams-Yulee v. Fla. Bar,*
   575 U.S. 433 (2015) ...................................................... 48

*Yoder v. Bowen,*
   146 F.4th 516 (6th Cir. 2025) ........................................... 34

**Constitutional Provision**

U.S. Const. art. III ...................................................... 55, 57, 59

**Statutes**

18 U.S.C. § 1590(a) ...................................................... 33

22 U.S.C. § 7102(11)(B) .................................................. 33

22 U.S.C. § 7102(12) ..................................................... 33

28 U.S.C. § 1291 ......................................................... xiii

28 U.S.C. § 1331 ......................................................... xiii

Ala. Code § 26-23H-4 ..................................................... 40

Ark. Code Ann. § 5-61-304 ................................................ 40

Ga. Code Ann. § 15-11-682(a)(1)(B) ....................................... 42

Id. Code Ann. § 18-622 ............................................................40

Ind. Code Ann. § 16-34-2-1......................................................40

Ky. Rev. Stat. Ann. § 311.7706 ...............................................40

Ky. Rev. Stat. Ann. § 311.990(12)(a)......................................42

La. Stat. Ann. § 14:87.7...........................................................40

La. Stat. Ann. § 40:1061 ..........................................................40

Miss. Code Ann. § 41-41-45 ....................................................40

Mo. Ann. Stat. § 188.028(1)......................................................42

N.C. Gen. Stat. Ann. § 90-21.7................................................42

Okla. Stat. Ann. tit. 21, § 861 .................................................40

S.D. Codified Laws § 22-17-5.1 ..............................................40

Tenn. Code Ann. § 1-3-110 ......................................................54

Tenn. Code Ann. § 39-11-302(a)................................26, 27, 28

Tenn. Code Ann. § 39-11-611(b)..............................................34

Tenn. Code Ann. § 39-13-101(a)(2) .........................................34

Tenn. Code Ann. § 39-13-101(a)(3) .........................................34

Tenn. Code Ann. § 39-13-308(a)(1) .........................................33

Tenn. Code Ann. § 39-13-309(a)(2) .........................................33

Tenn. Code Ann. § 39-13-506 ..................................................43

Tenn. Code Ann. § 39-14-112 ..................................................43

Tenn. Code Ann. § 39-15-201 .........................................*passim*

Tenn. Code Ann. § 39-15-201(a).....................................*passim*

Tenn. Code Ann. § 39-15-201(c) ....................................................... 17

Tenn. Code Ann. § 39-15-201(c)(1) ................................................. 7

Tenn. Code Ann. § 39-15-201(c)(2) ................................................. 7

Tenn. Code Ann. § 39-15-213 ....................................................... 40

Tenn. Code Ann. § 39-16-503 ....................................................... 43

Tenn. Code Ann. § 39-17-305(b) ................................................... 34

Tenn. Code Ann. § 39-17-318 ....................................................... 43

Tenn. Code Ann. § 39-17-901(10) ................................................. 33

Tenn. Code Ann. § 39-17-902(a)(1) ............................................... 33

Tex. Health & Safety Code § 170A.002 ......................................... 40

Va. Code Ann. § 18.2-76 .............................................................. 42

W. Va. Code Ann. § 16-2R-3 ........................................................ 40

**Rules**

Fed. R. Civ. P. 56 ....................................................................... 16

**Legislative Materials**

House Floor Session (Apr. 23, 2024) ............................................5, 8

House Health Committee Hearing (Feb. 21, 2024) ..................................8

House Population Health Subcommittee Hearing (Feb. 13, 2024) ......5, 6

Senate Judiciary Committee Hearing (April 2, 2024) ..........................7, 8

Senate Session (April 10, 2024) ....................................................6

**Other Authorities**

W. Baude & S. Bray, *Proper Parties, Proper Relief*,
  137 HARV. L. REV. 153 (2023) ...........................................................57

George Tucker Bispham, *The Principles of Equity: A Treatise on the System of Justice Administered in Courts of Chancery* § 408
  (Philadelphia, Kay & Brother 4th ed. 1874) ......................................64

S. Bray, *Multiple Chancellors: Reforming the National Injunction*,
  131 HARV. L. REV. 417 (2017) ..................................................... *passim*

John Norton Pomeroy, Jr., *Equity Jurisprudence* § 1360
  (San Francisco, Bancroft-Whitney Company 3d ed. 1905) ................64

*WE NEVER TELL': Planned Parenthood Helps 13 Year Olds Get Abortions in Nearby States to Evade Law*,
  Project Veritas, (Dec. 21, 2023) ...........................................................5

Kimya Forouzan, *Minors' Access to Abortion Care*,
  Guttmacher Inst., (Aug. 28, 2025)......................................................42

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellants respectfully request oral argument. The district court permanently enjoined and declared facially unconstitutional a provision of Tennessee law. That decision implicates important questions about federal jurisdiction, the First Amendment, and federal courts' remedial power. Oral argument will aid the Court's consideration of those questions.

# STATEMENT OF JURISDICTION

Plaintiffs Rachel Welty and Aftyn Behn invoked the district court's subject-matter jurisdiction under 28 U.S.C. § 1331. Compl., R.1, 3.[1] The district court issued a final judgment on July 24, 2025. Judgment, R.84, 1138-39. Defendants timely filed their notice of appeal on August 17, 2025. Notice of Appeal, R.86, 1146-48. This Court has jurisdiction to review the district court's "final decisions." 28 U.S.C. § 1291.

---

[1] All record pincites refer to the "Page ID" numbers in the ECF file stamps for the district court's docket, No. 3:24-cv-768.

# STATEMENT OF THE ISSUES

This case involves a Tennessee law that prohibits "abortion trafficking of a minor," committed if an adult "intentionally recruits, harbors, or transports a pregnant unemancipated minor within th[e] State" for purposes of obtaining an elective abortion *without parental consent*. Pub. Ch. No. 1032 § 1, 113th Gen. Assembly (2024) (codified at Tenn. Code Ann. § 39-15-201). The district court issued a statewide injunction preventing Defendants from enforcing the Act's "recruiting" prohibition against anyone. The issues presented are:

I.     Whether the district court exceeded its Article III jurisdiction.

II.    Whether the Act's "recruiting" restriction is facially unconstitutional under the First Amendment.

III.   Whether the district court erred in the scope of relief provided.

**INTRODUCTION**

Tennessee's elected representatives passed the Underage Abortion-Trafficking Act with a narrow goal in mind: Preventing kids from being trafficked for abortions without their parents' consent.  The Act imposes no restrictions on abortion access.  Nor does it prevent minors from traveling for out-of-state abortions.  It applies only when an adult "intentionally recruits, harbors, or transports a pregnant unemancipated minor" for the purpose of obtaining an elective abortion without her parents' consent.  Tenn. Code Ann. § 39-15-201.

When abortion is involved, though, "no legal rule or doctrine is safe from ad hoc nullification." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 286 (2022) (quotations omitted).  Time and again, courts addressing abortion-related statutes have "flouted" interpretive principles, "distorted First Amendment doctrines," and "diluted the strict standard for facial constitutional challenges." *Id.* at 286-87.  Here, the district court did all the above—and resurrected universal injunctions to boot.  Its decision rests on three layers of reversible errors: standing, facial invalidity, and relief.

Plaintiffs lack standing. By their own admission, they do not "recruit" minors for abortions without their parents' consent—let alone *intentionally*. Rather, they advocate for abortion rights and disseminate information about out-of-state abortion access. Under any reasonable interpretation of the Act, that's not "recruiting." Plaintiffs themselves insist that their "goal" is "never to persuade someone" to get an abortion. Hearing Tr., R.39-1, 527 (24:16-18); *see id.* at 535 (56:1-5). Far from a certainly impending threat of prosecution, there is a certainty of *non*-prosecution here. Plaintiffs' refusal to accept that "real-world win" does not somehow create Article III jurisdiction; it's the hallmark of a generalized grievance. *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 859-60 (6th Cir. 2024) (Murphy, J., concurring).

Even if they had standing, Plaintiffs cannot prove facial invalidity. Facial challenges are "hard to win"—even in the First Amendment context. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). To prevail, Plaintiffs needed to show that the Act's "unconstitutional applications *substantially outweigh* its constitutional ones," *id.* at 724 (emphasis added), and they needed to make that showing with "actual fact[s]," *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009) (en banc).

But they *skipped discovery* altogether—trading real-world facts for dreamed-up hypotheticals. The district court attempted to fill the evidentiary gap with intuition and rhetorical questions. But without a developed "factual record," it is "impossible" for Plaintiffs to satisfy the stringent facial-challenge standard. *NetChoice,* 603 U.S. at 760-61 (Thomas, J., concurring); *id.* at 743-44 (majority op.).

Finally, assuming some hypothetical constitutional violation, the district court erred in "enjoin[ing] *all* enforcement of the recruitment provision" through a "statewide injunction[]." Opinion, R.81, 1130-31 (emphasis added). Binding precedent is clear: Nonparty relief exceeds both statutory and constitutional limits on the judicial power. *See Trump v. CASA, Inc.,* 606 U.S. 831 (2025); *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023), *aff'd sub nom. United States v. Skrmetti*, 605 U.S. 495 (2025). That rule about *parties* does not turn on *the law's* geographic reach—statewide versus nationwide. Nor does a different rule apply for overbreadth claims. *See Doran v. Salem Inn*, 422 U.S. 922, 931, 933-34 (1975).

The Court should reverse.

## STATEMENT OF THE CASE

### A.    The Underage Abortion-Trafficking Act

"Western civilization['s] concept[] of the family as a unit with broad parental authority over minor children" is deeply rooted. *Parham v. J.R.*, 442 U.S. 584, 602 (1979).  The Supreme Court has long stressed the "liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce v. Soc'y of the Sisters*, 268 U.S. 510, 534-35 (1925).

Parental authority is especially heightened in the medical context. "There is a long tradition of permitting state governments to regulate medical treatments for adults and children"—meaning States control what treatments are available.  *L.W.*, 83 F.4th at 474.  But within the available treatments, parents generally control their child's healthcare. Children, after all, "do not possess the right to make medical decisions for themselves because" they "are not assumed to have the capacity to take care of themselves." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418-19 (6th Cir. 2019) (quotations omitted).

Tennessee lawmakers enacted the Underage Abortion Trafficking Act to preserve parents' involvement in their kids' medical care.

In late 2023, an undercover video revealed that Planned Parenthood staff in Missouri (a State that shares a border with Tennessee) regularly arranged for minors to be transported across state lines to obtain abortions *without their parents' knowledge or consent*. *See 'WE NEVER TELL': Planned Parenthood Helps 13 Year Olds Get Abortions in Nearby States to Evade Law*, Project Veritas, (Dec. 21, 2023), https://perma.cc/29UW-PLCY.  Staff told an undercover reporter they could help his "13-year-old" niece secure an abortion without "the parents finding out" by providing a doctor's note "to get the child out of school," and "pick[ing] up the child and transport[ing] her" across state lines. *See* Pet. for Dec. Judgment and Inj. Relief, *Missouri ex rel. Bailey v. Planned Parenthood Great Plains*, No. 24BA-CV00990, at 11-13 (Mo. Cir. Ct. Feb. 29, 2024), https://perma.cc/87MH-PLYX.

A Tennessee legislator shared a similar account: Someone reportedly took his constituent's 14-year-old daughter out of state for an abortion without her parents' consent.  Rep. Zachary, House Floor Session at 3:37:00-3:38:18, https://tinyurl.com/3nxm2s6u (Apr. 23, 2024); *see* Rep. Zachary, Population Health Subcommittee Hearing at 29:55-30:39, https://tinyurl.com/ycx4h46p (Feb. 13, 2024).  "The daughter called [her

parents] from West Tennessee and said they're taking me across state lines to get an abortion." Rep. Zachary, Population Health Subcommittee Hearing, *supra*, at 30:15-30:20. "Th[e] dad was crying." *Id.* at 30:20-22. But despite efforts to "stop it," "they took [the] child across state lines against the parents' wishes to get an abortion." *Id.* at 30:28-39.

Faced with these disturbing accounts, Tennessee's legislators examined whether additional legislation was needed to protect parental rights. *See* Sen. Rose, Senate Session at 24:20-24:39, https://tinyurl.com/yws5mx56 (April 10, 2024); Rep. Zachary, House Session, *supra*, at 3:35:55-3:36:19. Lawmakers reviewed research showing that minor girls are "more likely to feel pressured into abortion than adult women" and lack fully developed decision-making capabilities. Pimentel Testimony, Population Health Subcommittee Hearing, *supra*, at 7:20-8:18. And they heard testimony that parental involvement is vital to ensuring a child's health after an abortion, as post-abortion complications "can be life-threatening." *Id.* at 8:18-8:30.

The General Assembly then enacted the Underage Abortion Trafficking Act. Tenn. Code Ann. § 39-15-201. The Act creates a new misdemeanor offense—"abortion trafficking of a minor." *Id.* § 39-15-201(a), (b).

That offense occurs when an adult "intentionally recruits, harbors, or transports a pregnant unemancipated minor within" Tennessee "for the purpose of (1) [c]oncealing an act that would constitute a criminal abortion" under Tennessee law from the minor's parents or legal guardian, (2) "[p]rocuring an act that would constitute a criminal abortion" under Tennessee law, or (3) "[o]btaining an abortion-inducing drug for the purpose of an act that would constitute a criminal abortion" under Tennessee law. *Id.* § 39-15-201(a).

The Act's focus is narrow. It applies only to conduct that evades parental consent. It does not apply to a minor's "parents or legal guardian." *Id.* § 39-15-201(c)(1). Nor does it apply to persons who have "obtained the written, notarized consent of" a "minor's parent or legal guardian." *Id.* § 39-15-201(c)(2). The Act, moreover, does not itself restrict abortion access, in Tennessee or elsewhere. It does not categorically prohibit a minor's travel to another State for an abortion. Nor does it prevent minors from obtaining abortions in States where it remains legal to do so—independently or with parental consent. *See* Sen. Rose, Senate Judiciary Committee Hearing at 4:00:40-4:01:30, https://tinyurl.com/yfnesurm (April 2, 2024).

The recruiting provision is narrower still. It prohibits only the intentional targeting of an unemancipated minor to induce or persuade them to obtain an elective abortion without their parents' or guardian's consent. It does not prohibit general public advocacy for abortion, pregnancy-options counseling, or merely sharing information about the availability of abortion services in other states. Rep. Leatherwood, House Health Committee Hearing at 1:06:30-1:06:55, https://tinyurl.com/4nez799r (Feb. 21, 2024); Rep. Zachary, House Health Committee Hearing, *supra*, at 1:07:52-1:08:15. All told, the Act restricts only the intentional trafficking of someone else's child for an abortion *without parental consent*.

## B. Procedural History

Plaintiffs' objections to the Act predate its passage. Plaintiff Welty testified against the Act. Welty Testimony, Senate Judiciary Committee Hearing, *supra*, at 4:06:48-4:09:11. And Plaintiff Behn advocated against the Act in her role as a state representative. *E.g.*, Rep. Behn, House Floor Session, *supra*, at 3:22:08-3:23:29. When they failed to prevail in the democratic process, they sued under the theory that the Act prohibited

their pro-abortion advocacy. Compl., R.1. 1-15. The complaint asserts First Amendment and void-for-vagueness claims. *Id.* at 9-14.

The district court denied Plaintiffs' request for a temporary restraining order as too delayed. Order, R.24, 243-48. It added that Plaintiffs had not shown a need for immediate relief given Defendants' assurance that the Act's "recruiting" provision does not cover "[m]erely providing information about out-of-state abortion services or abortion drugs." *Id.* at 246-47.

At a subsequent preliminary-injunction hearing, Welty and Behn testified about their anticipated abortion-related activities: distributing literature and sharing information about out-of-State abortion options, volunteering to raise money for out-of-state abortion clinics, sitting for media interviews, giving speeches, joining marches, and posting abortion-related information on social media. Hearing Tr., R.39-1, 523-26, 531-35. They were clear, though, that they do not try to persuade anyone to have an abortion. Welty testified: "My goal as an advocate is *never to persuade someone.* It is to give them options and then let them make their own decision." *Id.* at 527 (24:16-18) (emphasis added). Behn testified similarly. *Id.* at 535 (56:1-5).

The district court nevertheless issued a preliminary injunction. Mem., R.40, 538-86; Order, R.41, 587-88. Defendants appealed and moved to stay proceedings in the district court. Defs.' Mot. to Stay, R.48, 604-09.[2] With the stay motion pending, Defendants answered the complaint. Defs.' Answer, R.51, 623-33.

Plaintiffs immediately moved for summary judgment, skipping the discovery process. *See* Pls.' MSJ Mot., R.54, 641-43. They sought no documents, conducted no depositions, and introduced no evidence of the Act's real-world applications. *See* Pls.' SUMF, R.55, 644-75; Pls.' MSJ Mem., R.56, 686-738. Defendants responded with their own summary-judgment motion. Defs.' MSJ Mot., R.67, 803-04; Defs.' MSJ Mem., R.69, 812-55. Defendants pointed out that, with no evidence, Plaintiffs could not possibly satisfy the strict facial-challenge standard. *See* Defs.' MSJ Mem., R.69, 822-23, 846-47; Defs.' MSJ Reply, R.75, 937. They also contended that Plaintiffs lacked standing, Defs.' MSJ Mem., R.69, 829-38, and stressed the need to carefully tailor any relief, *id.* at 851-53.

---

[2] With the parties' agreement, this Court dismissed the preliminary-injunction appeal as moot after the district court granted summary judgment. *Welty v. Dunaway*, 145 F.4th 628, 629-30 (6th Cir. 2025) (per curiam).

The district court granted Plaintiffs' summary-judgment motion in part.[3]  On standing, the court concluded that Welty and Behn had shown an intention to engage in conduct proscribed by the Act's recruiting provision.  Opinion, R.81, 1109-15.  The court observed that "[t]here are several plausible interpretations of 'recruit' in this context," acknowledging Defendants' "narrow interpretation" as well as Plaintiffs' "broader interpretation."  *Id.* at 1113.  "Under either," the court reasoned, Plaintiffs' "abortion-related advocacy and counseling would be proscribed."  *Id.* at 1115.

The court also believed that Plaintiffs had shown a credible threat of enforcement under this Court's *McKay* factors.  *See id.* at 1115-20.  The court conceded that the first two factors "do not support standing"—but gave them "little weight."  *Id.* at 1120.  Instead, the court rested its analysis on the two remaining factors, concluding that the Act "has several attributes that ease enforcement" and that "defendants have refused to disavow enforcement of it against [P]laintiffs for their specific speech."  *Id.*

---

[3] The court granted summary judgment to Defendants on Plaintiffs' void-for-vagueness claim.  Opinion, R.81, 1128-29, 1131.

The district court sided with Plaintiffs on the merits, too. It first concluded that the Act "regulates [P]laintiffs' speech because of its message … and is presumptively unconstitutional" as applied to them. *Id.* at 1124. The court then turned to the facial analysis. *See id.* at 1124-28. It acknowledged that Defendants had "identif[ied] several constitutional applications," *id.* at 1125, including recruiting for abortions that are illegal where they occur, *see id.* at 1125-27. But the court claimed—without any evidence—that those "circumstances reflect a small subset" of applications. *Id.* at 1125 (quotations omitted). To the court's eye, Plaintiffs' theorized applications were "much more 'realistic' and 'substantial.'" *Id.* at 1127 (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). Again, the court pointed to no evidence; it simply posed a rhetorical question: "Why would an adult recruit a Tennessee minor to obtain an illegal abortion in Tennessee, or another state where it is illegal, when many other states allow for legal abortion … ?" *Id.* at 1126. The court then held that the recruiting provision was "unconstitutionally overbroad." *Id.* at 1128.

Finally, the court rejected Defendants' request for party-specific relief and enjoined enforcement of the Act statewide against *anyone*.

"When a law is facially overbroad," the court proclaimed, "*all* enforcement of that law may be enjoined." *Id.* at 1129 (quotations omitted). In granting this expansive relief, the court recognized that *CASA* "limit[ed] the use of 'universal injunctions' by lower federal courts," but claimed that *CASA* "limit[ed] the availability of universal injunctions, not statewide injunctions." *Id.* at 1130.

Defendants appealed. *See* Defs.' Notice of Appeal, R. 86, 1146-48. Plaintiffs cross-appealed. *See* Pls.' Notice of Appeal, R.87, 1149-51.

## SUMMARY OF THE ARGUMENT

**I.** Plaintiffs lack standing. To establish pre-enforcement standing, Plaintiffs had to show both "an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" the Act and "a *certain* threat of prosecution" if they do engage in that conduct. *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454-55 (6th Cir. 2017) (quotations omitted). Plaintiffs failed to prove either.

*First*, Plaintiffs presented no evidence showing an intention to violate the Act's "recruiting" provision. That provision is narrow—it prohibits the intentional targeting of an unemancipated minor to induce or persuade them to obtain an elective abortion without parental consent.

Plaintiffs' own testimony confirms that they do nothing like that—much less with the Act's required *mens rea*.

*Second*, Plaintiffs failed to prove a certain threat of prosecution. Defendants have maintained since day one that Plaintiffs' intended conduct does not violate the Act. That should have ended the matter. But even if the Act did prohibit their intended conduct, this Court does not assume that every breach of the law will be prosecuted—it demands some proof of enforcement risk. *See McKay v. Federspiel*, 823 F.3d 862, 868-69 (6th Cir. 2016). Plaintiffs offered none. They pointed to no historical or threatened enforcement, nothing about the Act that makes enforcement especially easy, nor a refusal by any Defendant to disavow enforcement against their specific conduct.

**II.** The Act's "recruiting" restriction is not unconstitutionally over-broad. To prevail on a "disfavored" facial challenge, *NetChoice*, 603 U.S. at 744, Plaintiffs needed to show that the Act's "unconstitutional applications *substantially outweigh* its constitutional ones," *id.* at 724 (emphasis added), and they needed to make that showing with "actual fact[s]," *Connection Distrib.*, 557 F.3d at 336 (citation omitted). They did neither. Plaintiffs chose to *skip discovery*, so they offered only imagined

unconstitutional applications. That lack of record evidence meant that they could not rebut the State's various constitutional applications either, let alone prove that whatever unconstitutional applications might exist substantially outweighed the constitutional ones. The district court filled these evidentiary gaps with more speculation and its own evidence-free factfinding. That basic summary-judgment error demands reversal.

**III.** The district court granted an improper universal injunction. It "enjoin[ed] *all* enforcement" of the recruiting provision, against anyone statewide. Opinion, R.81, 1131 (emphasis added). That universal injunction "exceeds the norms of judicial power" under Article III. *L.W.*, 83 F.4th at 490. And it exceeds the statutory limits on judicial authority that the Supreme Court just reiterated in *CASA*.

## STANDARD OF REVIEW

This Court reviews *de novo* legal conclusions regarding Article III jurisdiction, *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019), the interpretation of state laws, *Hinman v. ValleyCrest Landscaping Dev., Inc.*, 89 F.4th 572, 574 (6th Cir. 2024), and the constitutionality of state laws, *Ent. Prods., Inc. v. Shelby Cnty.*, 721 F.3d 729, 733 (6th Cir. 2013).

The Federal Rules direct courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 thus "compels summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (quotations omitted). And that's true "even if the moving party does not itself come forward with evidence affirmatively negating the disputed element." *Id*. Said another way, the nonmoving party "must identify 'specific facts, as opposed to general allegations,' establishing the element." *Id*. (quotations omitted). "Conclusory statements unadorned with supporting facts will not do." *DeVore v. Univ. of Ky. Bd. of Trs.*, 118 F.4th 839, 844-45 (6th Cir. 2024) (quotations omitted).

## ARGUMENT

## I. Plaintiffs Lack Article III Standing.

To invoke federal jurisdiction, a plaintiff must prove "an injury in fact ... fairly traceable to the challenged conduct of the defendant ... that is likely to be redressed by the requested relief." *FEC v. Cruz*, 596 U.S. 289, 296 (2022). An injury can be established before enforcement only

when the plaintiff shows "an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" that statute, as well as "a *certain* threat of prosecution" if it engages in that conduct. *Crawford*, 868 F.3d at 454-55 (quotations omitted). And "[a]t summary judgment," the plaintiff "cannot rely on allegations alone but must set forth evidence demonstrating [its] standing." *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019). Plaintiffs failed to do so.

**A.    Plaintiffs presented no evidence that they intend to violate the Act's "recruiting" restriction.**

Plaintiffs presented no evidence showing that they intend to engage in conduct even arguably "proscribed by" the Act. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotations omitted). Abortion trafficking occurs when an adult "intentionally recruits, harbors, or transports a pregnant unemancipated minor … for the purpose of" obtaining an elective abortion without her parents' consent. Tenn. Code Ann. § 39-15-201(a), (c). Plaintiffs challenge only the "recruiting" restriction, but they proved no intent to engage in prohibited recruiting.

**1.  *The meaning of "recruit."*** The Act's "recruiting" restriction covers the intentional targeting of an unemancipated minor to induce or

persuade them to obtain an elective abortion without the consent of their parent or guardian.

Start with the "natural and ordinary meaning of the statute." *Corum v. Holston Health & Rehab. Ctr.*, 104 S.W.3d 451, 454 (Tenn. 2003) (cleaned up). Dictionaries define "recruit," as relevant here, to mean "to induce or enlist (a person) to participate." *Recruit*, Oxford English Dictionary Online. Courts have understood "recruit" the same way. *See, e.g.*, *In re Pro. Home Health Care, Inc.*, 159 F. App'x 32, 37 (10th Cir. 2005); Post-Trial Jury Instrs., *United States v. Withers*, No. 3:16-cr-0005-wmc, Doc. 126-2, at 12 (W.D. Wis. Apr. 28, 2017) ("To recruit means to persuade someone to join in or to help with some activity"). The idea is that recruiting involves affirmative, targeted conduct that seeks to drive a person to engage in a particular action—here, obtaining an elective abortion without parental consent.

Context and canons of construction confirm that ordinary meaning. "The words of a text," this Court has said, "must be read in their context and with a view to their place in the overall scheme." *United States v. Gillispie*, 929 F.3d 788, 790 (6th Cir. 2019); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012).

"In expounding a statute," then, courts "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 18 (1981) (quotations omitted). And here, the "whole law" reveals a singular focus on "abortion trafficking of a minor." The Act's title and even its first line make clear that its aim is not to suppress generalized pro-abortion advocacy, but to curb the trafficking of unemancipated minors. *See* Tenn. Code Ann. § 39-15-201.

The canon of *noscitur a sociis* underscores the Act's narrow trafficking focus. That canon "counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008); *accord Flade v. City of Shelbyville*, 699 S.W.3d 272, 286 (Tenn. 2024). Reading statutes this way helps ensure that courts "avoid" giving them "unintended breadth." *Maracich v. Spears*, 570 U.S. 48, 62-63 (2013) (quotation omitted). Here, the canon tethers the meaning of "recruit" to the Act's other key verbs—"harboring" and "transporting." Each involves conduct intended to facilitate a particular minor's elective abortion without parental consent. "Recruit" should

likewise be read to require targeted inducement or persuasion of a minor to pursue abortion.

Common usage bears this out.  A college basketball coach might "recruit" a particular player to a specific university.  But no one would think that a high-school guidance counselor is "recruiting" students simply by providing information about different college opportunities.  So too here.  Properly understood, "recruiting" entails targeted inducement for a specific purpose, not generalized public advocacy or sharing of abortion-related information.

Principles of avoidance counsel similarly.  This Court "appl[ies] the general rules of statutory construction as embraced by the Tennessee judiciary."  *United States v. Simpson*, 520 F.3d 531, 536 (6th Cir. 2008).  That includes the long-recognized "duty" of Tennessee courts "to adopt a construction which will sustain a statute and avoid constitutional conflict if *any* reasonable construction exists that satisfies the requirements of the Constitution."  *Planned Parenthood v. Sundquist*, 38 S.W.3d 1, 7 (Tenn. 2000) (emphasis added) (quotations omitted).  A Tennessee court would thus interpret the term "recruit" to require targeted efforts to persuade minors to obtain elective abortions without their parents'

knowledge or consent. That "reasonable" reading avoids potential "constitutional conflict[s]" associated with a more expansive interpretation that would sweep in general pro-abortion advocacy or abortion-related education. *Id.*

The bottom line: The Act's "recruiting" restriction prohibits only efforts intended to induce or persuade a minor to obtain an elective abortion without parental consent.

**2. *Plaintiffs do not engage in recruiting.*** To establish standing, Plaintiffs must show that they intend to induce or persuade minors to go behind their parents' backs to be trafficked (out of State or to an illegal operation in Tennessee) for an elective abortion. The evidence shows that they have not engaged in and do not plan to participate in that sort of conduct—let alone with the Act's required *mens rea*.

Plaintiff Welty testified that, in her capacity as a lawyer who advocates for abortion access, she engages in several categories of abortion-related communications. The first includes providing abortion-related "information" to the general public or to minors who "reach out to her." Hearing Tr., R.39-1, at 6:18-23, 7:19-22; *see id.* at 14:10-12, 16:4-17:4, 18:5-7 (distributing "handouts about abortion care [and] abortion pills"

at "different places" where "anyone" could find them); *id.* at 17:5-9 ("leaving "little cards" listing websites about abortion options in "different places," like the "bathrooms of bars"). The second includes volunteering with organizations that support abortion clinics "outside of the State of Tennessee." *Id.* at 13:21-14:5, 16:6-7. And the third includes public speeches, attending "marches," giving "talks," and participating in "interview[s]" with "reporters" about abortion. *Id.* at 15:6-7, 16:3-4, 18:23-19:3.

Plaintiff Behn testified similarly. She desires to give her constituents and social-work clients information about available abortion services "so that they can make an informed decision." *Id.* at 39:17-40:5, 44:18-19. She also disseminates abortion-related information on social media, makes literature available in her office with "information as to how to contact the nearest abortion provider outside the State of Tennessee," and leaves "stickers in places where there are minors" who might see them. *Id.* at 41:4-19, 54:4-12. And in her role as a state representative, she participates in "Day[s] on the Hill" to discuss legislation-related issues, including abortion. *Id.* at 40:13-22.

*None* of these activities are proscribed by the Act's "recruiting" provision.  Welty does not target any particular minor to induce that minor to obtain an elective abortion—she does not even know whether the recipients of her advocacy efforts are minors.  *See, e.g.*, *id.*at 33:15-34:19, 36:8-13; *id.* at 18:2-8 (acknowledging that she does not "know … specifically" whether unemancipated minors are among those who pick up her handouts).  Behn likewise clarified that she does not target minors or even interact with them "on an individual basis" in many of the situations she described.  *Id.* at 40:13-19.  Plaintiffs, in other words, aim to provide information so that people can make informed decisions—not to persuade anyone to do anything, let alone drive minors to take action without parental consent.  That is not "recruiting."

If doubt remains, the Act's scienter requirement removes it.  The Act requires that a person act "intentionally" *and* "for the purpose of" facilitating a minor's abortion without her parents' consent.  Tenn. Code Ann. § 39-15-201(a).  But Plaintiffs disavowed any such intent.  Welty explained that her "goal … is *never to persuade someone*," but always to "let them make their own decision."  Hearing Tr., R.39-1 at 24:16-18 (emphasis added).  Behn agreed, stating that her only goal when

communicating with a pregnant minor is to "provide her information …
so that she can make her own decision" and *not* "to persuade her to get
an abortion." *Id.* at 56:1-5

The takeaway:  Plaintiffs' proof confirms that their conduct is not
recruiting, period.  And even if their conduct came close, they don't have
the requisite intent to induce minors to seek abortions while evading pa-
rental consent.  Because Plaintiffs' "own testimony … failed to show any
intention to even arguably violate [the challenged law]," they lack stand-
ing to press a pre-enforcement suit.  *See Friends of George's, Inc. v. Mul-
roy*, 108 F.4th 431, 437 (6th Cir. 2024).

**3.  *The district court's analysis erred.***  The district court con-
cluded that the Act's recruiting provision "arguably proscribe[d]
[P]laintiffs' intended speech."  Opinion, R.81, 1112 (cleaned up).  It read
the Act to cover Plaintiffs' "public advocacy, information-sharing, and
counseling." *Id.* at 1109; *see id.* at 1115.  That's wrong, for a few reasons.

*First*, the district court failed to recognize that the term "recruit"
defines liability by reference to the recruiter's inducement efforts, *not* the
listener's reaction.  It concluded that the Act covers Plaintiffs' "abortion-
related advocacy" because information sharing may ultimately

"persuade[] unemancipated minors to obtain legal abortions." *Id.* at 1114. The court, in other words, focused not on the intentional action of the adult recruiter, but on the effect on the listener—i.e., whether the adult's "abortion-related advocacy and counseling" ultimately "induces, enlists, or persuades unemancipated minors in Tennessee to obtain abortions." *Id.* at 1113.

The text refutes that result-focused understanding. The Act uses "recruit" as a verb. It bars an adult from "intentionally recruit[ing] … a pregnant unemancipated minor within th[e] state for the purpose of … [p]rocuring an … abortion." Tenn. Code Ann. § 39-15-201(a). "Recruit[ing]" thus describes the "action the subject"—the adult—"exerts on the object"—the unemancipated minor. The Chicago Manual of Style ¶ 5.98 (17th ed. 2017). By drafting the Act this way, the General Assembly created a "nature-of-conduct offense, meaning that the offense seeks principally to proscribe the nature of the defendant's conduct, as opposed to the result that the defendant's conduct achieves." *State v. Mateyko*, 53 S.W.3d 666, 673 (Tenn. 2001) (citing *State v. Ducker*, 27 S.W.3d 889, 896-97 (Tenn. 2000)). This means that liability under the Act, just like under many other Tennessee laws, turns on the *defendant's* intentional actions,

not on whatever results might follow. *See, e.g.*, *id.* (interpreting Tennessee's criminal-attempt statute); *Ducker*, 27 S.W.3d at 896 (discussing child abuse through neglect).

Put less abstractly, not every person who leaves a conversation persuaded to get an abortion has been "recruited" to get an abortion—just like not every person who attends a university was "recruited" to be there. *See supra* 20. The relevant question is not whether minors *were* persuaded to have an abortion by learning more information, *contra* Opinion, R.81, 1113, but whether an adult intentionally acted to persuade. By focusing on the *effect* on the minor rather than the action of the adult, the district court dramatically expanded the Act's coverage.

*Second*, and relatedly, the district court's expansive, effect-focused reading necessarily gives short shrift to the intent requirement. The court acknowledged that the Act prohibits "recruiting" only when done "intentionally." *Id.* at 1114 n.4. But the court thought it "unclear whether the provision imposes a specific intent requirement" because Tennessee law defines "intentional" to include "conduct committed with the 'conscious objective or desire to engage in the conduct.'" *Id.* (quoting Tenn. Code Ann. § 39-11-302(a)). So the district court concluded that Plaintiffs

"violate the recruitment provision if they intend to engage in the conduct—their abortion-related advocacy and counseling—but do not intend any specific result." *Id.*

Once again, the district court's reading is inconsistent with the plain text. The Act prohibits "intentionally … recruit[ing] … a pregnant unemancipated minor … *for the purpose of*" obtaining an elective abortion without parental consent. Tenn. Code Ann. § 39-15-201(a) (emphasis added). That language makes clear that the defendant must act "intentionally" to accomplish a particular "purpose"—concealing or obtaining an unemancipated minor's abortion. *Contra* Opinion, R.81, 1114 n.4. But the district court overlooked the Act's "for the purpose of" language. And in doing so, it impermissibly expanded its coverage in yet another way.

The general definition of "intentional" changes nothing. That provision explains that "'[i]ntentional' refers to a person who acts intentionally with respect to the nature of the conduct *or to a result of the conduct* when it is the person's conscious objective or desire to engage in the conduct *or cause the result*." Tenn. Code Ann. § 39-11-302(a) (emphasis added). The term "intentional," then, can be read to include conduct-

focused *or* result-focused states of mind. And here, the Act's "purpose" language rules out a conduct-focused reading.

*Third*, the district court conflated *post-decision* "support and encourag[ement]," *id.* at 1114, with *pre-decision* recruiting. Recruiting entails front-end targeting and inducement of an unemancipated minor to obtain an elective abortion. *See supra* 17-21. Support *after* a minor has independently decided to get an abortion may well be prohibited "harbor[ing]" or "transport[ing]," depending on what form it takes, Tenn. Code Ann. § 39-15-201, but it wouldn't be *recruiting*.

All told, Plaintiffs—perhaps because of the "odd incentives created by the overbreadth doctrine"—pressed the meaning of recruit "toward the most expansive reading possible." *Hansen*, 599 U.S. at 781. And in accepting that expansive reading, the district court flouted the longstanding Tennessee Supreme Court precedent that governs the interpretation of Tennessee's statutes.

## B. Plaintiffs presented no evidence establishing a certain threat of prosecution under the Act.

Plaintiffs also failed to prove the "*certain* threat of prosecution" necessary to establish standing. *Crawford*, 868 F.3d at 455.

**1.** To begin, the district attorney defendants do not think that Plaintiffs' intended conduct violates the Act, *supra* 21-24, so Plaintiffs necessarily cannot show a certain threat of prosecution. That is, the persons charged with enforcing the Act do not believe the law "prevent[s]" the "conduct for which [Plaintiffs] invoke[] First Amendment protection," so they face no "credible threat of prosecution"—let alone a certain threat. *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 793 (8th Cir. 2004) (quotations omitted).

Even if the Act did "proscribe[] [Plaintiffs'] intended conduct," this Court does not assume that every breach of the law will be prosecuted. *McKay*, 823 F.3d at 868. Instead, it assesses the imminence of enforcement through a holistic, four-part framework—the "*McKay* factors." *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021). The Court requires "some combination" of the following factors: "(1) 'a history of past enforcement against the plaintiffs or others'; (2) 'enforcement warning letters sent to the plaintiffs regarding their specific conduct'; (3) 'an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action'; and (4) the 'defendant's refusal to

disavow enforcement of the challenged statute against a particular plaintiff.'" *Id.* (quoting *McKay*, 823 F.3d at 869).  These non-exhaustive factors "distill[] to whether surrounding factual circumstances" show a certain threat of enforcement. *Christian Healthcare*, 117 F.4th at 848 (cleaned up).  Here, they don't.

**No History of Past Enforcement**.  "A threat of future enforcement may be 'credible' when the same conduct has drawn enforcement actions or threats of enforcement in the past." *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014). But Plaintiffs cannot establish a history of prior enforcement.

**No Warning Letters**.  All agree that no "enforcement warning letters" have been "sent to the plaintiffs regarding their specific conduct." *McKay*, 823 F.3d at 869.

**No Attributes Making Enforcement Easy**.  Nor does the Act contain any "attribute … that makes enforcement easier or more likely." *Id.* Like other criminal laws, the "universe of potential" enforcers is limited to "state officials who are constrained by … ethical obligations." *Driehaus*, 573 U.S. at 164.  And while a civil enforcement mechanism "makes *civil* enforcement easier, it does not make *criminal* enforcement

easier—the type of enforcement that plaintiffs fear." Opinion, R.81, 1117-18. It follows that "[a]ny threat of injury from the civil-enforcement aspect of the statute is not traceable to the defendants here." *Christian Healthcare*, 117 F.4th at 850.

***Disavowal of Enforcement***. Nor is there any "refusal to disavow enforcement of the challenged statute against" the plaintiffs. *Online Merchs.*, 995 F.3d at 550 (quotations omitted). Although Welty sent a letter asking for disavowal days before the Act's effective date, that threadbare letter failed to identify her future intended speech with any specificity—and didn't even mention Behn. *See* Letter, R.1-4, 25-27. As this Court has emphasized, it is "unrealistic to expect a defendant to disavow a law's enforcement as applied to fluid and future facts that are unclear" at the time of the request. *Christian Healthcare*, 117 F.4th at 850 (cleaned up). What matters for pre-enforcement-standing purposes is not the refusal to disavow enforcement "in the *abstract*," but the refusal to disavow enforcement against the Plaintiffs' "*specific* speech." *Davis v. Colerain Twp.*, 51 F.4th 164, 174 (6th Cir. 2022). Welty's letter lacked the necessary specifics. And when those specifics were provided, Defendants *did* disavow enforcement—a position that, if accepted, would bind

them in any subsequent litigation with these Plaintiffs. *Mirando v. U.S. Dep't of Treasury*, 766 F.3d 540, 545 (6th Cir. 2014); *cf. Pavia v. NCAA*, 154 F.4th 407, 414 (6th Cir. 2025).

In sum, Plaintiffs did not prove any—much less, "some combination"—of the *McKay* factors. 823 F.3d at 869.

**2.** The district court's contrary reasoning, if adopted, would open the floodgates for pre-enforcement challenges.

Right off the bat, the court "discounted" and gave "little weight" to the first two *McKay* factors—history of enforcement and warning letters. Opinion, R.81, 1116, 1120. It surmised that because Plaintiffs sued "before [the Act] went into effect, the lack of enforcement history and warning letters does not defeat standing." *Id.* at 1117. But the absence of these factors, even if not enough by itself to "defeat standing," still matters. That absence should have required a *stronger* showing on the remaining factors. Under a test where "[n]o single factor is controlling," it is only "logical that the importance of [one] factor should vary in inverse proportion to the strength of [another]." *Allied Delivery Sys., Inc. v. I.C.C.*, 908 F.2d 972 (6th Cir. 1990) (unpublished table decision). Ignoring missing factors rather than counting their absence against Plaintiffs

perversely lowers the standing bar for pre-enforcement challengers who have the *least* evidence of enforcement risk.

On the third factor, the district court purported to find "attribute[s] of the challenged statute that make[] enforcement easier or more likely," Opinion, R.81, 1117 (quoting *McKay*, 823 F.3d at 869), but its miscellaneous observations do not prove standing. First, it said the term "recruit" could have multiple meanings and thus "gives prosecutors significant discretion." *Id.* at 1118. But parties attempting to establish pre-enforcement standing "cannot rely on an argument that the statute might be misconstrued by law enforcement." *Friends*, 108 F.4th at 437. Moreover, it's hard to see how the term "recruit," with a long pedigree in existing law,[4] confers significantly more discretion than typical criminal laws—like those that predicate liability on the obscenity standard, *see* Tenn. Code Ann. §§ 39-17-901(10), § 39-17-902(a)(1), or that require assessment

[4] The Act parallels and builds on existing trafficking laws. Tennessee law already criminalizes "recruit[ing]," "harbor[ing]," or "transport[ing]" another person for the purpose of human and sex trafficking. Tenn. Code Ann. §§ 39-13-308(a)(1) (human trafficking), 39-13-309(a)(2) (sex trafficking). Federal law does too. *See, e.g.*, 18 U.S.C. §§ 1590(a) (human trafficking), 1591(a)(1) (sex trafficking); 22 U.S.C. § 7102(11)(B), (12) (using these same terms to define "trafficking").

of "reasonableness," *e.g.*, *id.* §§ 39-11-611(b), 39-13-101(a)(2)-(3), 39-17-305(b).

The court then said the Act "does not require that the adult actually procure the abortion." Opinion, R.81, 1119. True enough. But that's no different from any attempt-based criminal law. And, more relevant for *McKay* purposes, the court's focus on the scope of the law is misplaced. *McKay*'s ease-of-enforcement factor looks for *structural* aspects that increase the odds of enforcement. A law that "allow[s] any member of the public to initiate an enforcement action," *McKay*, 823 F.3d at 869, the factor presumes, is more likely to be enforced than one that is "limited to a prosecutor or an agency," *Driehaus*, 573 U.S. at 164; *see Yoder v. Bowen*, 146 F.4th 516, 535 (6th Cir. 2025) (Mathis, J., concurring). Here, though, the Act is an ordinary criminal law. So Tennessee's district attorneys retain "the sole duty, authority, and discretion to prosecute" violations. *Friends*, 108 F.4th at 439 (quoting *State v. Spradlin*, 12 S.W.3d 432, 433 (Tenn. 2000)).

The court concluded its third-factor analysis by pointing to the Act's criminal penalties. Opinion, R.81, 1119. But it never explained how criminal penalties make enforcement "easier or more likely." *McKay*, 823

F.3d at 869.  One would think just the opposite—that enforcement is *less* likely when limited to prosecutors who know that success demands proof beyond a reasonable doubt.  Unsurprisingly, this Court has already rejected the suggestion that criminal laws are *per se* "easier to enforce." *Friends*, 108 F.4th at 440 (reasoning that the challenged law was "a *standard criminal law* with no attributes making enforcement easier or more likely" (emphasis added)).

The district court also claimed that the "chill" of Plaintiffs' speech supported standing.  Opinion, R.81, 1119.  But "mere allegations of a subjective chill" never suffice.  *McKay*, 823 F.3d at 868-69 (cleaned up).  The *McKay* factors exist precisely because plaintiffs must point to "other indication[s] of imminent enforcement" demonstrating that any chill is objectively reasonable.  *Id.* at 868 (quotations omitted).

Finally, the district court's disavowal analysis rests on Plaintiffs' thinly veiled attempt to manufacture standing.  In the court's view, Defendants' failure to respond to Welty's letter "asking each of them to 'disavow all enforcement' of the recruitment provision against her," Opinion, R.81, 1119, weighed "strongly" in support of standing, *id.* at 1120.  But, again, this Court has stated that it is "unrealistic to expect a defendant

to disavow a law's enforcement as applied to fluid and future facts that are unclear." *Christian Healthcare*, 117 F.4th at 850 (cleaned up). It's even more unrealistic to expect a coalition of eleven independent district attorneys to respond to an opaque demand letter in mere days. Not to mention that the letter didn't even reference Behn, *see* Letter, R.1-4, 25-27, so it could not support her standing. If plaintiffs can manufacture pre-enforcement standing by demanding rapid responses to vague letters from busy government officials, then the "*certain* threat of prosecution" requirement doesn't mean much. *Crawford*, 868 F.3d at 455.

At bottom, this case involves no "certain threat of prosecution." If anything, it involves a certainty of *non*-prosecution, given Defendants' consistent position that Plaintiffs' conduct is not "recruiting." Plaintiffs' refusal to accept that "real-world win," *Christian Healthcare*, 117 F.4th at 860 (Murphy, J., concurring), cannot create Article III jurisdiction.

## II. The Recruiting Restriction Is Not Unconstitutionally Overbroad.

Plaintiffs failed to prove that the Act is facially unconstitutional under the First Amendment's overbreadth doctrine. The district court's holding that they did was wrong as a matter of law.

"Even in the First Amendment context, facial challenges are disfavored" and "hard to win." *NetChoice*, 603 U.S. at 723, 744; *Connection Distrib.*, 557 F.3d at 336. To succeed on a facial-overbreadth claim, a plaintiff must show that a law "'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" *Hansen*, 599 U.S. at 770 (quoting *Williams*, 553 U.S. at 292). That requires courts to define the law's total "scope," determine "which of [its] applications violate the First Amendment," and then decide whether "the law's unconstitutional applications *substantially outweigh* its constitutional ones." *NetChoice*, 603 U.S. at 724-26 (emphasis added). "[N]either parties nor courts can disregard the requisite inquiry into how a law works in *all of its applications*." *Id.* at 744 (emphasis added). That inquiry is "impossible" without a developed "factual record." *Id.* at 760-61 (Thomas, J., concurring); *id.* at 744. Hypothesizing "some impermissible applications" will not cut it. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). The court needs "actual fact[s]." *Connection Distrib.*, 557 F.3d at 336 (quotations omitted).

Plaintiffs failed to present the necessary facts here. All agree that constitutional applications of the Act exist. But rather than focusing on

those applications, the lower court "focused on hypothetical scenarios where [the law] might raise constitutional concerns." *United States v. Rahimi*, 602 U.S. 680, 701 (2024). Even those concerns are unwarranted: The Act does not prohibit abortion-related public advocacy or the sharing of information about abortion availability. And the First Amendment provides no constitutional right to recruit someone else's child to leave the State for a medical procedure without parental consent.

More fundamentally, the record reflects a complete absence of proof as to how the law operates in "*all of its applications.*" *NetChoice*, 603 U.S. at 744 (emphasis added). Plaintiffs chose to skip discovery. And that choice makes the "fact intensive" facial-challenge inquiry impossible. *Id.* at 747 (Barrett, J., concurring). The district court erred by filling this evidentiary gap with rhetorical questions and its "own experience." *NetChoice v. Bonta*, 152 F.4th 1002, 1020 (9th Cir. 2025).

## A. Plaintiffs failed to prove real-world unconstitutional applications of the Act's "recruiting" provision.

Properly construed, the Act applies only to the intentional targeting of a pregnant, unemancipated minor in Tennessee to induce or enlist her to engage in a specific action, *i.e.*, obtaining an elective abortion without parental consent. With the "odd incentives created by the overbreadth

doctrine," Plaintiffs "press the [Act] toward[s] the most expansive reading possible." *Hansen*, 599 U.S. at 781. But despite their efforts to expand its coverage, the Act does not prohibit abortion-related public advocacy or information sharing. *Supra* 17-21, 24-28. So Plaintiffs' as-applied challenges fail because the Act does not apply to their intended speech. *Id.* 21-24. And the bulk of Plaintiffs' hypothetical applications fall outside the Act's bounds or beyond the First Amendment's protections.

## B.    The Act has numerous constitutional applications.

The Act prohibits the intentional targeting of an unemancipated minor to induce or persuade them to obtain an elective abortion without the consent of their parent or guardian. *Supra* 21-24. That narrow prohibition, to the extent it reaches speech at all, can be constitutionally applied in a wide array of situations. It can be applied to speech integral to illegal activity. And it can be applied to speech that interferes with parental rights.

### 1.    Speech integral to criminal activity.

The First Amendment allows the proscription of speech that constitutes a "solicitation to commit a crime," or that is "intended to induce … illegal activities." *Williams*, 553 U.S. at 298; *Giboney v. Empire Storage*

& *Ice Co.*, 336 U.S. 490, 502 (1949). Indeed, "prevention and punishment" of "speech integral to criminal conduct" has "never been thought to raise any Constitutional problem." *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (quotations omitted); *see Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388 (1973). It's no surprise, then, that "[m]any long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech (commercial or not) that is intended to induce or commence illegal activities." *Williams*, 553 U.S. at 298. The Act follows in this long tradition.

*First*, the Act constitutionally applies to adults recruiting minors for illegal elective abortions. Tennessee and 11 other States make it a crime to obtain an elective abortion.[5] Those bans on abortion regulate conduct that is wholly unprotected by the Constitution. *Dobbs*, 597 U.S. at 292. And, as this Court has recognized, "[t]he First Amendment does not confer the right to persuade others to violate the law." *Kasper v. Brittain*, 245 F.2d 92, 95 (6th Cir. 1957) (citing *Giboney*, 336 U.S. at 502).

---

[5] Tenn. Code Ann. § 39-15-213; Ala. Code § 26-23H-4; Ark. Code Ann. § 5-61-304; Idaho Code Ann. § 18-622; Ind. Code Ann. § 16-34-2-1; Ky. Rev. Stat. Ann. § 311.7706; La. Stat. Ann. §§ 14:87.7, 40:1061; Miss. Code Ann. § 41-41-45; Okla. Stat. Ann. tit. 21, § 861; S.D. Codified Laws § 22-17-5.1; Tex. Health & Safety Code § 170A.002; W. Va. Code Ann. § 16-2R-3.

The recruiting of a minor for an elective abortion in a State that bars such procedures thus falls within the heartland of the "speech-integral-to-unlawful-conduct exception." *Hansen*, 599 U.S. at 784; *see Williams*, 553 U.S. at 297-99.

Many courts have recognized as much. The Ninth Circuit, for example, recently concluded "that recruiting an Idaho minor to get an illegal abortion in Idaho qualifies as speech integral to criminal conduct." *Matsumoto v. Labrador*, 122 F.4th 787, 813 (9th Cir. 2024). The Seventh Circuit similarly held that the First Amendment does not protect communications designed to facilitate an illegal medical procedure. *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 630 (7th Cir. 2024). Even the district court here conceded that "recruiting a Tennessee minor to procure an illegal abortion is speech integral to criminal conduct" and the State "may validly proscribe it." Opinion, R.81, 1125. The Act, then, can be constitutionally applied to an adult who recruits a minor in Tennessee for an elective abortion performed in Tennessee or any other State that bars elective abortions.

*Second*, the Act constitutionally applies to adults recruiting minors for elective abortions in States that require parental notification or

consent. Tennessee is no outlier in seeking to protect parental participation in children's healthcare. Even in States that allow elective abortions, parental involvement remains key. As it stands, "38 states," the majority of which otherwise allow some form of elective abortion, "require parental involvement in a minor's decision to have an abortion." Kimya Forouzan, *Minors' Access to Abortion Care*, Guttmacher Inst., https://www.guttmacher.org/state-policy/explore/minors-access-abortion-care (Aug. 28, 2025). Closer to home, every State that borders Tennessee and allows elective abortions requires parental consent or notification.[6] So, as the district court recognized, the Act can be constitutionally applied to an adult who recruits a minor for an elective abortion, without parental consent, in a State that requires parental consent or notification. Opinion, R. 81, 1125; *cf. K.C.*, 121 F.4th at 630.

*Third*, the Act constitutionally applies to recruiting incident to the crimes of "harboring" and "transporting" minors in this State. The Act's prohibitions on "harboring" and "transporting" are independent of its "recruiting" prohibition. Tenn. Code Ann. § 39-15-201(a) (connecting the

---

[6] Ky. Rev. Stat. Ann. § 311.990(12)(a); § 311.732; Va. Code Ann. § 18.2-76; N.C. Gen. Stat. Ann. § 90-21.7; Ga. Code Ann. § 15-11-682(a)(1)(B); Mo. Ann. Stat. § 188.028(1).

prohibited actions with the disjunctive "or"). And neither of those separate prohibitions have been challenged here. *See* Compl., R.1, 9-14. That means that any "recruiting" incident to the crimes of "harboring" and "transporting" qualifies as speech incident to crime and can be constitutionally proscribed.

*Fourth*, the Act constitutionally applies to recruiting incident to extortion, coercion, or the concealment of other criminal conduct. *See, e.g.*, Tenn. Code Ann. §§ 39-14-112, 39-16-503. Consider for example a college freshman who blackmails his high-school girlfriend into getting an abortion by threatening to share intimate photos of her with her family. Tenn. Code Ann. § 39-17-318. Or consider an adult who forces a 14-year-old girl he impregnated to get an abortion through threats of physical harm to try to hide the statutory rape from her parents (and authorities). *Id.* § 39-13-506. Because that kind of speech would be used to violate or conceal the violation of an otherwise valid Tennessee law, those and other applications of the recruiting provision are constitutional.

The district court dismissed this category of applications because "Tennessee law already criminalizes extortion and attempting to coerce another or to conceal criminal conduct." Opinion, R. 81, 1127. Whether

that's true or not, it doesn't matter for the facial-challenge inquiry. The question is whether the Act's constitutional applications are "substantially outweigh[ed]," not whether they might be duplicative of other laws. *NetChoice*, 603 U.S. at 724. States can "authorize[] cumulative punishment under two statutes," even if they "proscribe the 'same' conduct." *Missouri v. Hunter*, 459 U.S. 359, 368–69 (1983); *see White v. Howes*, 586 F.3d 1025, 1035 (6th Cir. 2009) (same).

Adding it all up, the Act's recruiting provision has numerous crime-related constitutional applications. It applies to the recruiting of minors for abortions in States that prohibit them. Same for States that allow elective abortions only with parental participation. It also applies to recruiting incident to "harboring" and "transporting" minors in this State. And finally, it applies to recruiting intended to induce abortions through extortion or coercion, or to conceal criminal conduct. All of these applications are constitutional.

## 2.    Speech interfering with parents' rights.

The Act can also be constitutionally applied to speech that interferes with parental rights. The First Amendment does not confer a constitutional right to recruit someone else's child to leave the State to

obtain a medical procedure without parental consent. And even if such a right existed, the Act is still a constitutional exercise of Tennessee's authority to protect parents' rights to oversee their children's medical care.

A parent's right to control their child's healthcare has "coexisted with the First Amendment" since the founding without posing "constitutional concern." *Vidal v. Elster*, 602 U.S. 286, 295-96 (2024). Courts have long recognized that "legislature[s] [can] properly conclude that parents … who have … primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." *Ginsberg v. New York*, 390 U.S. 629, 639 (1968). Indeed, at common law, "parents could bring tort suits against those who knowingly enticed a minor away from them." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 833 (2011) (Thomas, J. dissenting) (compiled examples); *see also Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.,* No. 23-3630, 2025 WL 3102072, at *23 (6th Cir. Nov. 6, 2025) (Kethledge, J., concurring) (calling for a First-Amendment "inquiry more focused on the historic common law"). That historical understanding continues to this day in the many States that "make it a crime to entice or lure a child away from their parent." *Id*. at 836. This "history and tradition establish[es]" that

the Act "does not violate the First Amendment." *McLemore v. Gumucio*, 149 F.4th 859, 868 (6th Cir. 2025) (Bush J., concurring) (quoting *Vidal*, 602 U.S. at 310); *accord Free Speech Coal. v. Paxton*, 606 U.S. 461, 472 (2025) (looking to "[h]istory, tradition, and precedent").

Modern precedent confirms. The Supreme Court has recognized that the First Amendment protects adults' right to speak to children and children's right to hear that speech, *Brown*, 564 U.S. at 794, but that right is not unlimited. This Court has recognized that "certain speech, while fully protected when directed to adults, may be restricted when directed towards minors." *Friends*, 108 F.4th at 438 (quoting *James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002)). Pornography is a recent example. *See Paxton*, 606 U.S. at 481-82. Although courts have held that the First Amendment protects some pornography directed to adults, there's no First Amendment right to show pornography to minors. *Id.* at 482. That's because minors "have no First Amendment right to access speech that is obscene to them." *Id.*

The same goes here. "[C]hildren do not possess the right to make medical decisions for themselves because" they "are not assumed to have the capacity to take care of themselves." *Kanuszewski*, 927 F.3d at 418-

19 (quoting *Schall v. Martin*, 467 U.S. 253, 265 (1984)). Just as "there is no constitutional interest in exhibiting indecent material to minors," *Friends*, 108 F.4th at 438, there is no First Amendment right to interfere with parents' oversight of their children's medical care. The Constitution uniquely assigns *to parents* the "fundamental right" of consenting to available healthcare treatments,[7] and States can act to stop strangers from circumventing that fundamental right. *Kanuszewski*, 927 F.3d at 319; *Parham*, 442 U.S. at 602-03.

Even if adults had the right to persuade other people's children to get medical procedures without their parents' consent, that right would not be unlimited. Rather, like the other rights protected by the Constitution, it could be limited when the government has a countervailing compelling interest. *See Burson v. Freeman*, 504 U.S. 191, 198-200 (1992). And here, the States' long-recognized interest in fostering parental rights fits the bill. *See Pierce*, 268 U.S. at 534-35; *Ginsberg*, 390 U.S. at 639; *Parham*, 442 U.S. at 602-03; *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2358 (2025). That interest is especially strong with respect to kids'

---

[7] Of course, parents cannot "demand that the State make available a particular form of treatment." *L.W.*, 83 F.4th at 475 (quotations omitted).

medical care—as "children do not possess the right to make medical decisions for themselves." *Kanuszewski*, 927 F.3d at 418-19. And because the recruiting provision covers at most a "narrow slice of speech" and "is valid in numerous applications," it is narrowly tailored to protect the parental right to direct medical treatment. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452-53 (2015); *cf. Burson*, 504 U.S. at 205-09. Put simply, "in restricting the … freedom of speech" in this context, the State "advances the protection of the constitutional rights of parents: an interest which [it] may lawfully protect." *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1284 (11th Cir. 2008).

In sum, the law prohibits the intentional targeting of unemancipated minors to induce or persuade them to obtain elective abortions without the consent of their parents or guardians. The First Amendment, though, does not confer a right to recruit someone else's child to obtain a medical procedure while purposefully evading parental consent. Nothing in the Supreme Court's caselaw or the history and tradition of the First Amendment demands such a nonsensical result.

### C. Plaintiffs failed to prove that any unconstitutional applications substantially outweigh the constitutional applications.

Even assuming some unconstitutional applications of the Act exist, Plaintiffs never demonstrated, "from actual fact, that substantial over-breadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (cleaned up).

Plaintiffs' choice to bring a facial challenge "comes at a cost." *NetChoice*, 603 U.S. at 723. It brings with it a "hard to win" standard, *id.*, under which Plaintiffs must show that the Act's "unconstitutional applications *substantially outweigh* its constitutional ones." *Id.* at 724 (emphasis added). It also comes with a "heavy factual burden[]," *Bonta*, 152 F.4th at 1020 (citations omitted), requiring Plaintiffs to introduce "actual fact[s]" proving the Act's applications. *Connection Distrib.*, 557 F.3d at 336. After all, "it is impossible to determine whether [statutes] are unconstitutional in all their applications without surveying those applications." *NetChoice*, 603 U.S. at 769, (Alito, J., concurring in judgment). Courts thus need "a massive amount of information," *Bonta*, 152 F.4th, at 1020, to conduct the "daunting, if not impossible, task," of weighing all of a law's applications. *NetChoice*, 603 U.S. at 745 (Barrett, J., concurring).

Plaintiffs failed to provide that information. After the preliminary-injunction order, Plaintiffs immediately moved for summary judgment without any discovery. Pls.' MSJ Mot., R.54. Because of that, the factual record consists of the complaint and the preliminary-injunction-hearing transcript. *See* Compl., R.1; Hearing Tr., R.39-1. That's it. And the hearing focused almost entirely on whether the Act applied to Welty's and Behn's specific behavior. *Id*. Plaintiffs submitted basically no "evidence in support of their overbreadth claims beyond th[at] proffered in support of their as-applied challenges." *Richland Bookmart, Inc. v. Knox Cnty.*, 555 F.3d 512, 532 (6th Cir. 2009).

Plaintiffs offered no proof quantifying the proportion of constitutional applications to the supposedly unconstitutional applications, let alone weighing them. All agree that the law can be constitutionally applied to speech incident to unlawful conduct. *See supra* 39-40. And it's unlawful to obtain an elective abortion in Tennessee and 11 other States. *Id*. at 40-41. On top of that, 26 States require parental involvement before a minor can obtain an elective abortion. *Id*. at 41-42. That leaves only 12 States where "the recruitment provision will concern speech about *legal* abortion care." Pls.' MSJ Opp'n, R.71, 914. So even accepting

the notion that Plaintiffs have a First Amendment right to recruit some-one else's kid to obtain an abortion in those States, *but see supra* Part II.B.2, Plaintiffs presented no evidence as to how many applications of the law would "fall[] in one category or the other," *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 n.17 (2001). And how often minors are recruited for illegal abortions is a factual question on which Plaintiffs bear the burden of proof.

The district court could not make up for Plaintiffs' evidentiary fail-ings with *ipse dixit*. It agreed that recruiting for abortions performed in Tennessee, or in other States where it is illegal absent parental consent or notification, "may [be] validly proscrib[ed]." Opinion, R. 81, 1125. Yet, without a single citation to the record, it dismissed those constitutional applications as "a small subset" of the Act's coverage and "less likely and less weighty." *Id.* at 1125-26. Instead of evidence, the court's analysis rested on a rhetorical question: Why would a Tennessee minor obtain "an illegal abortion in Tennessee, or another state where it is illegal, when many other states allow for legal abortion ... ?" *Id.* at 1126. The court then mused that recruiting for an abortion in a State that mandates parental participation "is both unnecessary and dangerous to the adult

who risks criminal liability and the minor who risks death or severe health complications associated with unregulated abortion." *Id.*

The problem is that no evidence supports any of this. Courts cannot just assume that minors will travel to the minority of States that do not require parental participation. Indeed, the dissenters in *Dobbs* said the *opposite* would happen. Women, they warned, would "not have the money to make the trip [to another State]" and would thus turn to "illegal and unsafe abortions." *Dobbs*, 597 U.S. at 408 (Breyer, Sotomayor, Kagan, JJ., dissenting).

Reality also undercuts the district court's fact-free factfinding. Tennessee minors seeking elective abortions would have to either drive for hours through multiple States or fly across the country to reach a jurisdiction that does not require parental participation. And what's more, they would have to make that trip while avoiding parental detection. These minors, then, may well turn to "illegal … abortions" too. *See id.* Plaintiffs have "not introduced any evidence" suggesting that cross-country travel by minors without parental consent "even exists." *Connection Distrib.*, 557 F.3d at 336.

The district court erred by speculating about factual probabilities and dismissing lawful applications of the Act as "rare." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Connection Distrib.*, 557 F.3d at 336-37. Indeed, using intuition as to what is "likely" and "realistic," rather than evidence, is a fundamental summary-judgment error. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The "utterly barren" record here does not come close to satisfying the standards that govern normal cases. *Connection Distrib.*, 557 F.3d at 338; *see Viet*, 951 F.3d at 823. And abortion cases are not supposed to get special treatment. *See Dobbs*, 597 U.S. at 286-87. On this ground alone, reversal is warranted.

## III. The District Court Granted Improper Relief.

Setting the jurisdictional and merits errors aside, the district court also erred by "enjoin[ing] *all* enforcement of the recruitment provision" statewide. Opinion, R.81, 1131 (emphasis added). Any injunction issued must be limited to the allegedly unconstitutional applications and to the parties before the court.

### A. Any injunction must be limited to the "recruiting" provision's allegedly unconstitutional applications.

The district court defied the well-established principle that courts generally "enjoin" only those "unconstitutional applications of the law

while preserving [its] other valid applications." *Connection Distrib.*, 557 F.3d at 342; *see Ayotte v. Planned Parenthood*, 546 U.S. 320, 328-29 (2006). Tennessee law explicitly incorporates that principle. *See* Tenn. Code Ann. § 1-3-110. And the Supreme Court has repeatedly limited the scope of injunctions in First Amendment cases where the alleged unconstitutional application rests on a broad reading of a challenged statute. *See United States v. Grace*, 461 U.S. 171, 180-83 (1983) (enjoining federal law only insofar as it extended to public sidewalks); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504-05 (1985) (enjoining state obscenity statute only insofar as the term "lust" is taken to include "normal sexual appetites"). So even if injunctive relief were appropriate, the district court erred by failing to respect the federalism principles that "restrain a federal court" when "an injunction against a criminal proceeding is sought under § 1983." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976).

## B. Any injunction must be party-specific.

The district court also erred by granting a "statewide injunction[]." Opinion, R.81, 1130. A statewide injunction is just "a universal injunction by another name." *Nat'l Educ. Ass'n-N.H. v. N.H. Att'y Gen.*, No. 25-

CV-293-LM, 2025 WL 2807652, at *26 (D.N.H. Oct. 2, 2025). And both constitutional and statutory limits prohibit such relief.

**1. *Constitutional Limits.*** The district court's statewide injunction flouts Article III's limits on the judicial power. *See L.W.*, 83 F.4th at 490; *Commonwealth v. Biden*, 57 F.4th 545, 556-57 (6th Cir. 2023).

**a.** Article III grants "the judicial Power" to the federal courts. U.S. Const. art. III, § 2. That power allows them to "adjudge the legal rights of litigants in actual controversies." *United States v. Raines*, 362 U.S. 17, 21 (1960) (quotations omitted). The judicial power, in other words, "exists only to redress or otherwise to protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011) (limiting the judicial role to "redress[ing] an injury resulting from a specific dispute"). "[I]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996).

This "claimant-focused understanding of the judicial power" dictates both "who can sue in federal court" and "what remedies the federal courts have authority to give." S. Bray, *Multiple Chancellors: Reforming*

*the National Injunction*, 131 HARV. L. REV. 417, 471 (2017) (hereinafter "*Multiple Chancellors*"). To sue, a plaintiff must have a "concrete" "injury in fact." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citation omitted). And any remedy awarded must be "limited to the inadequacy that produced the injury in fact that the plaintiff has established." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis*, 518 U.S. at 357). Injunctive relief can thus be "no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added). As this Court recently recognized, an "order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power." *L.W.*, 83 F.4th at 490.

To be sure, decisions from appellate courts have *implications* beyond the parties. "[A] precedent of [a superior court] must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982). Subsequent courts must also follow prior opinions' reasoning, even in new contexts. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996). Because lower courts must follow the reasoning of higher courts,

appellate decisions will often "benefit others collaterally," *Warth*, 422 U.S. at 499; *see* W. Baude & S. Bray, *Proper Parties, Proper Relief*, 137 HARV. L. REV. 153, 183 (2023); *Multiple Chancellors* at 474. But this practical result of vertical stare decisis does not change the fact that proper coercive Article III remedies must always "operate with respect to specific parties," never with respect to a law "in the abstract." *California v. Texas*, 593 U.S. 659, 672 (2021) (quotations omitted). Even in facial-challenge cases, remedies "must operate in a party-specific and injury-focused manner." *L.W.*, 83 F.4th at 490.

Here, that means that the district court should have granted relief to only the named plaintiffs, Welty and Behn. To justify litigation, Plaintiffs claimed an intention to engage in specific conduct that would lead to a prosecution by "Defendants" for violating the "recruitment prohibition." Compl., R.1, 13 ¶ 73. So assuming they have a cognizable injury, *but see supra* Part I, an injunction prohibiting the named Defendants from enforcing the Act against them would fully redress any "injury in fact that the plaintiff[s] ha[ve] established." *DaimlerChrysler*, 547 U.S. at 353 (quotations omitted). By going "further than that" and "ordering the government to take (or not take) some action with respect to those who are

strangers to the suit," the district court exceeded "the judicial role of re-solving cases and controversies." *DHS v. New York*, 589 U.S. 1173, 1175 (2020) (Gorsuch, J., concurring); *see Doran*, 422 U.S. at 931.

**b.** The district court ignored these binding precedents and con-cluded that party-specific relief isn't required "[w]hen a law is facially overbroad" under the First Amendment. Opinion, R.81, 1129. That's wrong.

Contra the district court's contention, the First Amendment and other substantive doctrines cannot override Article III's limits on the fed-eral judicial power. *L.W.*, 83 F.4th at 490. True, decisions like *Virginia v. Hicks* have suggested that overbreadth "invalidate[s] *all* enforcement" of a law. 539 U.S. at 119. Whether this is loose language or merely a recognition of vertical stare decisis, it's dicta: *Hicks* found no overbreadth and no injunction issued. On the rare occasion that the Supreme Court has actually allowed injunctive relief in overbreadth cases, it has limited it to the parties. In *Doran v. Salem Inn*, the Court deemed a law over-broad, yet limited the injunction to the parties. 422 U.S. at 933-34. "[N]either declaratory nor injunctive relief," it observed, "can directly in-terfere with enforcement of contested statutes or ordinances *except with*

respect to the particular federal plaintiffs." *Id.* at 931 (emphasis added). And just this year, *CASA* quoted this language from *Doran* as an example of the Court properly declining to issue non-party relief. *See CASA*, 606 U.S. at 844 (quoting *Doran*, 422 U.S. at 931).

The upshot is that the party-specific-relief limitation applies with full force in overbreadth challenges. Indeed, it must. That limitation stems from Article III's restraints on the "judicial power," *L.W.*, 83 F.4th at 490, which the judiciary cannot expand by creating a new substantive doctrine, *see United States v. Sineneng-Smith*, 590 U.S. 371, 383 (2020) (Thomas, J., concurring). Although the overbreadth *merits* analysis requires consideration of all of a law's applications, the overbreadth *remedy* must still be "no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Califano*, 442 U.S. at 702 (emphasis added). Overbreadth, after all, is just a weaker form of facial invalidity. If courts cannot issue injunctive relief beyond the parties when a law is unconstitutional *in all its applications*, *see L.W.*, 83 F.4th at 490; *Labrador v. Poe*, 144 S. Ct. 921, 921 (2024), then they cannot do so when a law is unconstitutional *in a substantial number of applications*. The overbreadth doctrine is no end-run around Article III.

**2. *Statutory Limits.*** The district court's statewide injunction also exceeds the statutory limits on federal courts' authority—limits that the Supreme Court just reiterated in *CASA*.

The lower federal courts have "no jurisdiction but such as the statute confers." *Sheldon v. Sill*, 49 U.S. 441, 449 (1850). The Judiciary Act of 1789 confers jurisdiction over "all suits … in equity," and "still today, this statute 'is what authorizes the federal courts to issue equitable remedies,'" *CASA*, 606 U.S. at 841 (quoting S. Bray & E. Sherwin, *Remedies* 442 (4th ed. 2024)). That grant of authority "encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *Id.* (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund*, 527 U.S. 308, 319 (1999)). So to determine whether the district court entered proper relief, this Court must ask whether statewide injunctions "are sufficiently analogous to the relief issued by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act." *Id.* at 841-42 (quotations omitted).

The Supreme Court answered that question in *CASA*. The Court held that because universal injunctions were not "available in the High

Court of Chancery in England at the time of the founding," they "fall[] outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.* at 842, 847. And a "statewide injunction" is just "a universal injunction by another name." *Nat'l Educ. Ass'n*, 2025 WL 2807652, at *26. *CASA*, then, should have ended the debate.

The district court declared that *CASA* addressed only "universal injunctions, not statewide injunctions." Opinion, R.81, 1130. But there's no difference. *CASA* specifically defined a "universal injunction" as one that "prohibit[s] enforcement of a law or policy against *anyone*." *CASA*, 606 U.S. at 837 n.1. Said differently, a "universal injunction[]" is an injunction that "reach[es] *anyone* affected by legislative or executive action." *Id.* at 848. That's exactly what a "statewide injunction" does. Indeed, in describing the question presented, *CASA* specifically referenced statewide-injunction cases, and it equated statewide injunctions with universal injunctions. *Id.* at 843 (citing *Scott v. Donald*, 165 U.S. 107, 115-17 (1897)); *see id.* at 839-40 (citing *Labrador*, 144 S. Ct. at 921 and *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1 (2023)). The defining feature of a "universal injunction," it recognized, is not geographic scope, but the ordering of relief against "anyone." *Id.* at 837 n.1.

Unsurprisingly, numerous courts have read *CASA* to require party-specific relief in cases involving challenges to state laws. *See, e.g.*, *Fla. Decides Healthcare, Inc. v. Byrd*, 790 F. Supp. 3d 1335, 1359-60 (N.D. Fla. 2025); *accord Nussbaumer v. Sec'y, Fla. Dep't of Children & Fams.*, 150 F.4th 1371, 1381 n.5 (11th Cir. 2025); *Nat'l Educ. Ass'n*, 2025 WL 2807652, at *26-27; *Etienne v. Ferguson*, 791 F. Supp. 3d 1226, 1248-49 (W.D. Wash. 2025).

Even if *CASA*'s holding doesn't directly dictate the outcome here, its reasoning does. As *CASA* explained, Founding-era "suits in equity were brought by and against individual parties," and injunctions were limited to "'restrain[ing] the actions of *particular* officers against *particular* plaintiffs.'" 606 U.S. at 842 (emphasis added) (quoting *Multiple Chancellors* at 425). The Supreme Court has adhered to this "party-specific view of relief." *Id.* at 843 n.6. It has "consistently rebuffed requests for relief that extended beyond the parties," including in cases "where the plaintiff successfully challenged the constitutionality of a [*state*] law." *Id.* at 843. The general principle that *CASA* enforces is that "courts issued injunctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit." *Id.* at 837.

*Ex parte Young* provides no "historical support" for statewide, non-party injunctions either.  *Contra* Opinion, R.81, 1130.  "*Ex parte Young*," *CASA* points out, "does not say—either explicitly or implicitly—that courts may devise novel remedies that have no background in traditional equitable practice." *CASA*, 606 U.S. at 846 n.9.  Rather, "*Ex parte Young* justifies its holding by reference to a long line of cases" that hold "a court of equity could issue an antisuit injunction to prevent an officer from engaging in tortious conduct." *Id*.  And those cases show that "neither the universal injunction nor a sufficiently comparable predecessor was available from a court of equity at the time of our country's inception." *Id*. at 847.  The district court's reading of *Ex parte Young* cannot be squared with *CASA*'s reading of that same decision—or at least, not with the majority's reading. *Cf. id*. at 907 (Sotomayor, J., dissenting) (arguing that *Ex Parte Young* revolutionized equity practice and allowed courts to "protect rights and redress wrongs" even in a non-party manner).  And relying on a dissent would itself be an "error." *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch J., concurring).

*CASA* aside, the district court's view of *Ex parte Young* fails on its own terms.  *Ex parte Young* blessed antisuit injunctions prohibiting

"*named defendants* from taking *specified* unlawful actions." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (emphasis added). Historically, such injunctions enabled a plaintiff "to prevent an officer from engaging in tortious conduct" and litigate a claim offensively in equity, *CASA*, 606 U.S. at 846 n.9, rather than as a "defendant in [a] hypothetical future enforcement action," *Multiple Chancellors* at 449. These injunctions operated "*in personam*," addressed *only* "to the litigant parties." 4 John Norton Pomeroy, Jr., *Equity Jurisprudence* § 1360 (San Francisco, Bancroft-Whitney Company 3d ed. 1905); George Tucker Bispham, *The Principles of Equity: A Treatise on the System of Justice Administered in Courts of Chancery* § 408 (Philadelphia, Kay & Brother 4th ed. 1874) (similar). Actions for antisuit injunctions, moreover, were "not [] challenges to the validity of a statute," but a "defensive" maneuver to "forestall an enforcement action." *Multiple Chancellors* at 449; *accord Whole Woman's Health*, 595 U.S. at 44. The district court's universal antisuit injunction would thus be "illogical, almost unthinkable" to the High Court of Chancery in 1789. *Multiple Chancellors* at 450.

Finally, the district court sought to justify its grant of non-party relief by suggesting that "the many 'practical problems' created by

universal[] injunctions simply do not arise when a federal court issues statewide injunctive relief." Opinion, R.81, 1131 (quoting *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring)).

That's wrong too. The *scale* of those practical problems may differ (state, rather than national), but the problems exist all the same. Just like their nationwide counterparts, statewide injunctions "prevent the [State] from enforcing" its laws, "incentivize forum shopping" within the State, and "short-circuit the decisionmaking" process. *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring). And they "artificially increase[] pressure on the docket of this Court" by forcing States to appeal and seek "immediate" relief. *Califano*, 442 U.S. at 702. Tennessee would rather allow "different courts [to] weigh in," *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring), and not burden this Court (and the Supreme Court) with unnecessary (often, emergency) litigation. Indeed, the State often declines to appeal decisions providing as-applied relief, no matter how strongly it disagrees. *See, e.g.*, *L.E. v. Lee*, 728 F. Supp. 3d 806, 840 (M.D. Tenn. 2024) (party-specific injunction on sex-separated sports; not appealed). But that's hardly an option when a federal court prohibits enforcement of the law against all "seven million residents of the Volunteer

State." *L.W.*, 83 F.4th at 490 (statewide injunction; appealed; stay issued); *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 894-95 (6th Cir. 2024) (same); *Free Speech Coal., Inc. v. Skrmetti*, 2025 WL 512049 (6th Cir. Jan. 13, 2025) (same). In short, the practical problems endure.

At bottom, a party-specific injunction would give these Plaintiffs "complete relief." *CASA*, 606 U.S. at 861. If they wanted a broader injunction, then they needed to meet Rule 23's demanding requirements for a class action. They could not (and never tried). The district court's injunction thus unlawfully protects nonparties who never sued or proved their "standing" to sue. *Id.*

## CONCLUSION

This Court should reverse.

Dated: November 13, 2025

Respectfully submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

*/s/ J. Matthew Rice*
J. Matthew Rice
  *Solicitor General*

Steven J. Griffin
  *Deputy Attorney General*

Matthew D. Cloutier
Aaron L. Bernard
  *Assistant Solicitors General*

OFFICE OF THE TENNESSEE ATTORNEY
GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
Matt.Rice@ag.tn.gov
(615) 532-6026
*Counsel for Defendants-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the Court's type-volume limitations because it contains 12,994 words, excluding portions omitted from the Court's required word count.

This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Century Schoolbook font.

*/s/ J. Matthew Rice*
J. Matthew Rice

## CERTIFICATE OF SERVICE

On November 13, 2025, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

*/s/ J. Matthew Rice*
J. Matthew Rice

# ADDENDUM

# DESIGNATION OF COURT DOCUMENTS

*Welty, et al. v. Dunaway, et al.,*
No. 3:24-cv-768 (M.D. Tenn.)

| Docket Entry No. | Description | Page ID # |
|---|---|---|
| 1 | Plaintiffs' Complaint | 1-15 |
| 1-1 | Exhibit, Public Ch. 1032 | 16-18 |
| 1-2 | Exhibit, Informational Materials | 19-21 |
| 1-4 | Exhibit, Horwitz Letter to District Attorneys General | 25-35 |
| 1-5 | Exhibit, Rep. Behn Tweet with Infographics | 36-40 |
| 39-1 | Preliminary-Injunction-Hearing Transcript | 520-537 |
| 40 | Memorandum Opinion of the Court | 538-586 |
| 41 | Order Granting Plaintiffs' Motion for Preliminary Injunction and Denying Defendants' Motion to Dismiss in Part | 587-588 |
| 48 | Defendants' Motion to Stay Proceedings | 604-609 |
| 51 | Defendants' Answer | 623-633 |
| 54 | Plaintiffs' Motion for Summary Judgment | 641-643 |
| 55 | Plaintiffs' Statement of Undisputed Material Facts | 644-675 |
| 55-1 | Exhibit, Declaration of Glenn Funk | 676-678 |
| 55-2 | Exhibit, Declaration of Roger D. Moore | 679-683 |
| 55-3 | Exhibit, Email from Steven J. Griffin | 684-685 |
| 56 | Memorandum in Support of Plaintiffs' Motion for Summary Judgment | 686-738 |
| 67 | Defendants' Motion for Summary Judgment | 803-804 |
| 68 | Defendants' Statement of Undisputed Material Facts | 805-811 |
| 69 | Consolidated Memorandum in Support of Defendants' Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment | 812-855 |
| 70 | Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts | 856-885 |

| 71 | Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment | 886-916 |
| 72 | Plaintiffs' Response to Defendants Statement of Undisputed Material Facts and Statement of Additional Material Facts | 917-928 |
| 75 | Defendants' Reply in Support of their Motion for Summary Judgment | 932-938 |
| 76 | Defendants' Response to Plaintiffs' Statement of Additional Material Facts | 939-942 |
| 81 | Memorandum Opinion of the Court | 1101-1132 |
| 84 | Judgment | 1138-1139 |
| 86 | Defendants' Notice of Appeal | 1146-1148 |
| 87 | Plaintiffs' Notice of Cross-Appeal | 1149-1151 |