RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0271p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

RACHEL WELTY; AFTYN BEHN,
*Plaintiffs-Appellees/Cross-Appellants*,

*v*.

BRYANT C. DUNAWAY; JASON LAWSON; JENNINGS HUTSON JONES; ROBERT J. CARTER; RAY WHITLEY; ROBERT J. NASH; GLENN R. FUNK; STACEY EDMONSON; BRENT COOPER; RAY CROUCH; HANS SCHWENDIMANN,
*Defendants-Appellants/Cross-Appellees*.

Nos. 25-5738/5739

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:24-cv-00768—Julia Smith Gibbons, Circuit Judge, sitting by designation
as a United States District Judge for the Middle District of Tennessee.

Argued: June 2, 2026

Decided and Filed: September 24, 2026

Before: SUTTON, Chief Judge; STRANCH and RITZ, Circuit Judges.

## COUNSEL

**ARGUED:** Madeline W. Clark, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants/Cross-Appellees. William Powell, INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION, Washington, D.C., for Appellees/Cross-Appellants. **ON BRIEF:** Madeline W. Clark, J. Matthew Rice, Aaron L. Bernard, Matthew D. Cloutier, Steven J. Griffin, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants/Cross-Appellees. William Powell, Elizabeth R. Cruikshank, Shelby Calambokidis, INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION, Washington, D.C., Daniel A. Horwitz, HORWITZ LAW, PLLC, Nashville, Tennessee, for Appellees/Cross-Appellants. Matthew F. Kuhn, Caleb B. Childers,

OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Jonathan F. Mitchell, MITCHELL LAW PLLC, Austin, Texas, B. Tyler Brooks, Thomas More Society, Chicago, Illinois, Andrew Beck, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Sarah A. Hunger, OFFICE OF THE ILLINOIS ATTORNEY GENERAL, Chicago, Illinois, Bryce Ashby, DONATI LAW, PLLC, Memphis, Tennessee, Hunter C. Branstetter, SHERRARD ROE VOIGT & HARBISON, PLC, Nashville, Tennessee, Charlene O. Yim, David C. Ware, Emily R. Sauer, Emma S. Eisendrath, GIBSON, DUNN & CRUTCHER LLP, New York, New York, Kylee Sunderlin, IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE, New York, New York, Courtney Dankworth, DEBEVOISE & PLIMPTON LLP, New York, New York, Mary A. Parker, PARKER & CROFFORD, Brentwood, Tennessee, for Amici Curiae.

STRANCH, J., delivered the opinion of the court in which RITZ, J., joined. SUTTON, C.J. (pp. 46–73), delivered a dissenting opinion.

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge. When the Supreme Court issued *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), its decision triggered Tennessee's near-total abortion ban, which criminalizes performing an abortion at any stage of gestation, Tenn. Code Ann. § 39-15-213(b). Two years later, as part of its Underage Abortion Trafficking Act, the Tennessee legislature enacted the "Recruitment Provision," which criminalizes intentionally recruiting an unemancipated minor for purposes of obtaining an abortion that "would constitute a criminal abortion under § 39-15-213," regardless of where the abortion is procured. § 39-15-201(a). The Recruitment Provision thus purports to reach beyond Tennessee's regulation of abortion within its own borders, barring recruitment for abortions that are illegal in Tennessee but legal where they take place.

Rachel Welty and Aftyn Behn are two prominent advocates for abortion rights in the state of Tennessee, and they both regularly counsel minor Tennesseans regarding how they may obtain legal abortions. Before the Recruitment Provision went into effect, Welty and Behn filed this pre-enforcement suit against the district attorneys general in the Middle District of Tennessee, contending the provision violates the First Amendment facially and as applied. The district court granted summary judgment to Welty and Behn on the First Amendment claims,

holding that the Recruitment Provision constitutes unconstitutional viewpoint discrimination as applied to them, and that it is facially overbroad. The district court then issued an injunction barring the defendants from enforcing the Recruitment Provision. It also held that the Recruitment Provision is not unconstitutionally vague. For the following reasons, we **AFFIRM**, without reaching vagueness.

## I. BACKGROUND

Since the Supreme Court issued *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), the state of Tennessee has criminalized "perform[ing] or attempt[ing] to perform an abortion" at any stage of gestation. Tenn. Code Ann. § 39-15-213(b). Tennessee's abortion ban has one narrow exception, which requires, among other conditions, a "serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman." § 39-15-213(c).

### A. Welty's and Behn's Abortion-Rights Advocacy

Plaintiffs Welty and Behn are prominent abortion-rights advocates in Tennessee. Welty is an attorney in Nashville who operates her own family law practice with a particular focus on child advocacy. A major component of Welty's practice has been advocating for abortion access and helping minors obtain legal abortions. For a five-to-six-year period before *Dobbs*, Welty's practice included representing minors seeking to obtain judicial bypass authorization, a mechanism that formerly allowed minors to obtain legal abortions without parental consent in Tennessee under the state's pre-*Dobbs* abortion regulations. After *Dobbs*, Welty has counseled minors regarding their options for obtaining abortions notwithstanding Tennessee's abortion ban. Welty does not inquire into whether the minors she counsels have parental consent to seek abortions because, as she testified, "[i]t can be really dangerous for minors in regard to the care that they are trying to get. There may be a lot of reasons why they don't see[k] the consent of their parent. Sometimes their parent is their abuser." R. 35, Prelim. Injunction Hr'ing Tr., PageID 357.

Welty testified that her "goal as an advocate is never to persuade someone. It is to give them options and then let them make their own decisions." R. 35, PageID 374. She is aware,

however, that her counseling has sometimes resulted in pregnant minors choosing to seek legal abortion services. When asked whether she was aware "that providing [minors with] accurate information is persuasive to some of them," Welty responded, "Absolutely . . . the fact that they are communicating and being advocated for by someone like me could increase the likelihood they choose abortion." R. 35, PageID 381. When a minor does choose abortion, Welty "support[s] and encourage[s] that decision," including by "connecting them with resources whether it's . . . financial donations" or information about out-of-state clinics or obtaining abortion pills. R. 35, PageID 359, 374–75. She is committed to continuing to help minors access legal abortions, regardless of whether they have parental consent, because she believes that "[m]inors need to be able to make these decisions for themselves and be able to access routine, safe abortion care." R. 35, PageID 358.

Welty is a board member of Abortion Care Tennessee (ACT), a fund that raises money for block grants that it gives to out-of-state abortion clinics, where the grants are earmarked to pay for Tennessee residents to obtain abortion services. ACT provides resources including online literature and handouts that detail ways for Tennesseans to obtain legal abortions; these resources represent that abortion is "safe, common and normal." R. 35, PageID 359. When Welty counsels minors regarding their abortion options, she often refers them to these ACT resources and likewise expresses the view that abortion is safe, common, and normal. Welty has also engaged in various forms of public-facing abortion-rights advocacy related to her work with ACT. She has distributed ACT handouts to state legislators "[a]ny time [she goes] to the state legislature for any reason," as well as to members of the public, including by leaving them "around different places" like "bathrooms of bars." R. 35, PageID 367. She has traveled with ACT for advocacy events at places teens and young adults frequent, such as retail stores and festivals, where she distributes the same handouts. She has "show[n] up to a lot of marches and . . . given speeches," and spoken with "a lot of reporters." R. 35, PageID 369. She stated that minors have been in her audiences and have "definitely" received her messages. After the *Dobbs* decision was leaked, she started a social media account "[t]o provide information to Tennesseans about abortion care," including information about accessing abortion pills. R. 35, PageID 369.

Behn is a licensed social worker, a political organizer, and the elected representative of Tennessee House District 51, which includes downtown Nashville. As a social worker, Behn counsels pregnant clients about their options, including abortion. Her primary goals while counseling clients are to support their well-being and promote self-determination in their decisions. Sometimes, Behn concludes that having an abortion is in her client's best interest, "[i]n circumstances such as rape or incest, [or] if the health of the mother is at risk," in which case she considers it her ethical obligation to communicate that assessment to her client. R. 35, PageID 394. Behn communicates that abortion is in a client's best interest by, as she testified,

> providing them information so that they can make an informed decision and ensuring that the space that I offer and the professional advice is one that doesn't make them feel less than or [unvalued], or that harm will come from this decision. I try to leave it as open and inclusive a space as possible so that they feel they have met the decision to the best of their ability.

R. 35, PageID 394. When a client does choose abortion, Behn validates and supports the decision, including by directing the client to resources and offering information about how to obtain a legal abortion.

Behn understands her "responsibilities and roles" as social worker and elected representative to be "intrinsically tied." R. 35, PageID 393. As an elected official, she is a vocal advocate for abortion rights and is often contacted by Tennesseans within and outside of her district regarding abortion access. She is regularly "solicited by families across the State asking about the legal status of abortion access in Tennessee and how they can access truthful and accurate information about the resources that exist." R. 35, PageID 389. For instance, when a mother in Williamson County called out of concern for her pregnant daughter, Behn provided the mother with information about accessing out-of-state abortion services. When constituents and other Tennesseans reach out to Behn's office to learn about abortion access for Tennessee residents, she does not inquire about their ages, but she believes some are minors. She is often asked about abortion when she speaks at press conferences and other public events. Behn also uses social media to express her views and inform her constituents about abortion access.

### B. Tennessee Enacts the Recruitment Provision

In 2024, two years after the state's abortion ban went into effect, the Tennessee legislature enacted the Underage Abortion Trafficking Act, which includes the following "Recruitment Provision":

> An adult commits the offense of abortion trafficking of a minor if the adult intentionally recruits . . . a pregnant unemancipated minor within this state for the purpose of:
>
> . . .
>
> (2) Procuring an act that would constitute a criminal abortion under § 39-15-213 for the pregnant unemancipated minor, regardless of where the abortion is to be procured; or
>
> (3) Obtaining an abortion-inducing drug for the pregnant unemancipated minor for the purpose of an act that would constitute a criminal abortion under § 39-15-213, regardless of where the abortion-inducing drug is obtained.

Tenn. Code Ann. § 39-15-201(a) (2024). The full text of § 39-15-201(a) contains three operative verbs, "if the adult intentionally recruits, harbors, or transports . . .," but Welty and Behn do not challenge the harboring or transporting prongs. R. 1, PageID 1–5.[1]

The Recruitment Provision does not apply to the "parents or legal guardian of the unemancipated minor," or any "person who has obtained the written, notarized consent of the unemancipated minor's parent or legal guardian." § 39-15-201(c)(1)–(2). Violating the Recruitment Provision is a misdemeanor that carries a mandatory sentence of eleven months and twenty-nine days. § 39-15-201(b). The statute further provides that a person who violates the Recruitment Provision "may be held liable in a civil action for the wrongful death of an unborn child who was aborted," which may be brought by the "parent or guardian of the unemancipated minor"; the minor herself (the "biological mother of the unborn child"); or the "biological father of the unborn child," unless the pregnancy resulted from his commission of one of several

---

[1]The statute also describes three "purpose[s]" for which recruitment is prohibited, the first of which is "[c]oncealing an act that would constitute a criminal abortion under § 39-15-213 from the parents or legal guardian of the pregnant unemancipated minor," § 39-15-201(a)(1); Welty and Behn do not challenge the concealing provision either. R. 1, PageID 1–5.

enumerated crimes. § 39-15-201(e). The Recruitment Provision went into effect on July 1, 2024. § 39-15-201.

While the Act was pending before the Tennessee legislature, Behn opposed it and spoke out against it on social media. At one point, for instance, Behn stood on Broadway, a densely populated street in downtown Nashville that is in her district, with a sign that read, "Need an abortion, ask me for help." She also posted this message on Twitter: "I welcome the opportunity to take a young person out of state who wants to have an abortion even if it lands me in jail." R. 1-5, Behn Tweet, PageID 40. During the legislative debate on the bill, its sponsor, representative Jason Zachary, referred specifically to Behn's post as an example of "what recruitment looks like." R. 1-6, House Tr., PageID 61. When she spoke about her advocacy during this period, Behn testified, "I wanted young people, Tennesseans, to understand that I was a safe person and that I was willing to risk my privilege and power as an elected official to support them in seeking abortion care." R. 35, PageID 399.

Welty, for her part, stopped posting on social media after the Recruitment Provision passed because, as she testified, "the landscape started [to] change a little bit and it started to feel like there was criminalization of my advocacy." R. 35, PageID 370.

**C. Procedural History**

On June 6, 2024, plaintiffs' counsel sent a demand letter to the district attorneys general for the Middle District of Tennessee (the "District Attorneys"). R. 1-4, Ex., PageID 25–27. The letter (1) described Welty's counseling and advocacy-related conduct, (2) expressed concern that "any reasonable interpretation of the [Recruitment Provision] appears to criminalize pure speech and *advocacy*—a viewpoint-based speech restriction"; and (3) demanded that the District Attorneys "disavow all enforcement of [the Recruitment Provision] against Ms. Welty once the law takes effect" by June 20, 2024. R. 1-4, PageID 26–27. Tennessee concedes that the District Attorneys did not respond. Defs.'s Third Br. 21.

Then, on June 24, 2024, shortly before the Recruitment Provision went into effect, Welty and Behn brought suit in the Middle District of Tennessee, naming the District Attorneys. Welty and Behn alleged that the Recruitment Provision violates the First Amendment both facially and

as applied to them, and that it is unconstitutionally vague. They moved for a preliminary injunction, which the district court granted after a hearing, enjoining the defendants from enforcing the Recruitment Provision "other than in connection with obtaining or attempting to obtain an actually unlawful abortion." R. 41, Order, PageID 587–88. In the same order, the district court granted in part and denied in part a motion to dismiss, dismissing Welty's claims against some of the defendants. The District Attorneys, who are represented by the state of Tennessee in this litigation, filed an interlocutory appeal of these rulings and moved to stay proceedings at the district court pending resolution of that appeal.[2] Welty and Behn then moved for summary judgment on all claims. The district court denied the motion for a stay, and the District Attorneys filed their own motion for summary judgment.

The district court proceeded to rule on the parties' cross-motions. It held that the Recruitment Provision is unconstitutional as applied to Welty and Behn and on its face, but that it is not unconstitutionally vague. Pursuant to its First Amendment rulings, the district court issued an injunction enjoining the defendants "from enforcing § 39-15-201(a)'s recruitment provision." R. 81, Mem. Op. & Order, PageID 1131–32. The parties have filed timely cross-appeals of all rulings.

## II. LEGAL STANDARDS

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, courts must view the record evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *See Chapman v. UAW Loc. 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc). A district court's summary judgment decision is reviewed de novo. *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016).

We review a district court's decision to grant or deny permanent injunctive relief, as well as its fashioning of such relief when granted, for an abuse of discretion. *See eBay Inc.*

---

[2] Following the final judgment that is now before the court, we dismissed the interlocutory appeal as moot. *Welty v. Dunaway*, 145 F.4th 628 (6th Cir. 2025).

*v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *United States v. Miami Univ.*, 294 F.3d 797, 806, 820 (6th Cir. 2002). "A district court abuses its discretion when it relies on clearly erroneous findings of fact or when it improperly applies the law." *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 317 (6th Cir. 2001).

## III. ANALYSIS

Tennessee challenges three aspects of the district court's decision on appeal: (1) its holding that Welty and Behn have standing, (2) its holding that the Recruitment Provision violates the First Amendment, and (3) the scope of the district court's injunction. Because we will affirm on the merits of the First Amendment issues, we need not reach Welty and Behn's protective cross-appeal regarding their vagueness claim.

### A. Standing

To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). An injury means the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). In a pre-enforcement suit where a plaintiff contends she faces imminent criminal prosecution under the challenged law, she may satisfy the injury requirement by demonstrating "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

In this appeal, Tennessee confines its standing arguments to the second and third prongs of the pre-enforcement injury inquiry (whether the statute proscribes Welty's and Behn's conduct and whether they face a credible threat of prosecution under it); it does not contend the district court erred in concluding that the remaining elements, including traceability and

redressability, are satisfied. We will nonetheless address every element, as federal courts have an independent obligation to assure themselves that Article III standing exists. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006).

1. Intent to Engage in Conduct Affected with a Constitutional Interest

To satisfy the first prong of the injury analysis, Welty and Behn must intend to engage in "a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony List*, 573 U.S. at 159 (citation modified). Welty and Behn have already engaged, and intend to continue engaging, in a course of conduct that involves advocating for abortion access, sharing information with Tennesseans about how to obtain legal abortions, and one-on-one counseling with clients or constituents about abortion care. Welty's counseling conduct includes telling clients abortion is "safe, common, and normal" and, when a client does choose abortion, "support[ing] and encourage[ing] that decision." R. 35, PageID 359. Behn likewise "support[s] and encourage[s]" her clients when "they make [an] informed decision to obtain an abortion," including by "validat[ing]" a client's decision to have an abortion when Behn determines, using her "clinical judgment," that a legal abortion is in the client's "best interest." R. 35, PageID 393–95. This conduct is speech that readily satisfies the standard of being "arguably affected with a constitutional interest." *Susan B. Anthony List*, 573 U.S. at 159. The Supreme Court has recognized various forms of speech about abortion as protected under the First Amendment, including political advocacy expressing opposition to abortion, *Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 469–70 (2007); print advertisements in a Virginia newspaper concerning the availability of legal abortions in New York, *Bigelow v. Virginia*, 421 U.S. 809, 821–22 (1975); and "close, personal conversations" on public sidewalks adjacent to Planned Parenthood clinics intended to dissuade women from obtaining abortions, *McCullen v. Coakley*, 573 U.S. 464, 487 (2014). Because Welty's and Behn's conduct resembles these recognized forms of protected speech, it satisfies the first prong of the pre-enforcement injury inquiry.

The dissent repeatedly mischaracterizes Welty's and Behn's advocacy work and the scope of their legal challenge, often asserting without any citation to the record that Welty and Behn admit or agree to something they do not. The lack of record support for several of the dissent's claims hampers examination of our respective positions and impedes a more fulsome

response to the dissent. For example, the dissent summarily concludes without citation that the parties are in "violent agreement about the narrow scope of the law" and that "the claimants and the court accept that other anti-trafficking laws do not violate the free-speech rights of anyone." Dissenting Op. at 47, 53. And again when it represents that the information Welty and Behn share about abortion options remain "free of influence in either direction." Dissenting Op. at 59. But on this claim, the record readily demonstrates the exercise of influence: Behn states that she "support[s]" and "encourage[s]" her clients when "they make [an] informed decision to obtain an abortion," including by "validat[ing]" a client's decision to have an abortion when Behn determines, using her "clinical judgment," that a legal abortion is in the client's "best interest." R. 35, PageID 393–95.

2. Intent to Engage in Proscribed Conduct

This prong asks whether Welty's and Behn's intended conduct is "arguably . . . proscribed by [the] statute." *Susan B. Anthony List*, 573 U.S. at 159 (citation modified). This inquiry requires at least some preliminary construction of the challenged law. The word "arguably" is crucial, however, as we have instructed that courts should not wade too far, or too precisely, into the merits of what a statute means when evaluating standing in pre-enforcement suits: "at the pre-enforcement stage, [the plaintiff] need not prove conclusively that its intended course of conduct violates the [statute] but only that it is *arguably* proscribed by the statute." *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 437 (6th Cir. 2024) [hereinafter *Friends*] (citing *Davis v. Colerain Township*, 51 F.4th 164, 172 (6th Cir. 2022); *Susan B. Anthony List*, 573 U.S. at 162).[3]

Tennessee argues that the constitutional avoidance canon prevents the Recruitment Provision from applying to Welty's and Behn's conduct, but such reasoning has no place in the standing inquiry. In *Kentucky v. Yellen*, we pointed out that constitutional avoidance is "of

[3]The District Attorneys contend that *Friends* stands for the contrary proposition that a court must determine precisely what the statute proscribes before proceeding with this element of the standing analysis. This argument misapprehends our reasoning in *Friends*. In that case, it was not arguable that the plaintiffs' intended conduct would be proscribed by the challenged statute because their theory of that proscription was directly contradicted by a prior decision of the Supreme Court of Tennessee. *See Friends*, 108 F.4th at 435–37 (discussing *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520 (Tenn. 1993)). Welty and Behn are not advocating for a construction of the statute that is contrary to any existing precedent of the Supreme Court of Tennessee.

minimal importance to . . . justiciability" for several reasons, including that "for standing purposes, we accept as valid the merits of appellees' legal claims." 54 F.4th 325, 349 n.16 (6th Cir. 2022) (citation modified). *Yellen* further instructed that

> it would be inappropriate for us, at the justiciability stage, to render a merits interpretation of the [challenged law] and to then declare based on that merits interpretation that the controversy is not even justiciable. After all, if [the law] when "given one construction" would establish jurisdiction and would defeat it when "given another," then the plaintiff has established jurisdiction.

*Id.* (quoting *Bell v. Hood*, 327 U.S. 678, 685 (1946)) (citation modified).

So, do Welty and Behn intend to engage in conduct that is arguably proscribed by the Recruiting Provision? In *Matsumoto v. Labrador*, the Ninth Circuit invalidated an Idaho statute containing language that is similar to the Recruitment Provision. 122 F.4th 787, 794–95 (9th Cir. 2024); *see* Idaho Code § 18–623 (2023).[4] As *Matsumoto* explained, parsing several dictionary definitions, "[t]he ordinary meaning of the verb 'recruit' is to seek to persuade, enlist, or induce someone to join an undertaking or organization, to participate in an endeavor, or to engage in a particular activity or event." *Id.* at 808. The record indicates that Welty and Behn intend to engage in speech that encourages pregnant, unemancipated minors to have legal abortions, including by providing specific information about how Tennessee residents can obtain legal abortions. Welty and Behn are aware that their speech may persuade their clients or constituents to choose abortion, and they support and encourage a minor's decision to obtain an abortion, even though they generally do not begin these conversations with the specific goal of convincing the minor to come to that decision. This speech also involves the communication of Welty's and Behn's views in support of abortion access, such as Welty's view that abortion is

[4]The Recruitment Provision and the Idaho statute the Ninth Circuit invalidated in *Matsumoto* are similar in some respects but not others. Chief among their differences is that Idaho Code § 18–623 requires an "intent to conceal an abortion from the parents or guardian of a pregnant, unemancipated minor" for all the conduct it criminalizes, whereas Tennessee Code § 39-15-201(a) does not include an intentional concealment element for violations of all its provisions. Tennessee's version incorporates intentional concealment only as a separate offense under the statute, § 39-15-201(a)(1), which is not at issue in this case; it does not include intentional concealment as an element of the Recruitment Provision (§§ 39-15-201(a)(2) and (a)(3)). What the statutes have in common, though, is the key concept of recruitment for out-of-state abortions: like the Recruitment Provision, Idaho Code § 18–623 criminalizes "recruiting" a "pregnant minor within" Idaho to obtain an abortion, even if "the abortion provider or the abortion-inducing drug provider is located in another state."

"safe, common, and normal." R. 35, PageID 359. Such speech arguably constitutes "intentionally recruit[ing]" "a pregnant unemancipated minor within [Tennessee] for the purpose of" procuring an abortion. § 39-15-201(a).

Tennessee attempts to evade this conclusion by fashioning an arbitrary distinction between "pre-decision" and "post-decision" speech.[5] Tennessee also contends that Welty's and Behn's intended conduct cannot satisfy the Recruitment Provision's scienter requirement. These arguments are unconvincing for related reasons. Tennessee's pre- and post-decision binary treats a decision to seek an abortion—an incredibly weighty and personal choice—as if it happens at a discrete, specific moment in time. But the record reflects that this decision is a dynamic process that may occur over the course of a conversation, or that may solidify only through personal, private reflection after a conversation concludes. When Behn determines that abortion is in a client's best interest, such as "[i]n circumstances such as rape or incest, [or] if the health of the mother is at risk," she uses her counseling skills to convey that determination gently. R. 35, PageID 394–95. The record does not reflect that Behn ever simply tells a client, "I think you should have an abortion," at which point the client immediately becomes convinced. When a minor client does choose abortion, Welty and Behn encourage that decision and provide practical information about how the minor can obtain one legally, such as by seeking treatment in one of a select number of abortion-protective states—perhaps in a specific clinic that receives ACT funding. Such speech, too, arguably constitutes recruitment prescribed by the statute, as it may persuade the listener to obtain an abortion by a specific means. *See Matsumoto*, 122 F.4th at 809–10. This sense of the word is consistent with common usage; for instance, a young college graduate may have decided that she wants to be a lawyer, but she may nonetheless be "recruited" to pursue her legal education at Vanderbilt. By categorizing and then dismissing such conduct as "post-decision," Tennessee's argument conveniently discounts Welty's and Behn's speech in the moments when the record suggests their intent to persuade minors to obtain legal abortions is at its clearest and most powerful. This element of standing is satisfied.

---

[5]The dissent adopts the same framing to argue the Recruitment Provision does not apply to Welty and Behn, Dissenting Op. at 60–61, even though it elsewhere frames recruitment as a nearly imperceptible first step on the way to harboring and trafficking, Dissenting Op. at 51–52.

3. Credible Threat of Enforcement

The final piece of the pre-enforcement injury inquiry requires a credible threat that the Recruitment Provision will be enforced against Welty and Behn. *See Susan B. Anthony List*, 573 U.S. at 159. A showing of "subjective chill" alone is insufficient to establish a credible threat of enforcement. *See Berry v. Schmitt*, 688 F.3d 290, 296–97 (6th Cir. 2012); *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). In *McKay v. Federspiel*, we identified four factors, unrelated to subjective chill, on which the Supreme Court and this court have relied when considering whether a threat of enforcement is credible: (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." 823 F.3d at 869 (collecting cases). "These *McKay* factors are not exhaustive, nor must each be established," but there should typically be "some combination" of relevant factors to demonstrate a credible threat. *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (citing *McKay*, 823 F.3d at 869), *abrogated on other grounds as recognized by Tenn. Conf. of NAACP v. Lee*, 139 F.4th 557, 563 (6th Cir. 2025). We have applied the *McKay* factors to pre-enforcement suits challenging civil and criminal laws alike. *See, e.g.*, *id.*; *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034–36 (6th Cir. 2022) [hereinafter *ULCM*].

We pause before proceeding to address a few points regarding the credible threat of enforcement element and the *McKay* test. First, Tennessee contends that binding precedent requires a *certain* threat of prosecution, citing language from *Crawford v. U.S. Department of Treasury* stating that "the threat of prosecution 'must be *certainly impending* to constitute injury in fact.'" 868 F.3d 438, 454–55 (6th Cir. 2017) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). But more recent governing precedents have clarified that the correct standard is credibility, not certainty. As the Supreme Court explained one year after *Clapper* in *Susan B. Anthony List*, a showing that impending prosecution is certain is but one way to demonstrate that the threat is credible: "An allegation of future injury may suffice if the threatened injury is

'certainly impending,' or there is a 'substantial risk that the harm will occur.'" 573 U.S. at 158 (quoting *Clapper*, 398 U.S. at 409, 414 n.5) (citation modified). Several of our recent decisions have confirmed, often while citing *Susan B. Anthony List*, that credibility is the correct measure. *See Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (order) (per curiam) (citing *Susan B. Anthony List*, 573 U.S. at 159); *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 742 (6th Cir. 2025) (en banc) (same); *Cath. Charities of Jackson, Lenawee, & Hillsdale Cntys. v. Whitmer*, 162 F.4th 686, 691 (6th Cir. 2025) (citing *Susan B. Anthony List*, 573 U.S. at 158). "In a First Amendment pre-enforcement case," as we explained in *Catholic Charities*, "this test is met when 'the threat of future enforcement' under the statute 'is substantial.'" 162 F.4th at 691 (quoting *Susan B. Anthony List*, 573 U.S. at 164).

Welty and Behn suggest that we need not apply the *McKay* factors because they have shown their speech is objectively chilled by the Recruitment Provision (though they also contend that they satisfy the *McKay* approach). Our decision in *McKay* did not address the concept of *objective* chill—it merely acknowledged the long-standing rule that subjective chill alone is insufficient. *See* 823 F.3d at 868–69. Welty and Behn's argument regarding objective chill relies principally on our decision in *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019). *Speech First* concerned First Amendment challenges to two related policies at the University of Michigan: (1) a "policy prohibiting harassing and bullying behavior," and (2) an initiative that established a "Bias Response Team" to respond to student-reported "bias incidents," where "bias incident" was defined as "conduct that discriminates, stereotypes, excludes, harasses or harms anyone in our community based on their identity." *Id.* at 761–62 (citation modified). When a bias incident was reported, the Bias Response Team contacted the reporting student for more information, then (if that student so desired) contacted the student or students allegedly responsible and invited them to meet with a member of the response team. *Id.* at 762. The team had no "direct punitive authority" over the students it contacted, but it could make referrals to the police or university offices. *Id.* at 763. On this record, we held that Speech First had standing to seek a preliminary injunction enjoining the Bias Response Team initiative. We reasoned that Speech First's members (who included students) "face[d] an objective chill based on the functions of the Response Team" because "the referral power and the invitation to meet with students objectively chill[ed] speech," such that the team acted "by way of implicit threat of

punishment and intimidation to quell speech." *Id.* at 765. *Speech First* is distinguishable from the instant case, however, because our reasoning in that case relied on the particularized circumstances of the Bias Response Team's activities, which meant Speech First was uniquely positioned to show objective chill relating to "*some* specific action on the part of the defendant," 939 F.3d at 766 (emphasis added) (citation modified), even if those allegedly chilling actions carried "no direct punitive authority," *id.* at 763. Thus, we are not persuaded by Welty and Behn's suggestion that we can skip the *McKay* inquiry.

Still, we have recognized that chill may carry "particular force" in pre-enforcement First Amendment challenges, because "self-censorship is a harm that can be realized even without an actual prosecution." *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1023 (6th Cir. 2024) (citation modified). Some of our recent First Amendment cases have combined an examination of chill, however defined, with a *McKay* analysis. In *Fischer*, which involved the Kentucky Judicial Conduct Commission's investigations of political candidates for state judgeships, we found a credible threat of enforcement when the plaintiffs were "self-censoring because the vague threats from the Commission could apply to a wide range of campaign-related speech" and all four factors recognized in *McKay* were present. 52 F.4th 303, at 307–308. Our decision in *Catholic Charities* went a step further, finding a credible threat of enforcement based on a showing of chill and one of the *McKay* factors, a refusal to disavow enforcement, *see* 162 F.4th at 691, even though we have typically required a showing of multiple *McKay* factors other than chill, *see Online Merchs. Guild*, 995 F.3d at 550.

Ultimately, though, we need not opine on the extent or nature of chill present in this case, because Welty and Behn satisfy the *McKay* test as we have traditionally employed it, *see* 823 F.3d at 869, regardless of any special consideration of chill in the First Amendment context. Under the first *McKay* factor, whether there is "a history of past enforcement against the plaintiffs or others," *id.*, the record does not reflect any past prosecutions under the Recruitment Provision. This fact may not suggest that prosecution is *less* credible, though, because it is likely attributable instead to the preliminary injunction the district court entered soon after the Recruitment Provision went into effect. *See ULCM*, 35 F.4th at 1034–36. Indeed, we recently ruled in *NetChoice, LLC v. Skrmetti*, that the absence of past prosecution is "far from

dispositive" on the issue of credible threat of enforcement "where, as here, the statute had only been in effect for a short while prior to the district court's preliminary-injunction decision and had only ever existed under the shadow of pre-enforcement litigation." --- F.4th ---, No. 25-5660, 2026 WL 2546423, at *9 (6th Cir. Aug. 28, 2026). As to the second factor, "enforcement warning letters sent to the plaintiffs regarding their specific conduct," the record reflects no such letters. *Online Merchs. Guild*, 995 F.3d at 550. The lack of enforcement letters is likewise unsurprising, given that Welty and Behn sued before the Recruitment Provision went into effect.

The third factor, whether "an attribute of the challenged statute . . . makes enforcement easier or more likely," *id.*, is present because the Recruitment Provision includes a civil enforcement mechanism whereby the speaker may be held liable for the "wrongful death of an unborn child who was aborted," § 39-15-201(e). Tennessee objects that this mechanism is not traceable to the District Attorneys, nor redressable by an injunction against them, but they cite no authority for the proposition that the evidence for each individual *McKay* factor must independently satisfy the other elements of standing. On the contrary, we have instructed that *McKay* is a broad, totality-of-the-circumstances inquiry that, "[a]t bottom, . . . distills to whether surrounding factual circumstances plausibly suggest a credible fear of enforcement." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024) (citation modified). Here, it is plausible that the Recruitment Provision's civil enforcement mechanism suggests a "credible fear of [criminal] enforcement," *id.*, because the initiation of a wrongful death suit could alert prosecutors to a speaker's alleged recruiting conduct. The mechanism thus distinguishes the Recruitment Provision from a "standard criminal law with no attributes making enforcement easier or more likely." *Friends*, 108 F.4th at 440. This factor is present.

The fourth factor, "refusal to disavow enforcement," is also supported by the record. *Online Merchs. Guild*, 995 F.3d at 550. Tennessee concedes that the District Attorneys did not respond to the pre-suit demand letter requesting that they "disavow all enforcement of [the Recruitment Provision] against Ms. Welty once the law takes effect." R. 1-4, Ex., PageID 27; Defs.'s Third Br. 21. It argues that the letter was insufficiently clear regarding Welty's intended conduct and that it was "unrealistic to expect a coalition of eleven independent districts to

respond to an opaque demand letter" in the allotted two weeks. Defs.'s First Br. 35–36. By this logic, the District Attorneys could have responded by requesting more information on Welty's conduct or at least mustered enough coordination among their offices to ask for an extension. They did neither. The District Attorneys' total silence for the eighteen days that elapsed between the demand letter and the filing of this suit suggests a refusal to disavow enforcement against Welty, regardless of how they now construe their reasons for that silence.

Tennessee further contends, though, that the District Attorneys have *subsequently* disavowed enforcement against both plaintiffs by repeatedly taking the position over the course of this litigation that the Recruitment Provision does not proscribe their conduct. However, the District Attorneys have "not represented that [they] disavowed enforcement in a non-litigation context, and 'the government's disavowal must be more than a mere litigation position.'" *Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025) (per curiam) (quoting *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010)), *cert. denied*, 2026 WL 1780109 (2026). The record does not support that these supposed disavowals amount to "more than a mere litigation position," *id.*, because, "both before this suit was filed and in the district court below, [the District Attorneys] took no *meaningful steps*—like submitting an affidavit forswearing prosecution—to mitigate [Welty's and Behn's] fears," *ULCM*, 35 F.4th at 1035 (emphasis added). This factor is also present.[6]

Finally, the "*McKay* factors are not exhaustive." *Online Merchs. Guild*, 995 F.3d at 550. In *ULCM*, we recognized that "surrounding factual circumstances [may] show that a fear of prosecution is plausible" when those circumstances support an "inference that the legislature intends to target plaintiffs." 35 F.4th at 1034–35. The record in this case supports such an inference based on Behn's activities while the Recruitment Provision was pending before the

[6]Strangely, the dissent's one-paragraph standing analysis contains a one-sentence discussion of the requirement that a pre-enforcement plaintiff demonstrate a credible threat of enforcement, Dissenting Op. at 48–49, even though that element is fiercely disputed by the parties. Instead, the dissent saves its clearest discussion of whether there is such credible threat for its merits analysis, where it marshals Tennessee's litigation positions about enforcement in service of its argument that the Recruitment Provision does not apply to Welty and Behn. Dissenting Op. at 59–60. Elsewhere, the dissent suggests that Welty and Behn have likewise disclaimed intent to violate the statute (though often with inaccurate representations of Welty's and Behn's arguments, *see supra* Section III.A.1).

One is left to wonder how the dissent squares this approach: if it is as convinced as it says of the parties' "violent agreement about the narrow scope of the law," and of the "facts" regarding the defense's disavowal and Plaintiffs' disclaimed intent to violate the statute, how can it be so quick to find standing? Dissenting Op. at 47–48.

legislature, of which she is a member. After Behn posted on Twitter, "I welcome the opportunity to take a young person out of state who wants to have an abortion even if it lands me in jail," the sponsor of the bill stated during legislative debate that her post was "what recruitment looks like." R. 1-5, PageID 40; R. 1-6, PageID 61. These circumstances support a reasonable inference that, were Behn not already an intended target of the Recruitment Provision, she likely became one by the time it passed the state legislature.

In sum, two of the four factors named in *McKay*—attributes of the challenged statute that make enforcement easier and refusal to disavow enforcement—are present on this record for both plaintiffs. *See Online Merchs. Guild*, 995 F.3d at 550. And the additional factor recognized in *ULCM*, circumstances supporting an "inference that the legislature intends to target plaintiffs," 35 F.4th at 1034–35, is present for Behn. Welty and Behn have demonstrated a credible threat of enforcement.

4. <u>Traceability and Redressability</u>

"The second and third standing requirements—causation and redressability—are often flip sides of the same coin. If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (citation modified). Here, there is no dispute that either element is satisfied. Welty and Behn contend that they face a credible threat of prosecution under the Recruitment Provision, which is traceable to the District Attorneys' duties to enforce criminal laws in districts where Welty and Behn seek to engage in their arguably proscribed conduct. An injunction enjoining enforcement of the Recruitment Provision will therefore redress this injury.

We hold that Welty and Behn have standing to bring their claims.

**B. First Amendment Merits**

The First Amendment's freedom of speech clause "protects the inalienable right of every individual to decide for himself 'how best to speak.'" *Chiles v. Salazar*, 607 U.S. ---, 146 S. Ct. 1010, 1021 (2026) (quoting *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781,

791 (1988)). In the United States, no government at any level has the "power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790–91 (2011) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)). The Supreme Court has recognized "even greater dangers associated with regulations that discriminate based on the speaker's point of view," *Chiles*, 146 S. Ct. at 1021, instructing repeatedly that viewpoint discrimination is "'an egregious form' of content regulation" from which "governments in this country must nearly always 'abstain,'" *id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). As the Court explained in *Rosenberger*, "the violation of the First Amendment is all the more blatant" when a regulation restricts not only content but what "opinion or perspective" a speaker may express. 515 U.S. at 829. Or as Justice Alito put it recently, viewpoint discrimination "is poison to a free society." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring).

Consistent with these bedrock principles, laws that regulate speech based on "communicative content" are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). To defeat this presumption, the government must satisfy strict scrutiny, "a demanding standard that requires the government to prove its restriction on speech is 'narrowly tailored to serve compelling state interests.'" *Chiles*, 146 S. Ct. at 1021 (quoting *Reed*, 576 U.S. at 163). It is "rare that a regulation" subject to strict scrutiny "will ever be permissible." *Brown*, 564 U.S. at 799 (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000)).

The district court held that the Recruitment Provision is unconstitutional both facially and as applied to Welty and Behn. Before proceeding to the merits of Tennessee's appeal, we address Welty and Behn's contentions that it has forfeited two issues: (1) whether the Recruitment Provision is unconstitutional as applied and (2) whether strict scrutiny is satisfied. A party can forfeit an issue by either failing to raise it below or failing to brief it sufficiently on appeal. *See Cockrun v. Berrien County*, 101 F.4th 416, 419–20 (6th Cir. 2024).

Tennessee's appellate brief is missing a discrete section on the as-applied challenge—the brief's First Amendment merits arguments appear devoted almost entirely to the facial overbreadth challenge. Tennessee contends it did not forfeit the as-applied challenge,

however, because the merits analysis in its principal brief addressed it at least in passing: "Plaintiffs' as-applied challenges fail because the Act does not apply to their intended speech." Defs.'s First Br. 39. While passing references to an issue may be insufficient in some contexts, *see Cockrun*, 101 F.4th at 419, there is a readily apparent explanation for why Tennessee did not devote a large, discrete section of its principal brief to the as-applied challenge in this case (regardless of the merits of their arguments). Its theory is that the Recruitment Provision is not unconstitutional as applied to Welty and Behn because it *does not apply* to their intended conduct, and it had already explained this theory at length in a preceding section relating to standing. On this record, we do not construe Tennessee's briefing as having forfeited opposition to the as-applied challenge.

Whether Tennessee has forfeited an argument that strict scrutiny is met is a different story. It is the government's burden to satisfy strict scrutiny, *see Reed*, 576 U.S. at 163, and the district court found that Tennessee made no attempt to do so in summary judgment proceedings below. As the district court put it, "defendants fail to show—indeed, they do not even argue—that the law survives strict scrutiny." R. 81, PageID 1124. While Tennessee's principal brief has no discrete sections on strict scrutiny, it contains some language relevant to strict scrutiny in a section devoted to an argument that the Recruitment Provision can "be constitutionally applied to speech that interferes with parental rights."[7] Defs.'s First Br. 44–48. One paragraph in this section contains language that might be said to allude to the strict scrutiny standard—namely, that Tennessee states it has a "compelling interest . . . in fostering parental rights," and that the Recruitment Provision is "narrowly tailored to protect the parental right to direct medical treatment." *Id.* at 47–48. These statements represent passing suggestions at best, however, as Tennessee does not elaborate on *why* the Recruitment Provision is narrowly tailored to protect that asserted state interest. And, perhaps most tellingly, Tennessee never contests the district court's holding that it forfeited the strict scrutiny issue by failing to "even argue" it below. R. 81, PageID 1124. On this record, we find Tennessee has forfeited any argument that strict scrutiny is met.

[7]We will return to the merits of this argument in due course.

1. <u>As-Applied Challenge</u>

"While the First Amendment protects many and varied forms of expression, the spoken word is perhaps the quintessential form of protected speech. And that is exactly the kind of expression in which [Welty and Behn] seek[] to engage." *Chiles*, 146 S. Ct. at 1023. As applied to Welty and Behn, the Recruitment Provision restricts their ability to speak freely about abortion; it is therefore a content-based regulation that is presumptively unconstitutional, *see Reed*, 576 U.S. at 163. And as discussed earlier, the Supreme Court has already recognized several scenarios in which speech related to abortion is protected under the First Amendment. *See Fed. Election Comm'n*, 551 U.S. at 469–70; *Bigelow*, 421 U.S. at 821–22; *McCullen*, 573 U.S. at 487. "Encouragement, counseling, and emotional support are plainly protected speech under Supreme Court precedent, including when offered in the difficult context of deciding whether to have an abortion." *Matsumoto*, 122 F.4th at 811; *see McCullen*, 573 U.S. at 473, 487. Finally, Welty's and Behn's speech does not fall within the exception for speech that is integral to criminal conduct, *see Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949), because they encourage minors to obtain legal abortions, not illegal ones.

Yet the Recruitment Provision goes further than regulating the content of Welty's and Behn's protected speech—it also restricts what "opinion[s] or perspective[s]" they may express. *Rosenberger*, 515 U.S. at 829. The Supreme Court's recent decision in *Chiles* is instructive on this point. *Chiles* concerned an as-applied challenge by a mental health counselor to a Colorado statute proscribing mental health professionals from engaging in conversion therapy with minors. 146 S. Ct. at 1017–18 (citing Colo. Rev. Stat. § 12-245-224(1)(t)(V) (2025)). The statute prohibited "*any* practice or treatment" attempting "to change an individual's sexual orientation or gender identity," including "any effort to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex." *Id.* at 1018 (citation modified). "At the same time," the statute expressly allowed mental health professionals to provide "acceptance, support, and understanding for the facilitation of an individual's identity exploration and development," as well as "assistance to a person undergoing gender transition." *Id.* (citation modified). The only question before the Court in *Chiles* was whether this statute was subject to strict scrutiny, and the Court concluded that it was, because it

discriminated based on content and, "a step further," viewpoint. *Id.* at 1024. For instance, the Court explained, when "clients seek her counsel on how to 'reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with their bodies,'" the statute "regulates how Ms. Chiles may respond." *Id.* at 1023 (citation modified). As applied to Chiles, then, Colorado's conversion therapy ban "prescrib[ed] what views she may and may not express" in her speech to her clients. *Id.* at 1024.

Like Chiles, Welty and Behn regularly counsel minors. But when one of their minor clients seeks guidance regarding her pregnancy, the Recruitment Provision "regulates how [Welty and Behn] may respond." *Id.* at 1023. Nothing in Tennessee's law would prevent them from encouraging a minor to carry her pregnancy to term. Nor could it prevent them from, say, suggesting a minor carry to term with the intention of placing her baby up for adoption. But the Recruitment Provision does restrict Welty's freedom to share with clients her view that abortion is "safe, common and normal." It likewise prevents her and Behn alike from supporting and encouraging their clients' decisions to obtain legal abortions and sharing information about how they may do so. Like Colorado's conversion therapy ban, the Recruitment Provision therefore prohibits them from "voic[ing] certain perspectives the State disfavors when speaking with consenting clients." *Id.* at 1024 (citation modified). At bottom, both laws regulate speech about personal choices that are disfavored by their respective states; *Chiles* confirms that such speech is entitled to the full force of First Amendment protections even when it is directed toward minors. *See id.* And because both laws restrict what perspectives a speaker may express about those disfavored personal choices, "they represent 'an egregious form of content discrimination' where First Amendment concerns are at their most 'blatant.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 829); *see also Iancu*, 588 U.S. at 390.[8]

In this way, the Recruitment Provision discriminates based on content as well as the viewpoint of the speaker. The Recruitment Provision is therefore "presumptively unconstitutional" as applied to Welty and Behn and subject to strict scrutiny, which Tennessee

[8]The dissent argues that *Chiles* is inapposite because, unlike the statute at issue in that case, the Recruitment Provision "proscribes recruitment for separately outlawed criminal acts—the intentional recruitment of Tennessee minors to obtain an abortion within the State or outside of it." Dissenting Op. at 64. That is misleading—the Recruitment Provision proscribes recruitment for both illegal and legal abortions.

has forfeited. *Reed*, 576 U.S. at 163. If there is any doubt, though, the record makes clear that they could not satisfy this most "demanding standard." *Chiles*, 146 S. Ct. at 1021. As we observed recently in *Catholic Charities*, which enjoined a Michigan conversion therapy ban similar to the one at issue in *Chiles*, no "viewpoint-discriminatory restriction" on speech has *ever* survived strict scrutiny. 162 F.4th at 696. Supreme Court precedent makes clear that Tennessee has no compelling "interest in shielding its citizens from information about activities outside [its] borders." *Bigelow*, 421 U.S. at 827–28; *see also Katt v. Dykhouse*, 983 F.2d 690, 695 (6th Cir. 1992). Furthermore, even crediting Tennessee's passing suggestion that it has a compelling interest in protecting "the parental right to direct medical treatment," the Recruitment Provision is not narrowly tailored to that interest. Tennessee's law is "wildly underinclusive when judged against [this] asserted justification," *Brown*, 564 U.S. at 802, because it criminalizes speech that encourages a minor to get an abortion yet is silent on speech encouraging a minor to carry a pregnancy to term with or without parental involvement. Thus, the Recruitment Provision cannot survive strict scrutiny and is unconstitutional as applied to Welty and Behn.

2. <u>Facial Challenge</u>

We next consider whether the Recruitment Provision is unconstitutional on its face. Facial challenges are generally disfavored "[e]ven in the First Amendment context." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024). Ordinarily, a litigant bringing a facial challenge must "establish that no set of circumstances exists under which [the statute] would be valid." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (citation modified). The Supreme Court has recognized another path in the First Amendment context, however—the overbreadth doctrine, "whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 473 (quoting *Wash. State Grange v. Wash. State Republication Party*, 552 U.S. 442, 449 n.6 (2008)). The overbreadth doctrine thus "instructs a court to hold a statute facially unconstitutional even though it has lawful applications." *United States v. Hansen*, 599 U.S. 762, 769 (2023). "We have provided this expansive remedy," as Justice Scalia explained for a unanimous Court in *Virginia v. Hicks*, "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the

overbroad statute imposes criminal sanctions." 539 U.S. 113, 119 (2003) (citing *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 380 (1977); *NAACP v. Button*, 371 U.S. 415, 433 (1963)). Overbroad laws "'may deter or "chill" constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'" *Hansen*, 599 U.S. at 769–70 (quoting *Hicks*, 539 U.S. at 119). The overbreadth doctrine thus "allows a litigant" to reach beyond the scope of her own injury "to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Id.* at 770.

Here, the parties agree that the Recruitment Provision may be constitutionally applied in theory to speech that recruits an unemancipated minor to obtain an illegal abortion, although Welty and Behn contend that this application is unrealistic in practice given the availability of legal abortions in some states. We assume without deciding that abortion bans such as Tennessee's are valid after *Dobbs*, *see* 597 U.S. at 301, which would in turn mean that speech recruiting minors to obtain abortions in states where they are illegal is integral to criminal conduct and therefore unprotected under the First Amendment, *see Giboney*, 336 U.S. at 498. Given Welty and Behn's agreement on this point, they cannot establish that "no set of circumstances exists under which" the Recruitment Provision is valid. *Stevens*, 559 U.S. at 472 (citation modified). We will therefore proceed, as did the district court, to the overbreadth doctrine.[9]

We pause first, though, to address some methodological points. The parties dispute what sources of information the court may consider—and what sources can be sufficient—when assessing the Recruitment Provision under the overbreadth doctrine. Tennessee contends that Welty and Behn cannot satisfy their burden because, by moving for summary judgment when they did, Welty and Behn "chose to skip discovery" and thus failed to develop the factual record.

---

[9]Welty and Behn suggest in passing that we can invalidate the statute as facially unconstitutional *without* proceeding to the overbreadth inquiry because it constitutes viewpoint discrimination, based on the Supreme Court's decisions in two cases involving viewpoint-discriminatory trademark regulations, *Iancu*, 588 U.S. 388, and *Matal v. Tam*, 582 U.S. 218 (2017). But neither of those cases involved a record-established, valid application of the challenged trademark regulations, *see Iancu*, 588 U.S. at 398–99 (discussing *Tam*), and Welty and Behn have not explained how they can avoid satisfying the overbreadth doctrine after conceding at least one constitutional application.

Defs.'s First Br. 38. It concedes, however, that Welty's and Behn's testimonies during the preliminary injunction hearing, as well as their verified complaint, constitute record evidence, and Tennessee ultimately cites no controlling authority requiring the district court to have had more evidence before it than it had before issuing its ruling. On the contrary, in *Village of Schaumburg v. Citizens for a Better Environment*, the Supreme Court affirmed a grant of summary judgment on an overbreadth challenge when the district court record consisted only of pleadings and affidavits. *See* 444 U.S. at 626, 633–39.

There is yet another problem with Tennessee's protestations regarding discovery: it overlooks that the overbreadth test is a *legal* inquiry that reaches well beyond discoverable facts. As the Supreme Court instructed in *NetChoice*, a court must exercise its legal judgment to "determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other," regardless of what record evidence the parties present. 603 U.S. at 718. We have observed that "litigation by hypothetical . . . is sometimes *required*" to complete these tasks. *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc) (citation modified). Tennessee fails to explain how discovery—which pertains to factual evidence within the control of the parties—could have elucidated the "full set of applications," *NetChoice*, 603 U.S. at 718, of the Recruitment Provision. Nor does Tennessee elaborate on how discovery between the parties could have revealed which of these applications are "realistic" and not merely "fanciful." *Hansen*, 599 U.S. at 770. Indeed, Tennessee's observation that "the [preliminary injunction] hearing focused almost entirely on whether the Act applied to Welty's and Behn's specific behavior," Defs.'s First Br. 50, undermines its argument rather than supports it, because details about a party's "specific behavior" are precisely what discovery tends to reveal.[10] Any other information relevant to an overbreadth challenge is, by definition, information about *other* applications and *other* people. *See Hansen*, 599 U.S. at 769–70. When the Supreme Court invalidated a criminal statute under the overbreadth doctrine in *Stevens*, for

[10]The pre-enforcement posture of this case matters too, because sworn testimony about the conduct in which a plaintiff intends to engage represents the full extent of evidence regarding her behavior that is necessary to prevail in a pre-enforcement challenge. *See Susan B. Anthony List*, 573 U.S. at 159. The District Attorneys cite no authority to support the proposition that Welty and Behn, having already presented sworn testimony about their intended conduct at the preliminary hearing (which included cross-examination), were obligated to present the same evidence again in, say, a deposition.

instance, it consulted a variety of sources outside the factual record, including case law, positive law like statutes and regulations, secondary sources like print journalism, and amicus briefs. *See* 559 U.S. at 475–77. The same outward-looking approach is appropriate in evaluating the overbreadth challenge in this case.

*a. The Scope of the Recruitment Provision*

"The first step in overbreadth analysis is to construe the challenged statute" to determine "what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). The Recruitment Provision criminalizes "intentionally recruit[ing] . . . a pregnant unemancipated minor within this state [Tennessee] for the purpose of" "[p]rocuring" an abortion that is illegal in Tennessee, or "[o]btaining an abortion-inducing drug . . . for the purpose of" an abortion that is illegal in Tennessee. § 39-15-201(a). The meaning of this text is a question of Tennessee state law, under which "[t]he most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *State v. Curry*, 705 S.W.3d 176, 184 (Tenn. 2025) (citation modified). Tennessee courts generally apply the natural and ordinary meaning of statutory terms. *See id.*; *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, 574 S.W.3d 832, 839 (Tenn. 2019); *Corum v. Holston Health & Rehab. Ctr.*, 104 S.W.3d 451, 454 (Tenn. 2003); *Bryant v. Genco Stamping & Mfg. Co.*, 33 S.W.3d 761, 765 (Tenn. 2000).

"The ordinary meaning of the verb 'recruit,'" which the Recruitment Provision does not define, "is to seek to persuade, enlist, or induce someone to join an undertaking or organization, to participate in an endeavor, or to engage in a particular activity or event." *Matsumoto*, 122 F.4th at 808. As it appears in the statute, then, "recruit[ing]" can mean any speech that persuades or induces the listener—a pregnant unemancipated minor within Tennessee—to seek abortion care. *See* § 39-15-201(a). The statute further provides that the speaker must engage in the recruitment "intentionally" and "for the purpose of" an unemancipated minor's obtaining an abortion; the minor's decision, in other words, cannot be an accidental or unintended consequence of the recruiting speech. *Id.* As we explained in Section III.A.2, persuasion and inducement can be incredibly subtle acts in the context of speech directed toward a pregnant minor—who, with all the challenges and sensitivities of youth, faces the profoundly difficult and

personal decision of whether or not to carry a pregnancy to term. Nothing in the statutory text supports a distinction between what Tennessee urges us to classify as pre- and post-decision conduct, nor does it require that the minor would not have chosen abortion but for the recruiting conduct. *See id.* Any speech that supports or encourages a minor's consideration of abortion, or her decision to seek an abortion, can constitute "recruitment" within the ordinary meaning of the term and under the statute.

Tennessee characterizes the Recruitment Provision as a "narrow prohibition" of the "intentional targeting of an unemancipated minor to induce or persuade them to obtain an elective abortion without the consent of their parent or guardian." Defs.'s First Br. 39. But this construction cannot stand up to scrutiny. The statute refers not to *elective* abortion—a polemical, value-laden term—but to "an act that would constitute a criminal abortion under § 39-15-213 [Tennessee's abortion ban]." § 39-15-201(a).[11] We decline to opine on the relationship between abortions that are illegal under § 39-15-213 and so-called "elective abortions," a category which is not at issue in this case and, if anything, obfuscates the question of what the statute encompasses.

There are also problems with Tennessee's construction as it relates to parental consent. In the first place, the import of Tennessee's reading is not entirely clear, because whether a minor obtains parental consent does not necessarily control whether an abortion she obtains is legal where she obtains it. In any event, this characterization appears to be based on a misreading of the statute. The Recruitment Provision's sole reference to parental consent is an express carveout from criminal liability for "[a] person who has obtained the written, notarized consent of the unemancipated minor's parent or legal guardian." § 39-15-201(b)(2). The only logical reading of this language is that the Recruitment Provision does not apply to a person who has obtained written and notarized parental consent *for the minor to participate in the recruiting*

[11]The word "elective" does not appear in § 39-15-213 either.

*conduct*, not for the minor to obtain an abortion, because it is the recruiting conduct that the statute criminalizes in § 39-15-201(a), not the abortion itself.[12]

Properly construed, the statute prohibits recruiting a minor to obtain a legal abortion even if the minor does obtain parental consent for the abortion procedure, so long as a parent or legal guardian did not provide written, notarized consent for the recruitment. *See* § 39-15-201. Consider this example. A sixteen-year-old Tennessean has consensual sex with a classmate and becomes pregnant after their birth control method fails. The teenager, frightened and unsure of what to do, confides in her high school guidance counselor, who explains that abortion is safe and legal in Virginia. She leaves the guidance counselor's office having made a tentative decision to obtain an abortion. That evening, the teenager decides to explain the situation to her mother. The mother verbally supports and encourages her daughter's decision, then agrees to take her to Virginia, which is a parental consent state, *see* Va. Code Ann. § 16.1-241(w). When they reach an abortion provider in Virginia, the mother provides her consent as is required under Virginia law, and the daughter obtains a legal abortion. The mother in this hypothetical cannot be prosecuted under the Recruitment Provision due to its carveout for parents and legal guardians, *see* Tenn. Code Ann. § 39-15-201(c)(1). The high school guidance counselor, however, can be prosecuted because the mother did not provide written, notarized consent for the recruiting conduct to take place, § 39-15-201(c)(2). There is nothing in the statute to stop this prosecution; the guidance counselor in this hypothetical has violated the Recruitment Provision, even though the mother in fact supported her daughter's decision when she learned of it, and even though the mother and daughter ultimately complied with Virginia law to obtain a legal abortion.[13] Thus, Tennessee's attempts to construe the Recruitment Provision as a narrow prohibition on recruitment for abortions that take place without parental consent cannot be squared with the statutory text.

---

[12]Indeed, the very enactment of the Recruitment Provision suggests that the people to whom it will apply will rarely be the providers performing abortions, because providers can already be prosecuted for criminal abortion under Tennessee's abortion ban, § 39-15-213, which is a more serious crime (a Class C felony) than abortion trafficking under § 39-15-213(a) (a Class A misdemeanor).

[13]The dissent's response to this illustration ignores its point. We offer this example not to comment on whether the course of action is "troubling," Dissenting Op. at 68, but to clarify how the Recruitment Provision functions in relation to parental consent.

The dissent takes pains to construe the Recruitment Provision narrowly, so that it does not apply to Welty and Behn. Yet it makes little or no effort to explain what kind of speech would violate the statute. It instead strains to analogize the conduct that it prohibits to sex trafficking. Dissenting Op. at 52–53. But many abortions are legal, making that a false analogy at best. It is difficult, moreover, to square this inflammatory framing with the dissent's claimed intent to "lower [the] temperature" of our political discourse. Dissenting Op. at 48. The dissent's analogy fails on its own terms—abortion and sexual servitude are plainly distinguishable. After *Dobbs*, abortion is legal in some states and illegal in others, as the Supreme Court anticipated. *See* 597 U.S. at 232. And Americans have varied and deeply held beliefs regarding the ethics of abortion and the extent to which it should be regulated by law, as the Court has recognized at every turn. *See id.* at 223; *Planned Parenthood of Southeastern Penn. v. Casey*, 505 U.S. 833, 852 (1992); *Roe v. Wade*, 410 U.S. 113, 116 (1973). Sex trafficking, in contrast, is a federal crime. As to the specific context of child sex trafficking (a bugbear the dissent evokes, Dissenting Op. at 52), we cannot think of any jurisdiction that does not criminalize, nor any person of moral character who would not abhor, the exchange of money for statutory rape.

The dissent's analysis evidences its refusal to acknowledge that the Recruitment Provision regulates speech about legal abortions. The statute on its face applies to recruitment for legal abortions, as we discuss in more detail below, *see infra* Section III.B.2.b. Counsel for Tennessee conceded this point during oral argument. *Welty v. Dunaway*, No. 25-5738/5739, Oral Argument at 14:53–15:05 (6th Cir. June 2, 2026). In the dissent's attempts to narrow the reach of the statute, though, it proceeds from a false analogy to child sex trafficking to argue that any speech actually proscribed by the statute is unprotected by the First Amendment because it is integral to criminal conduct. Dissenting Op. at 53. The dissent does not explain how it arrives at this conclusion, and it is hard to see how it could. The criminal conduct exception applies to "speech or writing [that is] used as an integral part of conduct in violation of a valid criminal statute." *Giboney*, 336 U.S. at 498. The criminal conduct in question cannot be what the *challenged* law seeks to criminalize; if it were otherwise, every First Amendment challenge to a criminal statute would fail. Nor can the speech that a challenged statute proscribes be integral to criminal conduct on the basis that it seems, in the dissent's

unsupported supposition, *akin* to other criminal conduct. Dissenting Op. at 52–53. Speech that "recruits" a minor to obtain a legal abortion is not speech integral to criminal conduct.

The Seventh Circuit's recent ruling in *Planned Parenthood v. Commissioner of the Indiana State Department of Health* tracks this logic and rebuts the dissent's. --- F.4th ---, No. 24-2219, 2026 WL 2409722 (7th Cir. Aug. 18, 2026). That case also concerned a pre-enforcement challenge to a state law prohibiting speech associated with a minor's procurement of an abortion, including an abortion lawfully performed in another state. *Id.* at *1. As in our case, the *Planned Parenthood* defendants raised the criminal conduct exception. *Id.* at *9. Also as in our case, the only criminal conduct they identified is that which the challenged statute proscribes, a tautological argument the court sums up as follows: "the speech is illegal because it is illegal." *Id.* The criminal conduct exception, the court held, "demands more," and denying this reality "would undermine First Amendment rights by shielding any statute that criminalizes speech from strict scrutiny solely because the legislature made such speech criminal." *Id.* The court went on to clarify that "an abortion performed lawfully in another state [cannot] serve as the underlying offense" for this exception, either. *Id.* at *10. This is because "[a] state does not have the power to regulate or prohibit lawful activities in another state 'merely because the welfare and health of its own citizens may be affected when they travel to that State.' Any contrary argument disturbs long-held principles of horizontal federalism that confine a state's legislative and police powers to within its own borders." *Id.* (quoting *Bigelow*, 421 U.S. at 824). We agree. *See infra* Section III.C.2.

Through its flawed premises, the dissent presumes that its definition of "abortion trafficking" (which it assures us Welty and Behn do not do) is self-evidently immoral. It even asserts that "the court must agree" there is a clear public interest in prohibiting "abortion trafficking of a minor" and wonders "what [States allowing abortions] would say about providing abortions for minors who were intentionally recruited in another State." Dissenting Op. at 66, 73–74. We do not presume the immorality of the conduct proscribed by a challenged statute, which would be poison to the foundations of judicial review. Nor do we presume the immorality of the actions of other states that provide abortions to the individuals who live there

and to those who do not. Whether states that have legalized abortion decide to welcome individuals from other states seeking abortion is inapposite.

It is also worth again noting, *see supra* Section III.A.1., that there is no "violent agreement," Dissenting Op. at 47, that the Recruitment Provision does not apply to Welty and Behn, nor is there any agreement—violent, peaceful, or defensible—that it is analogous to sex trafficking.

The dissent's constitutional avoidance arguments fare no better. We may "impose a limiting construction on a statute only if it is readily susceptible to such a construction." *Stevens*, 559 U.S. at 481 (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884 (1997) (citation modified)). We may "not rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain and sharply diminish [a legislature's] incentive to draft a narrowly tailored law in the first place." *Id.* (citation modified) (collecting cases). The statutory language of the Recruitment Provision is not readily susceptible to a construction that confines its reach to speech about illegal abortions, because it already expressly applies to speech about any abortion that "would constitute a criminal abortion" in Tennessee, "regardless of where it is to be procured." § 39-15-201(a). The dissent's construction ignores these statutory words save for "criminal abortion," effectively rewriting the statute in contravention of the Supreme Court's guidance. *Stevens*, 559 U.S. at 481. Given that the statute applies to speech about legal abortions, not just illegal ones, at least some of its applications impose content-based restrictions on protected speech. Thus, the dissent's efforts to limit the Recruitment Provision's application to speech about illegal abortions cannot save it from constitutional trouble. Nor can the dissent's attempt to narrow the statute's scienter requirement move the needle of constitutional avoidance, because the statute would still apply to protected speech about legal abortions—regardless of what sort or degree of intent it requires. So that limiting construction cannot save the statute either.

*b. Its Applications*

We now consider the various applications of the Recruitment Provision to assess whether "a substantial number of its applications are unconstitutional, judged in relation to the statute's

plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (citation modified). Start with the unconstitutional application that Welty and Behn's as-applied challenge has already demonstrated: the Recruitment Provision is unconstitutional as applied to speakers who seek to encourage and support minors to obtain legal abortions. This represents a substantial portion of speech to which the statute might apply, such as "encouragement, counseling, and emotional support" or "education about available medical services and reproductive health care." *Matsumoto*, 122 F.4th at 814–15. Such applications could include the speech of adults who occupy a virtually limitless range of roles in a pregnant minor's life (except her parents or legal guardians), as long as they encourage her to obtain a legal abortion. These adults could be an aunt or uncle, grandparent, older sibling, teacher, school counselor, therapist, physician, pastor, youth minister, family friend, mentor, or anyone else a pregnant minor might encounter or herself seek out whose speech might impact her decision. As the adage goes, it takes a village to raise a child. Anyone in that village is capable of "recruit[ing]" her to obtain a legal abortion. § 39-15-201(a).

The parties agree that the Recruitment Provision can be constitutionally applied to speech that recruits a minor to obtain an illegal abortion because such speech would fall within the unprotected class of speech that is integral to criminal conduct. *See Giboney*, 336 U.S. at 498. Yet the text of the Recruitment Provision suggests that most applications will involve recruiting a minor to obtain an abortion that is legal where it is obtained, not an illegal one. After all, the statute's evocation of "trafficking" implies crossing state lines, and its repeated references to "an act that *would* constitute a criminal abortion under [Tennessee's abortion ban]" make plain that it contemplates abortions that are illegal in Tennessee but legal where they are obtained. § 39-15-201 (emphasis added). Had the legislature intended to criminalize the recruitment of minors to obtain illegal abortions only, it could have replaced the above language with, simply, "an illegal abortion." The statute follows these references to "an act that would constitute a criminal abortion under [Tennessee's abortion ban]" with the clarifying language "regardless of where the abortion is to be procured," § 39-15-201(a)(2), or "regardless of where the abortion-inducing drug is obtained," § 39-15-201(a)(3). This language, too, expressly contemplates that the recruited minor will obtain abortion care elsewhere. Indeed, counsel for Tennessee conceded at oral argument that the statutory text contemplates abortions, or abortion-

inducing drugs, that are obtained outside Tennessee, and that it would apply to a person who recruits a minor Tennessean to obtain an abortion in a state like Illinois. *Welty v. Dunaway*, No. 25-5738/5739, Oral Argument at 14:53–15:05 (6th Cir. June 2, 2026).

Imagine that the Recruitment Provision provided, instead, that it applied to the recruitment of minors to obtain abortions in violation of Tennessee's abortion ban, § 39-15-213. Such a statute would likely be surplusage in the Tennessee code, because an adult who recruits a minor to obtain an abortion prohibited under that section could be prosecuted for facilitation, independent of the Recruitment Provision. *See* Tenn. Code Ann. § 39-11-403 (providing that a person who "knowingly furnishes substantial assistance in the commission of [a] felony" is criminally liable for a felony "the class next below the felony facilitated by the person so charged"). This context makes it clearer yet that the Recruitment Provision's express references to § 39-15-213 constitute an *expansion* of Tennessee's criminalization of abortion and abortion-related conduct to speech about abortions that are legal where they are performed. In sum, the most natural reading of the statutory text is that it criminalizes the recruitment of minors to obtain legal abortions.

The fiscal note for § 39-15-201(a) further demonstrates, if there is any doubt, that lawmakers were focused chiefly on speech concerning lawful out-of-state abortions. The note observes that "[a]s of January 24, 2024, there are 36 states and the District of Columbia where abortion is legal in some capacity," notes that "Illinois and Virginia are the closest states to Tennessee with the least abortion restrictions," and proceeds to use data on Illinois abortions for out-of-state residents to estimate the fiscal impact of the statute. R. 29-1, Fiscal Note, PageID 328–30.

Empirical evidence likewise supports the conclusion that applications of the Recruitment Provision to legal abortions will predominate over applications to illegal ones. Welty and Behn cite several secondary sources demonstrating that, after *Dobbs*, rates of abortion fell dramatically in states that banned or severely restricted abortion, while the number of people traveling out of their home states to seek legal abortions "skyrocketed," as did rates of self-managed medication

abortions.[14] They also cite data about abortion rates in Tennessee that reflects these trends. For example, over a six-month period in 2020, before *Dobbs*, 4,045 Tennesseans obtained in-state abortions and 1,095 traveled out of state for abortions; whereas in a six-month period in 2023, after *Dobbs* triggered Tennessee's abortion ban, 5,265 Tennesseans obtained out-of-state abortions and 1,820 obtained medication abortions from out-of-state providers. *#WeCount Report: April 2022 to June 2024* 21, Soc'y of Fam. Planning (Oct. 22, 2024), https://perma.cc/BCC6-6E95. A group of amici states and the District of Columbia, all of which have abortion-protective laws,[15] cite additional sources demonstrating that most Tennesseans who travel out of state for legal abortion care go to Illinois, followed by Virginia and North Carolina. *See* ECF 39, Br. of Amicus Curiae, 14–15.[16] Welty's record testimony about the activities of the fund where she is a board member, ACT—which raises and earmarks funds for Tennesseans to obtain legal abortions in other states—is consistent with these trends. One amicus organization, If/When/How: Lawyering for Reproductive Justice, likewise plays an active role in disseminating information regarding how residents of abortion-banning states can obtain legal abortions by operating a helpline that "provides free, confidential legal services to thousands of people in all 50 states and D.C." ECF 51, Br. of Amicus Curiae, 6–7. If/When/How reports that, since the Recruitment Provision went into effect, its helpline "has provided legal advice to more than 180 people in Tennessee, including people under age 18."

[14]*See* Suzanne O. Bell et al., *US Abortion Bans and Fertility*, 333 JAMA 1324, 1331 (2025), https://jamanetwork.com/journals/jama/fullarticle/2830297; Isaac Maddow-Zimet & Kimya Forouzan, *Stability in the Number of Abortions from 2023 to 2024 in US States Without Total Bans Masks Major Shifts in Access*, Guttmacher Inst. (Apr. 2025), https://perma.cc/4LCV-BRVN; Abigail R.A. Aiken et al., *Provision of Medications for Self-Managed Abortion Before and After the* Dobbs v. Jackson Women's Health Organization *Decision*, 331 JAMA 1558, 1560 (2024), https://jamanetwork.com/journals/jama/fullarticle/2816817; Geoff Mulvihill, *Abortions Rose in 2024 Due to Pills Available Through Telehealth, Report Finds*, PBS News (June 23, 2025), https://perma.cc/CQV6-7M4B.

[15]These include Illinois (authoring the brief), Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, and Washington. ECF 39, Br. of Amicus Curiae, 1.

[16] *See Monthly Abortion Provision Study*, Guttmacher Inst., https://tinyurl.com/bdcpa9h4; Kaitlin Washburn, *Illinois Planned Parenthood Clinics See Uptick in Southerners Seeking Abortions Since Overturning of* Roe, Chi. Sun-Times (June 11, 2024), https://tinyurl.com/u3pftdtf; *Abortion Statistics*, Ill. Dep't of Pub. Health, https://tinyurl.com/3wds99r2; Maddow-Zimet & Forouzan, *Stability in the Number of Abortions from 2023 to 2024 in US States Without Total Bans Masks Major Shifts in Access*, Guttmacher Inst. (Apr. 2025), https://tinyurl.com/yVxsv89e.

ECF 51, Br. of Amicus Curiae, 8. All of this information indicates that, since *Dobbs*, Tennesseans have traveled out of state in significant numbers to seek legal abortions.

Notwithstanding these clear trends, we hesitate to place too much weight on the particularities of abortion access in other states or the details of other states' laws, which are outside the Tennessee legislature's control and continue to evolve. For instance, as of June of this year, medication abortion is legal and available in Missouri. *See Comprehensive Health of Planned Parenthood Great Plains v. State*, No. 2416-CV31931 (Jackson Cnty. Cir. Ct. June 18, 2026). Missouri was initially among the states that banned abortion following *Dobbs*, but in November 2024 (a few months after Tennessee passed the Recruitment Provision), voters approved a state constitutional amendment protecting a "fundamental right to reproductive freedom." Mo. Const. art. 1, § 36. Planned Parenthood then brought suit in Missouri state court challenging the abortion ban and a panoply of other abortion restrictions that remained in that state; the circuit court granted a preliminary injunction and the Missouri Court of Appeals affirmed. *See Comprehensive Health of Planned Parenthood Great Plains v. State*, 726 S.W.3d 716, 723–25, 742 (Mo. Ct. App. 2025). Most recently, on June 18, 2026, the circuit court issued a summary judgment order and final judgment striking down several of Missouri's abortion restrictions, including the total abortion ban and a ban on abortion inducing drugs. *See Comprehensive Health of Planned Parenthood Great Plains*, No. 2416-CV31931. This order has yet to reach the state's higher courts, but as of now, abortion (including medication abortion) is legal and available in Missouri, giving Tennesseans yet another option to obtain legal abortions in a nearby state.[17]

The fate of the Recruitment Provision under the overbreadth doctrine, however, cannot ultimately hinge on the specifics of other states' abortion laws. The Supreme Court has suggested that what warrants the most weight in the overbreadth inquiry is "the principal thing[] regulated," *NetChoice*, 603 U.S. at 726, which here is speech pertaining to abortions that are

---

[17]Planned Parenthood began offering appointments for medication abortions in Missouri on the same day the circuit court's order issued. *See* Press Release, ACLU, *Right to Reprod. Freedom Amend. Delivers: Medication Abortion Restored and Procedural Abortion Access Affirmed in Mo. Following Court Ruling* (June 18, 2026), https://www.aclu.org/press-releases/right-to-reproductive-freedom-amendment-delivers-medication-abortion-restored-and-procedural-abortion-access-affirmed-in-missouri-following-court-ruling.

illegal in Tennessee but legal where they are obtained—wherever and however that may be. No matter the number or proximity of states providing safe and legal abortion care, the Recruitment Provision would still expressly contemplate (and criminalize) recruitment to obtain legal abortions in other states. *See* § 39-15-201; *see also* R. 29-1, Fiscal Note, PageID 328–30. The Recruitment Provision's clear contemplation of out-of-state abortions effectively "allows [Tennessee] to export its laws to the rest of the country." *Stevens*, 559 U.S. at 476.

By its own terms and under Tennessee law, the Recruitment Provision could also apply to out-of-state residents who recruit minor Tennesseans to obtain legal abortions elsewhere. Nothing in the statute limits its application to Tennessee residents. *See* § 39-15-201. And Tennessee's criminal jurisdictional statute permits prosecutions of out-of-state residents who never set foot in Tennessee during the commission of their crimes. *See State v. Lacy*, --- S.W.3d ---, 2026 WL 982142, at *4–7 (Tenn. Apr. 13, 2026) (citing Tenn. Code. Ann. § 39-11-103).[18] Specifically, the jurisdictional statute provides that when an offense is "commenced outside of this state and consummated in" Tennessee, "[i]t is no defense that the person charged with the offense was outside of this state when the offense was consummated, if the person used: (A) [a]n innocent or guilty agent; or (B) [o]ther means proceeding directly from the person." § 39-11-103(b)(2). In its recent *Lacy* decision, the Supreme Court of Tennessee affirmed the defendant's conviction for theft when, "through a series of electronic communications sent from Kentucky, Lacy persuaded the owner of a car dealership in Tennessee to wire him funds for a Mercedes." 2026 WL 982142, at *0.

*Lacy* illustrates the breadth of the extraterritorial applications of the Recruitment Provision. Assume an abortion-rights advocate in Illinois with a website or social media presence provides her contact information to the public.[19] A pregnant minor in Tennessee reaches out to the Illinois advocate through some means of electronic communication. The advocate shares information with the minor about how to obtain a legal abortion in Illinois, or

[18] See David S. Cohen, Greer Donley & Rachel Rebouche, *The New Abortion Battleground*, 123 Colum. L. Rev. 1, 32–33 (2023) (discussing the potential impact of states' criminal jurisdictional statutes for extraterritorial applications of state laws criminalizing abortions or conduct related to procuring abortions for other people).

[19] The analysis in this paragraph would apply equally if the advocate were a provider, or even an agent staffing If/When/How's helpline.

about the different types of abortion treatment that would be available to the minor in Illinois, as well as their safety and efficacy. Based on the advocate's speech, the minor decides to travel to Illinois to obtain an abortion. That Illinois advocate could be prosecuted for violating the Recruitment Provision under § 39-11-103(b). The crime would have been "consummated" in Tennessee because the minor was in Tennessee when she became convinced to seek abortion in Illinois—a completed recruitment—just as the crime in *Lacy* was consummated when the victim wired the money while in Tennessee. *See* 2026 WL 982142, at *6. And because the Illinois advocate "brought about" the consummation of this recruitment through electronic communication, it will be no defense that she was not in Tennessee when that consummation occurred. *Id.* at *6–7; *see* § 39-11-103(b)(2); *see also State v. Berkebile*, No. E2022-01700, 2024 WL 2881089, at *1, *12–13 (Tenn. Crim. App. June 7, 2024) (holding that a person can be convicted of criminally negligent homicide in Tennessee under § 39-11-103(b) when, without setting foot in the state, "he incites, encourages or coerces another person to commit suicide . . . via electronic means").

Applications of the Recruitment Provision to out-of-state residents who recruit minors to obtain legal abortions are unconstitutional several ways over. In addition to discriminating based on content and viewpoint, out-of-state enforcement would violate Supreme Court and Sixth Circuit precedent on the constitutionality of extraterritorial applications of content-discriminating laws. As the Supreme Court explained in *Bigelow*,

> A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State. It may seek to disseminate information so as to enable its citizens to make better informed decisions when they leave. But it may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State.

421 U.S. at 824–25. Similarly, when this court considered "whether the First Amendment protects speech that proposes a transaction lawful in the place where the transaction is to occur when both the underlying transaction and the offer are unlawful in the place where the offer is made," we concluded "that the First Amendment does provide such protection." *Katt*, 983 F.2d at 695. That the Recruitment Provision applies to out-of-state residents significantly enlarges the scope of its unconstitutional applications in comparison to its constitutional ones.

In the face of the Recruitment Provision's sweeping unconstitutional reach, Tennessee musters only a meager rebuttal. Tennessee argues that the provision does not "prohibit[] a substantial amount of protected speech relative to its plainly legitimate sweep," *Hansen*, 599 U.S. at 770 (citation modified), because Tennessee can lawfully regulate "speech that interferes with parental rights." Defs.'s First Br. 44–48. Binding precedent instructs, however, that exclusions from protected speech must be "rooted in history and tradition, and include only those forms of expression that are 'long familiar to the bar' as falling outside the confines of First Amendment protection." *Bible Believers v. Wayne County*, 805 F.3d 228, 244 (6th Cir. 2015) (en banc) (quoting *United States v. Alvarez*, 567 U.S. 709, 717 (2012)). The Supreme Court has repeatedly explained that such categories of unprotected speech are narrow and "limited," and a state legislature cannot invent new ones simply because it "concludes certain speech is too harmful to be tolerated." *Brown*, 564 U.S. at 791 (collecting cases). Tennessee cites no authority for the proposition that such an exception to First Amendment protections for "speech interfering with parental rights" is rooted in this Nation's history and tradition. Nor can it discount the many unconstitutional applications of the Recruitment Provision by reclassifying them under a newly asserted category of unprotected speech infringing on parental rights. The Supreme Court instructed in *Brown*, moreover, that children "are entitled to a significant measure of First Amendment protection," and the government can restrict information given to them "only in relatively narrow and well-defined circumstances." *Id.* at 794 (citation modified). The "legitimate power" of a state "to protect children from harm" does not give the state free rein "to restrict the *ideas* to which children may be exposed." *Id.* (emphasis added).

One final point merits emphasis. None of the unconstitutional applications of the Recruitment Provision is viewpoint neutral. Recruitment is accomplished through speech, and "recruit[ing] . . . a pregnant unemancipated minor" for purposes of obtaining an abortion that would be illegal in Tennessee will necessarily involve the speaker's expression of a view that the state disfavors. § 39-15-201(a); *see Matsumoto*, 122 F.4th at 808. Consider an extreme example. An unemancipated minor in Tennessee becomes pregnant after being raped by her uncle. The minor confides in a trusted adult, with no familial relation, about her pregnancy. The trusted adult has negative views of abortion in most circumstances, but when she hears about this pregnancy, she tells the minor something like this: "You can get an abortion in another state. It

might not be right in most cases, but in your situation, I think it's justified. I'll help you figure out how to do it." Following their conversation, the minor manages to obtain a legal abortion in Illinois. This abortion would be illegal in Tennessee because its abortion ban contains no exceptions for rape or incest. *See* § 39-15-213. If the trusted adult were prosecuted under the Recruitment Provision, she will have been prosecuted for expressing her view that abortion should be allowed in a circumstance involving rape and incest (even if she disfavors abortion in other circumstances). *All* invalid applications of the Recruitment Provisions, then, are "egregious form[s] of content discrimination" from which Tennessee must "abstain." *Rosenberger*, 515 U.S. at 829.

Because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Stevens*, 559 U.S. at 473 (citation modified), we hold that the Recruitment Provision is substantially overbroad and facially unconstitutional.

**C. Scope of Relief**

What remains is whether the district court's injunction exceeded its authority when it enjoined the District Attorneys "from enforcing § 39-15-201(a)'s recruitment provision" under *Ex Parte Young*, 209 U.S. 123 (1908). R. 81, Mem. Op. & Order, PageID 1131–32.

As a general matter, federal courts should exercise restraint when fashioning injunctions. The Supreme Court held in *Trump v. CASA, Inc.* that the Judiciary Act of 1789 does not authorize federal courts to issue injunctive relief that is "broader than necessary to provide complete relief to each plaintiff with standing to sue." 606 U.S. 831, 841 n.4, 861 (2025). The Court thus reasoned that "universal injunctions"—those which "prohibit enforcement of a law or policy against *anyone*"—are likely impermissible under the 1789 act, unless such an injunction is necessary to afford complete relief. *Id.* at 837, 854. Our precedent likewise supports the principle that federal courts generally "must operate in a party-specific and injury-focused manner," such that "[a] court order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023) (citation modified); *see also Commonwealth v. Biden*, 57 F.4th 545, 556–57 (6th Cir. 2023). *CASA* leaves open the

possibility, however, that these general principles may not apply in all contexts. *See CASA*, 606 at 847 n.10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."). We are not convinced that *CASA* controls the injunction in this case.[20]

1. Remedies and the Overbreadth Doctrine

Broader violations justify broader remedies. As the Supreme Court explained in *Citizens United v. Federal Election Commission*, which invalidated a campaign finance regulation as facially unconstitutional, "the distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court." 558 U.S. 310, 331 (2010). The overbreadth doctrine does more than consider the full scope of a statute's applications in the abstract; rather, it is specifically intended to "vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Hansen*, 599 U.S. at 769–70 (citing *Williams*, 553 U.S. at 292). To accomplish this purpose, the doctrine provides an exception to "the usual rule [of prudential standing, which] is that a party may assert only a violation of its own rights," *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988), thereby "allow[ing] a litigant" to reach beyond the scope of her own Article III injury, *Hansen*, 599 U.S. at 770. *See Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349–50 (6th Cir. 2007). Binding precedent directs courts to "invalidate such statutes in their entirety to prevent a chilling effect, whereby speakers self-censor protected speech to avoid the danger of possible prosecution." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1054 (6th Cir. 2015) (citation modified) (citing *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003); *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

In other words, when a court determines that "a substantial number of [a challenged statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate

[20]In addition to the reasons explained in the following subsections, the procedural context of a district court's injunction may matter. Both *L.W.* and *Commonwealth*, for instance, were decided at the preliminary injunction stage. In *L.W.*, we held that the district court's issuance of preliminary injunctions that applied to non-parties was improper because the plaintiffs had not shown a sufficient likelihood of success on their facial challenge, "and that by itself undercuts the preliminary injunctions." 83 F.4th at 489–90. *Commonwealth* likewise justified its invalidation of a universal injunction based on the preliminary posture of that case. *See* 57 F.4th at 557. Both cases are therefore distinguishable from this one based, at minimum, on their preliminary injunction posture.

sweep," the overwhelming weight of Supreme Court precedent counsels that the court should issue an injunction that vindicates the rights of non-parties. *Stevens*, 559 U.S. at 473 (citation modified); *see Hicks*, 539 U.S. at 119–20. That is exactly what the district court did in this case. And nothing in *CASA* addresses, let alone forecloses, the propriety of a broad injunction like this one in the First Amendment overbreadth context. *See generally* 606 U.S. 831.

It is a distortion of Supreme Court precedent to suggest otherwise. In a strained effort to construe *CASA* as addressing overbreadth, Tennessee relies on a passing citation to a single case that predates the Court's most definitive statements regarding the overbreadth doctrine—*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975). *Doran* involved a challenge to a local ordinance in the town of North Hempstead, New York, that prohibited topless dancing. *See id.* at 924. *CASA* cites the following language from *Doran*: "'[N]either declaratory nor injunctive relief,' we have said, 'can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.'" 606 U.S. at 844 (quoting 422 U.S. at 931) (alteration in original). Tennessee construes *CASA*'s citation of this language as an implied repudiation of the overbreadth doctrine's remedial power, claiming that, in *Doran*, "the Court deemed a law overbroad, yet limited the injunction to the parties," Defs.'s First Br. 58.

This is wrong. The Court did no such thing in *Doran*, and neither it nor *CASA*'s citation of its language can bear the weight of Tennessee's argument, for several reasons. In the first place, *Doran* issued no definitive holding on whether the topless dancing ordinance was overbroad because it came to the Court on a motion for a preliminary injunction, and the Court held only that the district court did not err in finding the challengers likely to succeed on the merits of their First Amendment claim. *See* 422 U.S. at 932–34. Second—and crucially here—the preliminary injunction at issue in *Doran* was party-specific from the start: the district court enjoined the defendant "pending the final determination of this action . . . from prosecuting *the plaintiffs* for any violation of" the topless dancing ordinance. *Id.* at 926 (alteration in original) (emphasis added) (citation modified). On appellate review, both the Second Circuit and the Supreme Court affirmed that injunction as written—so the Court in no way "limited" the injunction, as the District Attorneys claim. *See id.* at 926, 934. The language Tennessee cites

from *Doran* was therefore dicta insofar as it can be interpreted to speak on non-party injunctions, because there was no such injunction at issue in that case. *See id.*

Third, Tennessee's reliance on that language takes it out of context and obscures the wholly unrelated reason that the *Doran* Court had occasion to consider whether an injunction might apply beyond "particular federal plaintiffs." *Id.* at 931. In addition to an overbreadth challenge, *Doran* involved an abstention issue under *Younger v. Harris*, 401 U.S. 37 (1971), because there were pending state court prosecutions against some of the plaintiffs. The Court held that *Younger* barred preliminary relief for those plaintiffs, though it affirmed the preliminary injunction as it applied to the remaining plaintiffs. *Doran*, 422 U.S. at 927–31. *CASA*'s citation to *Doran* also takes it out of this context, but contrary to what Tennessee suggests, nothing about *CASA*'s citation of the *Doran* language suggests that it posits anything about the overbreadth doctrine specifically. *See CASA*, 606 U.S. at 844. Rather, *CASA* evokes this language, without elaborating on *Doran*'s substantive context, merely as support for the general proposition that "early refusals to grant relief to nonparties are consistent with the party-specific principles that permeate our understanding of equity," *id.*, and no more. Thus, *CASA* does not dispense with the "expansive remedy" the overbreadth doctrine provides. *Hicks*, 539 U.S. at 119.

2. <u>Federalism and Abortion Regulation</u>

As the extraterritorial applications of the Recruitment Provision suggest, its viewpoint-discriminatory regulation of speech threatens to undermine the powers of other states to protect the First Amendment rights of their own residents. *See Bigelow*, 421 U.S. at 824–25; *Katt*, 983 F.2d at 695. Along the same lines, amici abortion-protective states, all of which "permit abortion care that would be illegal in Tennessee," argue that the Recruitment Provision threatens their own sovereign interests:

> Tennessee is entitled to make choices that differ from amici States' own as to whether its residents are able to access legal abortion care within that State. But it is not entitled to threaten the ability of either its residents or the residents of amici States to provide counseling and information about legal abortion care.

ECF 39, Br. of Amici Curiae, 7, 24. And Tennessee itself recently defended its own sovereignty by employing a comparable argument. As amicus curiae in a case pending before the Supreme

Court, it contended that certain remedies available under Colorado common law infringe on Tennessee's sovereignty. Br. for Tennessee as Amicus Curiae in Support of Petitioners, *Suncor Energy (U.S.A.) Inc. v Cnty. Comm'rs of Boulder Cnty.*, No. 25-170.

The Supreme Court's reasoning in *CASA*, which addressed an executive order about national immigration policy, is primarily concerned with the powers of federal courts to issue universal injunctions against co-equal branches of the *federal government*. *CASA*'s language repeatedly demonstrates this focus: *e.g.*, "[w]hen a district court issues a universal injunction, thereby halting the enforcement of federal policy, the Government says that it has little recourse but to proceed to the court of appeals for an emergency stay," 606 U.S. at 856; "[w]hen a federal court enters a universal injunction against the Government, it improperly intrudes on a coordinate branch of the Government and prevents the Government from enforcing its policies against nonparties," *id.* at 859 (citation modified); or, as the majority states in its conclusion, "federal courts do not exercise general oversight of the Executive Branch; . . .[w]hen a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too," *id.* at 861. Such reasoning predominates the Court's opinion, even though it cites a few examples of injunctions against state laws as part of its analysis of its historical analysis. *See* 606 U.S. at 839–40, 843.

A federal court's relationship to a state is one of vertical federalism, reflecting the federal government's elevated power over the states under the Supremacy Clause. *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. 316 (1819). A federal court's relationship to another branch of the federal government, however, reflects co-equal powers. The relationships among states are characterized by horizontal federalism, reflecting their co-equal sovereignty. *See, e.g.*, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023). The Supreme Court's reasoning in *CASA* manifests a concern that universal injunctions issued by federal courts against federal laws or policies risk disturbing the balance of powers between co-equal branches. *See* 606 U.S. at 861. The same concern does not apply to a federal court's injunction that enjoins enforcement of a state law against non-parties. On the contrary, the Supremacy Clause and its attendant federalist principles suggest that broad injunctions against unconstitutional state laws can *protect* the boundaries of horizontal federalism, especially when a state law risks intruding on the sovereign

powers of its peers. Tennessee's Recruitment Provision is thus an exceptional content regulation that warrants the broad remedy ordered by the district court because, in addition to being facially overbroad, it threatens the sovereignty of other states. As the Supreme Court instructed in *Bigelow*, which concerned a print advertisement in a Virginia newspaper about the availability of legal abortions in New York, "[a] State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State." 421 U.S. at 824; *see also Katt*, 983 F.2d at 695. This still holds true when the speech's recipient is a minor. *See Planned Parenthood*, 2026 WL 2409722, at *15 (observing that *Bigelow*'s advertisements "appear to have been equally available to adults and minors" and citing Supreme Court and Seventh Circuit reasoning that "weighs against efforts to deny minors the benefit of *Bigelow*").

The dissent argues that *Bigelow* is distinguishable because it was decided at the time when the Supreme Court recognized a constitutional right to abortion under *Roe v. Wade*. The dissent claims this context meant that Virginia "did not—indeed, could not—prohibit the abortions described by the advertisement," Dissenting Op. at 64. That is no distinction at all, because Virginia *still* cannot prohibit abortion in New York. When the *Dobbs* Court said its overturning of *Roe* would "return the issue of abortion to the people's elected representatives," 597 U.S. at 232, it did not mean that the issue of abortion in New York should be "return[ed]" to representatives elected by the citizens of Virginia. Yet what the dissent implies here, as well as in its persistent and otherwise unexplainable refusal to accept that the Recruitment Provision applies to legal abortions, is that Tennessee can in fact prohibit abortion in other states. This is a shocking proposition. But—fortunately for the federalist pillars of our constitutional democracy—it is also a false one.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the Recruitment Provision is unconstitutional as applied to Welty and Behn, and that it is substantially overbroad on its face. We therefore **AFFIRM** the district court's grant of summary judgment to Welty and Behn on the First Amendment claims, without reaching the vagueness claim. We further **AFFIRM** the district court's permanent injunction as written.

---

**DISSENT**

---

SUTTON, Chief Judge, dissenting. The court, I fear, makes this free-speech case more difficult than it is. In 2024, Tennessee enacted a law that prohibits the "abortion trafficking of a minor." The law prohibits individuals from "intentionally recruit[ing], harbor[ing], or transport[ing]" pregnant minors living in Tennessee for one of three purposes: (1) to "conceal[]" an illegal abortion from the parents; (2) to "procur[e]" an abortion in violation of Tennessee law, whether the abortion occurs in Tennessee or elsewhere; or (3) to "obtain[]" an "abortion-inducing drug" for the minor to get an abortion banned by Tennessee law.

Rachel Welty and Aftyn Behn, the two plaintiffs in the case, are abortion-rights advocates. They do not challenge the ban on harboring or transporting pregnant minors to obtain abortions banned by Tennessee law. They instead challenge only the ban on intentionally recruiting minors to obtain abortions in violation of Tennessee law, whether the minors ultimately procure the abortion in the State or elsewhere.

Yet the law does not cover their abortion counseling efforts. Welty admits that her "goal" in speaking with minors "is never to persuade someone" to get an abortion. R.35 at 24. And Behn admits that she merely "provid[es]" minors "information so that they can make an informed decision." R.35 at 44. Their work, in short, is pro-choice, not pro-abortion. All they want to do is to continue to advocate in favor of changes to abortion policy in Tennessee and to provide counseling—information that would inform the individual's decision whether to obtain an abortion—to pregnant minors and adults. On the other side of the case sits the State of Tennessee and its district attorneys. They agree that the plaintiffs' past abortion counseling and planned future counseling do not violate the statute. Leaving no room for doubt, they disclaim any desire to prosecute the plaintiffs under the new law for their counseling and information-providing activities.

Yet this violent agreement about the narrow scope of the law has somehow prompted a decision by the court to invalidate it universally—which is to say on its face, across the board, in

all of its applications. How could a case that barely amounts to a "case" under Article III and one that a skilled mediator ought to be able to resolve in two hours lead to a ruling of unconstitutionality and a form of relief—a universal injunction—that the U.S. Supreme Court just one year ago called a "sweeping" overreach? *Trump v. CASA, Inc.*, 606 U.S. 831, 843 (2025). Because I see consensus where the court sees conflict, because the best reading of the statute permits plaintiffs' counseling speech and actions, and because at all events longstanding constitutional avoidance principles require us to minimize rather than maximize any potential constitutional conflict, I would resolve this case by giving both parties what they want. For the plaintiffs, that means they may continue to do the only things they claim an interest in doing, because the law does not apply to mere advocacy and counseling but only to intentionally recruiting Tennessee children—at a minimum inducing them—to obtain abortions banned by Tennessee law. For the State, that means upholding the law after clarifying its narrow scope. While we judges often lament the heated political conflicts of our times, we sometimes miss opportunities to lower that temperature rather than to increase it.

I.

*Standing.* The astute reader might wonder how the plaintiffs could have an Article III stake in this free-speech dispute if the law does not cover their conduct and if the district attorneys disclaim any desire to prosecute them under the law. The answer turns on the difference between an arguable reading of a law and the best reading of a law. To have standing to bring a claim in federal court, Welty and Behn must show that they suffered an injury in fact, that the Tennessee law caused their injury, and that a decision in their favor would redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The key debatable point is whether the law in fact injures them. Because Welty and Behn lodged a pre-enforcement challenge, they merely need to show that the Act "arguably" applies to their allegedly protected speech. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162–63 (2014). While the point is close, I agree with the court that the "intentional[] recruit[ment]" banned by the Act could arguably cover their abortion counseling. Tenn. Code Ann. § 39-15-201(a). This arguable reading of the law also suffices to establish a credible threat of liability given the law's authorization of criminal *or* civil enforcement. *Id.* § 39-15-201(b), (e); *see Susan B. Anthony*,

573 U.S. at 159. But an arguable reading of a law differs from the best reading of a law, and that is where Welty and Behn's claim flounders.

II.

*The best reading of the law eliminates the claimants' free-speech concerns.* Take a look at what the Act says:

> (a) An adult commits the offense of abortion trafficking of a minor if the adult intentionally recruits, harbors, or transports a pregnant unemancipated minor within this state for the purpose of:
>
> (1) Concealing an act that would constitute a criminal abortion under § 39-15-213 from the parents or legal guardian of the pregnant unemancipated minor;
>
> (2) Procuring an act that would constitute a criminal abortion under § 39-15-213 for the pregnant unemancipated minor, regardless of where the abortion is to be procured; or
>
> (3) Obtaining an abortion-inducing drug for the pregnant unemancipated minor for the purpose of an act that would constitute a criminal abortion under § 39-15-213, regardless of where the abortion-inducing drug is obtained.

Tenn. Code Ann. § 39-15-201. "Criminal abortion" means "the use of any instrument, medicine, drug, or any other substance or device with intent to terminate the pregnancy of a woman known to be pregnant with intent other than to" protect the life of the mother or to terminate a failed pregnancy. *Id.* § 39-15-213(a)(1), (c)(1)(A). The Act reaches only recruitment of a minor without her parents' consent: It "does not apply to" any "person who has obtained the written, notarized consent" of the minor's parent or guardian. *Id.* § 39-15-201(c)(2).

The plaintiffs challenge only the recruitment provision. They do not contend that the ban on harboring or transporting minors to locations within or outside the State to obtain Tennessee-banned abortions violates their free-speech rights. As to the targeted recruitment provision, an adult violates this aspect of the Act's "abortion trafficking" ban only by "intentionally recruit[ing]" a minor "for the purpose of" concealing the abortion from the parents, procuring a Tennessee-banned abortion in the State or outside of it, or obtaining an abortion-inducing drug to end the pregnancy. *Id.* § 39-15-201(a).

The Act's leading words ("recruit," "intentionally," "for the purpose of" obtaining an illegal "abortion") and its summary of those words ("abortion trafficking") all show that the statute trains its sights on a narrow range of speech and conduct. What's required are words and actions designed to induce, convince, coerce, or bend the will of a minor to obtain an abortion banned by Tennessee.

Consider each word and the context in which it appears.

"Recruit." The "natural and ordinary meaning" of the term, Tenn. Code Ann. § 1-3-105(b), captures the key theme of the prohibition: inducing someone to engage in a specific act or at least seeking to do so. Here's how one dictionary defines the term: "To induce or enlist (a person) to participate or provide assistance." *Recruit*, Oxford English Dictionary (online ed. 2026) (def. 4g). Here's another: "To hire or enroll, or to seek to hire or enroll (new employees, members, or students)." *Recruit*, American Heritage Dictionary of the English Language (5th ed. 2011) (def. 2). And another: "[T]o enlist (new members), as for a party or organization" or "to seek to enroll (students)." *Recruit*, Webster's New World College Dictionary (5th ed. 2014) (defs. 3a, 5). And still another: "[T]o seek to enroll," such as "prospective students." *Recruit*, Merriam-Webster's Collegiate Dictionary (11th ed. 2004) (def. 1d).

What these definitions of recruit have in common, what a "fair reading" of the statutory text demonstrates, Antonin Scalia & Bryan A. Garner, *Reading Law* 33 (2012), is that the term covers only efforts to induce, seek, coerce, or bend the will of someone to do something. *See United States v. Hill*, 963 F.3d 528, 533 (6th Cir. 2020). Think of a college fraternity, which might recruit members by hosting events designed to "sell . . . the fraternity" and encourage other students to join it. *Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*, 502 F.3d 136, 142 (2d Cir. 2007). Or imagine how the U.S. Army might recruit troops by visiting schools and identifying and attracting potential candidates. *See, e.g.*, *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006); *About USAREC*, U.S. Army Recruiting Command (last visited Aug. 13, 2026), https://tinyurl.com/23w4j62k. Or consider even how a gang might recruit members by "lur[ing] susceptible" people into its fold and "[s]upplanting other influences" in their lives. *United States v. Chan*, 645 F. Supp. 3d 71, 73 (E.D.N.Y. 2022).

In each of these examples, "recruit" refers to speech and actions designed to convince someone to engage in a specific activity—to join the fraternity, the Army, or the gang.

"Intentionally" and "for the purpose of." The Act's state-of-mind requirements reinforce the significant, but narrow, reach of the law. The Act doesn't stop with recruit. It requires the adult to "intentionally recruit[]" a minor "for the purpose of" concealing an abortion from the parents, procuring an illegal abortion, or obtaining an abortion through a pregnancy-ending drug. Tenn. Code Ann. § 39-15-201(a). That narrows still further the conduct the Act covers. Culpable adults must intend—have the "conscious objective or desire"—to recruit someone. *Id.* § 39-11-302(a); *cf. United States v. Williams*, 553 U.S. 285, 294 (2008). They must intend that someone to be a minor. *See* Tenn. Code Ann. § 39-11-301(a)–(b); *State v. Bible*, 2024 WL 3519982, at *5 (Tenn. Crim. App. July 24, 2024); *cf. Williams*, 553 U.S. at 294. And they must intend to recruit that minor "for the purpose of" concealing the abortion from the parents, procuring an abortion that Tennessee law prohibits, or obtaining an abortion-inducing drug to end a pregnancy. Tenn. Code Ann. § 39-15-201(a); *see State v. Clark*, 452 S.W.3d 268, 298 (Tenn. 2014).

"Abortion trafficking." Eliminating any doubt left by these specific words, the statute summarizes the conduct targeted by the Act with a name—"abortion trafficking"—that confirms that it covers a significant, but circumscribed, range of activity. One does not lightly connect advocacy for reproductive autonomy with abortion trafficking of minors, just as one would not, for example, connect advocacy for sexual freedom with sex trafficking of minors or advocacy for medical services for those suffering from gender dysphoria with trafficking in gender-altering surgeries for minors.

The neighboring terms of the Act show why the legislature described the law as a ban on "abortion trafficking." The Act not only bans intentionally recruiting, but it also bans intentionally "harbor[ing]" and "transport[ing]" a minor to conceal an abortion or to procure an abortion. Tenn. Code Ann. § 39-15-201(a). To "harbor" means to "serve as, or provide, a place of protection to; shelter or house; conceal or hide." *Harbor*, Webster's New World College Dictionary (5th ed. 2014) (def. 1). To "transport" means to "carry from one place to another, esp. over long distances." *Transport*, Webster's New World College Dictionary, *supra* (def. 1).

The "obvious common feature" uniting these three verbs is that they describe conduct intended to induce a minor to obtain an abortion, to hide the activity from the parents, and to take the individual to a place to obtain the abortion. *Flade v. City of Shelbyville*, 699 S.W.3d 272, 286–87 (Tenn. 2024). Put together, the terms cover the steps from start to finish that an adult would take to urge a minor to obtain an abortion without the parent's consent and to facilitate that action. *Cf. Williams*, 553 U.S. at 294.

All of this accords with how courts have interpreted anti-trafficking provisions in other statutes. A good place to start is Tennessee's sex-trafficking statute. It bans anyone from "[r]ecruit[ing], entic[ing], harbor[ing], [or] transport[ing] . . . another person for the purpose of providing a commercial sex act." Tenn. Code Ann. § 39-13-309(a)(2). As understood by Tennessee courts, the statute bans targeted conduct and words to induce or coerce another person to provide commercial sex. *See, e.g.*, *State v. Ward*, 2020 WL 974193, at *4 (Tenn. Crim. App. Feb. 27, 2020).

The same goes for a pertinent federal law: the Trafficking Victims Protection Act. It criminalizes knowingly "recruit[ing], entic[ing], harbor[ing], [or] transport[ing]" a minor for commercial sex. 18 U.S.C. § 1591(a). A person of "ordinary intelligence" would understand that a person recruits another under the law if they "identify, contact, and persuade them" to make a particular choice. *United States v. Lazzaro*, 129 F.4th 514, 526 (8th Cir. 2025); *see Noble v. Weinstein*, 335 F. Supp. 3d 504, 517 & n.6 (S.D.N.Y. 2018).

So also for similar statutes that other States have enacted. Consider Massachusetts: To recruit a person for commercial sex, the defendant must "engage[] in conduct aimed at alluring, attracting, tempting, or persuading the victim to engage in commercial sexual activity." *Commonwealth v. Garafalo*, 256 N.E.3d 621, 628 (Mass. 2025); *see* Mass. Gen. Laws ch. 265, § 50(a)(i). Or Michigan: To recruit a minor to commit a felony, the adult must engage in "conduct [to] attract[] a minor or ask[] a minor to commit or attempt to commit the felony." *People v. Pfaffle*, 632 N.W.2d 162, 172 (Mich. Ct. App. 2001) (per curiam); *see* Mich. Comp. Laws § 750.157c. Or Iowa: To recruit a minor for the purpose of facilitating the transfer of drugs, the defendant must "seek out a person to perform" that task. *State v. Cartee*, 577 N.W.2d 649, 652 (Iowa 1998) (quotation omitted); *see* Iowa Code § 124.406A. Or California: To recruit

someone for a street gang, the defendant must "fill up the gang with new members including that target" or "seek to enroll the target in the gang." *People v. Martinez*, 269 Cal. Rptr. 3d 430, 443 (Ct. App. 2020); *see* Cal. Penal Code § 186.26(a). These laws all require targeted efforts to induce or coerce someone to do something.

All pertinent perspectives considered—the targeted "recruitment" language of the Act, its context in an "abortion-trafficking" ban, and the narrow scope of other anti-trafficking laws in Tennessee and elsewhere—show that Welty and Behn have nothing to worry about if they continue to provide abortion counseling to minors in Tennessee. Providing information about abortion to minors is one thing; recruiting minors to obtain an abortion is quite another.

So construed, the Act does not violate the First Amendment. That is because the First Amendment's directive—"Congress shall make no law . . . abridging the freedom of speech"—does not prohibit States from regulating the use of language to solicit crimes. *United States v. Hansen*, 599 U.S. 762, 783 (2023). Because "[s]peech intended to bring about a particular unlawful act has no social value . . . , it is unprotected." *Id.* Much like threats and fraud, solicitation to "'induc[e]' a target to violate the law" falls outside of the First Amendment's ambit. *Id.* (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). A drug distributor and a drug solicitor do not have free-speech rights to sell or buy illegal drugs. *Williams*, 553 U.S. at 298. Neither does a sex trafficker have the right to leverage the First Amendment to immunize his conduct. *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000). Just as the claimants and the court accept that other anti-trafficking laws do not violate the free-speech rights of anyone, so too Tennessee's anti-abortion-trafficking law does not violate anyone's free-speech rights. The best reading of this Act in the end eliminates any free-speech concerns. If the kinds of words used in "recruiting" individuals for actions that violate other anti-trafficking statutes are not protected by the First Amendment, it follows that those words are not protected here either.

Speaking of words, Welty and Behn's own words show that the statute does not cover their counseling and advocacy efforts. Consider their many statements made in this litigation. Welty admits that her "goal as an advocate is never to persuade someone. It is to give them options and then let them make their own decision." R.35 at 24. She realizes that giving

"accurate information" to minors about abortion may be "persuasive to some of them" and may "increase the likelihood they choose abortion." R.35 at 31. But she does not claim a desire to recruit them. If a minor chooses to obtain an abortion, she "support[s] and encourage[s] that decision" and "connect[s] them with resources," including information about out-of-state options and abortion pill options. R.35 at 9, 24–25. In addition to these counseling activities, Welty advocates for abortion-related issues across Tennessee, "show[ing] up to a lot of marches" and "giv[ing] speeches" and speaking to "a lot of reporters." R.35 at 19.

Behn is a social worker and elected representative in the Tennessee General Assembly. She admits that she merely "provid[es]" minors "information so that they can make an informed decision." R.35 at 44. Behn more fully describes her counseling as "providing" to her clients "information so that they can make an informed decision and ensuring that the space that [she offers] and the professional advice is one that doesn't make them feel . . . that harm will come from this decision." R.35 at 44. To this point, she tries "to leave it as open and inclusive a space as possible so that they feel they have met the decision to the best of their ability." R.35 at 44. As a representative, Behn is an advocate for abortion rights and is often "solicited by families . . . asking about the legal status of abortion access in Tennessee and how they can access truthful and accurate information about the resources that exist." R.35 at 39.

All in all, Welty and Behn's abortion counseling and advocacy, in their own words, do not include efforts to induce Tennessee minors to obtain abortions without their parents' knowledge, within the State or outside the State. In providing information about abortion options and in allowing minors to "make [their] own decision[s]," R.35 at 24, 56, they are committed pro-choice advocates. But they do not, in the words of the statute, claim to "intentionally" "recruit[]" minors to obtain abortions or otherwise engage in abortion "trafficking" of minors without parental consent. Tenn. Code Ann. § 39-15-201(a), (c)(2).

That should be the end of this case, and it should take less than ten pages to say so. Yes, the claimants (barely) have standing to challenge the Act. But no, the Act does not cover their proposed speech or conduct. In the absence of a limitation on the words they plan to use, their free-speech case disappears.

But that is not the only flaw in this challenge. Still more follow.

*Constitutional-avoidance principles confirm the best reading of this anti-trafficking law.* In a challenge to the constitutionality of a democratically enacted law, our job is not only to give the words on the page a fresh read. It's also to limit rather than aggravate any potential conflict between the statute and the higher law of a state or federal constitution. If a potential fork in the road appears in a challenged law, it's our job to pick the road more traveled, the one that the free-speech principles of the U.S. Constitution permit rather than potentially bar. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

Tennessee courts, no surprise, adhere to these constitutional-avoidance principles, so venerable that they emerged only shortly after the State's entry into the Union. *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (Marshall, C.J.). If any reasonable interpretation exists that avoids constitutional conflict, it is the Tennessee courts' duty—and ours as well—to adopt it. *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 529–30 (Tenn. 1993). This interpretation of the Act, in the words of the Tennessee Supreme Court, has the "saving grace of common sense" because it respects both the Act's text and Tennessee's practice of eliminating potential constitutional problems rather than magnifying them. *State ex rel. Maner v. Leech*, 588 S.W.2d 534, 540 (Tenn. 1979). A broader interpretation—applying the law to any provided information that might influence a minor's decision—would draw the Act "beyond its intended scope" and into potential conflict with free speech and other constitutional guarantees. *See Harrison v. Harrison*, 643 S.W.3d 376, 380–81 (Tenn. Ct. App. 2021) (quotation omitted).

The United States Supreme Court, no surprise either, continues to enforce these constitutional-avoidance principles, including in free-speech cases just like this one. Take the recent decision in *United States v. Hansen*. It addressed whether a criminal prohibition on "encourag[ing] or induc[ing]" illegal immigration amounted to "a narrow prohibition covering solicitation and facilitation of illegal conduct" or "a sweeping ban" that reached everyday speech. *Hansen*, 599 U.S. at 766, 768 (alterations in original) (quotation omitted). The Ninth Circuit had opted for the broad reading as the one closer to "ordinary meaning" and held the law facially overbroad on that basis. *Id.* at 775. The Court objected. Adopting the "most expansive

reading possible" of a law, the Court explained, amounts to creating a "canon of constitutional collision" rather than constitutional avoidance. *Id.* at 781 (quotation omitted).

Turn to *United States v. Williams*. A jury convicted Williams for "knowingly" "promot[ing]" images of child pornography. *Williams*, 553 U.S. at 289–90. Williams argued, and the Eleventh Circuit agreed, that "promoting" extended beyond "the recommendation of a particular piece of child pornography" to include protected "abstract advocacy." *Id.* at 299–300. Instead of using the statute's "knowing" element to narrow the reach of the statute, the lower court relied on a hypothetical to trivialize it. *Id.* at 301. The Court objected. It held that the term's susceptibility to "multiple and wide-ranging meanings" must give way to the "more precise content" indicated by the scienter requirement and "the neighboring words" in the statute. *Id.* at 294. That a statute "might cover" protected activity is an occasion for a narrowing construction, the Court explained, not for "summon[ing] forth an endless stream of fanciful hypotheticals" to invalidate the law. *Id.* at 301, 302. So true.

These are not recent insights, as the Court conducted a similar analysis over forty years ago in *Brockett v. Spokane Arcades*, 472 U.S. 491 (1985). Washington criminalized the public sale of pornography, defined to cover material that "incites . . . lust." *Id.* at 494 (quotation omitted). At issue was whether "incit[ing] . . . lust" amounted to shorthand for unprotected obscenity or took on a "far broader" meaning. *Id.* at 499. The Ninth Circuit opted for the broader reading, leveraging this interpretation to invalidate the law across the board. *Id.* The Court objected. It explained that the lower court had cherry-picked definitions to transform a permissible limitation on speech into a free-speech violation. *Id.* at 500 & n.10. "Facial invalidation of the statute" was particularly "improvident," the Court added, given "two of the cardinal rules governing the federal courts: 'one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Id.* at 501 (quoting *Liverpool, N.Y. & Phila. S.S. Co. v. Comm'rs of Emigration*, 113 U.S. 33, 39 (1885)).

There is no mistaking the teaching of these free-speech cases. As the Tennessee cases and the U.S. Supreme Court cases confirm, our job is to accept reasonable limiting

interpretations of laws, not "stack[] the deck" in order to "manufacture conflict." *Hansen*, 599 U.S. at 775, 781. Consistent with these cases, a fair reading of the words of the Act, the context in which those words appear, and the constitutional-avoidance canon all point in one direction: The recruitment provision covers only those actions purposely designed to induce a minor to obtain an abortion.

Welty and Behn resist this clarification of the narrow scope of the statute, claiming that someone can recruit "without an intent to persuade." Second Br. 23. By way of example, they point to a college football coach "insisting" a potential recruit "should make whatever decision is best for him." *Id.* The illustration hurts more than helps their cause. One reason is that, in most college football programs, the coach is not intentionally recruiting the individual to do something illegal. The other reason is that it is the rare football coach who does not want, and does not try to get and indeed induce, a recruit to join his team. It may be that the coach, at the end of the recruiting process, says to the recruit to "make whatever decision is best for him." But by then, the coach has already explained what is "best" for the potential recruit, with lots of incentives and inducements to boot, and the recruiter (wisely) lets the recruit make the final choice in view of the facts and far-from-subtle arguments already on the table. Welty and Behn do not help their case by saying the statute extends to the kinds of recruiting college football coaches engage in: inducing, arguing, persuading, even will bending.

My narrow interpretation of the Act, for what it's worth, is the same meaning that Welty and Behn ascribe to "recruit" in sex-trafficking statutes. As their brief succinctly puts it, such laws use "recruit" to mean "enlistment of a victim to . . . perform a certain criminal task." Fourth Br. 16 (citing *United States v. Snead*, 2022 WL 17975015, at *1, *3 (4th Cir. Dec. 28, 2022) (per curiam)). Just so here. Although Welty and Behn note that "recruit" could take on different meanings in different statutes, this reality does not make it unreasonable to interpret the same word to have the same meaning across trafficking statutes. *United States ex rel. Chi. Refrigerator Co. v. Interstate Com. Comm'n*, 265 U.S. 292, 295 (1924).

Welty and Behn contend that the Act's specific-intent requirement does not have any bite. They point to the general definition of "intentional" under Tennessee law, which includes a "desire to engage in the conduct." Tenn. Code Ann. § 39-11-302(a). Any speech that falls under

recruiting, they say, would satisfy this element simply by showing that the advocate meant to speak. But this argument ignores the Act's requirement that the recruiting must happen "for the purpose of" concealing an abortion from a parent, procuring an illegal abortion, or obtaining a drug to end a pregnancy. *Id*. § 39-15-201(a).

Welty and Behn claim that constitutional avoidance principles have no role to play in a facial overbreadth challenge under the First (and Fourteenth) Amendments. But as the above analysis shows, Welty and Behn are wrong many times and many cases over. *E.g.*, *Hansen*, 599 U.S. at 781 n.3. Overbreadth's "strong medicine," the Court keeps cautioning lower courts, should be "employed . . . sparingly and only as a last resort," and never "when a limiting construction has been or could be placed on the challenged statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

III.

*As-applied challenge.* This interpretation makes short work of Welty and Behn's claim that the Act, as applied to them, violates their free-speech rights. Neither Welty nor Behn says they have intentionally recruited minors to obtain an abortion or to conceal one from a minor's parents, and neither of them asks the court for permission to do so in the future. That means that the Act does not reach their past or future activities.

To repeat, because it is worth repeating, Welty and Behn's abortion counseling and advocacy fall outside the Act. Take stock, again, of what Welty and Behn say they have done and what they say they want to do. As a family-law attorney, Welty gives her minor clients "information" about "the legal options they have to obtain" abortions and tells them that abortion is "safe, common and normal." R.35 at 9. Welty says her "goal" in speaking with minors "is never to persuade someone" to get an abortion. R.35 at 24. As an advocate, Welty takes a similar approach. She volunteers for an abortion fund that provides "[o]nline literature" about abortion options. R.35 at 14. She leaves handouts and "cards" with lists of websites about abortion options in places where "anyone" could pick them up, such as in the public "bathrooms of bars." R.35 at 16–18. She "[t]alk[s] to a lot of reporters," attends "marches," and gives

"speeches" about abortion access. R.35 at 19. And she previously managed "some social media" accounts to "provide information to Tennesseans about abortion care." R.35 at 18–19.

Behn engages in similar kinds of counseling and promotion of pro-choice policies. As a social worker and as a legislator, Behn shares "information" about "how to access abortion services," all to the end of allowing her clients and constituents to make "informed decision[s]." R.35 at 40–41, 44. She talks about abortion-related bills with her constituents. She uses "social media platforms to demystify legislation and provide information" about abortion laws. R.35 at 41. And she places "stickers" sharing information about abortion options in public "places where . . . minors" might see them. R.35 at 54.

None of these words or actions amounts to "abortion trafficking"—"intentionally recruit[ing]" minors to obtain an abortion. Tenn. Code Ann. § 39-15-201(a). Welty and Behn's activities instead fall into two permissible categories: generally promoting abortion access and sharing specific information about abortion options. In arguing for abortion access for the public generally, Welty and Behn say and do nothing to induce minors to obtain abortions or to conceal them from the children's parents. Much less do they try to entice, coerce, or encourage minors to get an abortion. So too with the information they share about abortion options. Both claimants instead leave the ultimate decision to the minor, free of influence in either direction. In Behn's words, she "provid[es] them information so that they can make an informed decision." R.35 at 44. In Welty's words, she wants to make sure "[m]inors" are "able to . . . make these decisions" about whether to have abortions "for themselves." R.35 at 8. "My goal," Welty says, "is never to persuade someone. It is to give them options and then let them make their own decision." R.35 at 24. These actions and forms of sharing information fall well short of "abortion trafficking." How strange that, in a free-speech case of all things, the court is not honoring the claimants' own words about what they do and don't do when it comes to abortion counseling.

It's not just the claimants who deny any efforts to take actions and use words that would violate the Act. The defendants in the case, the State's district attorneys, also deny that Welty and Behn's past and future efforts to promote pro-choice policies would violate the Act and have specifically disavowed "any intent to prosecute them" moving forward. Third Br. 21–22. Charged with principal responsibility for enforcing the Act, the district attorneys have stated in

every relevant filing before the district court and this court that the plaintiffs' actions and words do not violate the Act. In their response to Welty and Behn's motion for a preliminary injunction, for example, they said that the plaintiffs "haven't come close" to "demonstrat[ing] an intention to engage in th[e] sort of conduct" prohibited by the Act. R.22 at 17. In their response to Welty and Behn's motion for a permanent injunction, they said that "[*n*]*one* of the activities described by Plaintiffs are proscribed by the Act's 'recruiting' provision." R.69 at 17. In their opening brief on appeal, they say that Welty and Behn "have not engaged in and do not plan to participate in th[e] sort of conduct" prohibited by the Act—"let alone with the Act's required *mens rea*." First Br. 21. And in their reply brief, they say that Welty and Behn's speech and activities "do not violate the Act." Third Br. 13.

Welty and Behn invoke the Act's legislative history, claiming that it shows that the Act covers their advocacy. In explaining "what recruitment looks like," one Tennessee representative pointed to a social media post by Behn that read: "I welcome the opportunity to take a young person out of the state who wants to have an abortion, even if it lands me in jail." R.1-6 at 21. But "no matter how illuminating legislative history is, it cannot provide a basis for departing from clear codified statutory provisions." *State v. Welch*, 595 S.W.3d 615, 624 (Tenn. 2020) (quotation omitted). The text controls, and it confirms that political advocacy, including Behn's social media post protesting passage of the Act as well as her abortion counseling, does not count. To repeat still again, Behn "provid[es]" minors "information so that they can make an informed decision." R.35 at 44. She never claims a desire to intentionally induce minors to obtain an abortion or to hide the act from their parents. Whatever value legislative history has, it is not linguistic alchemy, transforming words into a meaning the underlying speaker denies.

Acknowledging that they have "disclaimed an intent to persuade," Fourth Br. 11, Welty and Behn insist that they engage in prohibited recruiting when they "help[] and encourag[e]" minors who have decided to have an abortion, Second Br. 23–24. But whatever happens after a minor chooses to have an abortion does not amount to recruiting the minor to make that choice in the first instance.

All of this back and forth returns us to one mystery of this case already mentioned and identifies another. The one: Why won't Welty and Behn and the court simply agree to eliminate

any risks to their work by supporting and announcing a decision that the Act does not cover anything the plaintiffs have done in the past or wish to do in the future? The other: Does the court think there is any way to write a law that bans "abortion trafficking of a minor" without violating the First Amendment?

*Facial challenge.* That brings us to Welty and Behn's facial challenge to the Act. "A facial challenge to a law is no small matter." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc). It is "unusual" in First Amendment cases too. *Hansen*, 599 U.S. at 769. True, a First Amendment claimant may prevail on a facial challenge even without showing that the law is unconstitutional as applied to her. *Id.* To do so, however, the claimant must show that the statute is unconstitutional in a large percentage of its applications. *Id.* at 770.

*Moody v. NetChoice, LLC* sets the framework. 603 U.S. 707 (2024). In First Amendment cases, a statute is facially invalid if its "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. That requires us to examine "rigorous[ly]" "which of the law[']s] applications violate the First Amendment, and to measure them against the rest." *Id.* at 723, 725. Those "unconstitutional applications must be realistic, not fanciful." *Hansen*, 599 U.S. at 770. And "their number must be substantially disproportionate to the statute's lawful sweep," *id.*, after accounting for the "full scope of the law's coverage," *NetChoice*, 603 U.S. at 744. "[T]he burden of demonstrating" the Act's overbreadth rests with Welty and Behn. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003).

In this instance, the Act's unlawful applications do not remotely "substantially outweigh" its lawful ones, as shown by the reality that no one has yet identified a person who plans to violate this anti-abortion-trafficking law by intentionally recruiting minors to obtain an abortion they otherwise would not have obtained. *NetChoice*, 603 U.S. at 724. If advocating for abortion access and sharing information about abortion options are not banned by the Act, as just shown, that leaves few forms of speech covered by the Act. *See Hansen*, 599 U.S. at 782–83. What the Act *does* ban is targeted conduct intended to induce a minor to conceal or to have an abortion. But those applications of the Act are perfectly constitutional for the same reason that sex-trafficking statutes are constitutional. *See, e.g.*, *Woodhull Freedom Found. v. United*

*States*, 72 F.4th 1286, 1299–303 (D.C. Cir. 2023); *State v. Washington-Davis*, 881 N.W.2d 531, 537–41 (Minn. 2016).

Also unhelpful is Welty and Behn's reliance on the Ninth Circuit's decision in *Matsumoto v. Labrador*, 122 F.4th 787 (9th Cir. 2024). Idaho's statute, sure enough, bans adults from "procur[ing]" or "obtain[ing]" an abortion for minors by "recruiting, harboring, or transporting" them "with the intent to conceal [the] abortion from the [minors'] parents." Idaho Code § 18-623(1). But in contrast to the Tennessee law, the Idaho law does not require the individual to "intentionally" recruit the minor. That by itself separates this case from that one. Without that word's narrowing effect, the Idaho law covers more actions and speech than the Tennessee law does.

The Ninth Circuit, at any rate, did not do what *NetChoice* requires: "rigorous[ly]" weigh the statute's unlawful applications against its lawful ones. 603 U.S. at 723; *see Doe v. Burlew*, 165 F.4th 525, 532–33 (6th Cir. 2026). *Matsumoto* tabulated numerous applications of the statute that it said might abridge speech. *See* 122 F.4th at 811–15. But it gave no attention, so far as the opinion shows, to the many applications of the law that would not violate the First Amendment. *Matsumoto* did not, for example, consider the extent to which the statute criminalizes conduct that is aimed at recruiting minors and that is not protected by the First Amendment. *See, e.g.*, *Hansen*, 599 U.S. at 782. Because *Matsumoto* did not "explore the law['s] full range of applications," "the constitutionally impermissible and permissible both," it could not comprehensively "compare the two sets." *NetChoice*, 603 U.S. at 726.

Further afield is the Seventh Circuit's decision in *Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky, Inc. v. Commissioner of the Indiana State Department of Health*, No. 24-2219, 2026 WL 2409722 (7th Cir. Aug. 18, 2026). It involved only an as-applied challenge and thus says nothing to support the court's broad facial invalidation of this law. Even on its own terms, the decision offers no support for the court's as-applied ruling. The Indiana law at issue in that case did not regulate the "intentional" "recruiting" of minors to obtain an abortion or any other form of minor-abortion "trafficking." Indiana instead barred someone from merely "aid[ing]" or "assist[ing]" a minor to obtain an abortion without following the State's parental consent laws. Ind. Code § 16-34-2-4.2(c); *Planned Parenthood*, 2026 WL 2409722, at

*1–2. Noting that "Planned Parenthood does not try to persuade anyone to have an abortion," the Seventh Circuit invalidated only Indiana's effort to ban the organization from "providing information and referrals so clients can make their own decisions" about an abortion. *Planned Parenthood*, 2026 WL 2409722, at *13. That ruling calls to mind my approach to today's case, not the court's.

What of the reality that the court in today's decision has construed this anti-trafficking law broadly rather than narrowly and, in doing so, has increased the amount of activity that might be covered by the Act? To that end, Welty and Behn claim to have substantial data indicating that the Act's allegedly unlawful applications substantially outweigh its lawful ones. But no such data was presented below. Welty and Behn declined the opportunity for discovery, and their motion for injunctive relief offered no evidence about the Act's applications. *See* R.56 at 45–46. Their brief on appeal, it is true, seeks to add data about the Act's potential lawful and unlawful applications, but this effort is too little and too late. It is too little because the alleged facts mentioned in the appellate brief—that Tennessee residents of all ages obtained most of their abortions outside of the State in 2023—say nothing about minors or the lawfulness of those abortions, whether in-state or out-of-state, and fail to acknowledge the many abortions procured by drugs and the percentage of them procured illegally in the State. *See* Second Br. 47. These "statistics" thus fall short of demonstrating any "actual fact" about abortion or speech directed at Tennessee minors. *Holder*, 557 F.3d at 336 (quotation omitted). It is too late because "appellate briefs may not supplement the record below." *Bennett v. Durham*, 683 F.3d 734, 738 (6th Cir. 2012).

Welty and Behn insist that *NetChoice* does not require this comparison when a statute discriminates on the basis of viewpoint. But this ignores *NetChoice*'s treatment of viewpoint discrimination claims. *See* 603 U.S. at 723–24, 736–38. In addressing those precise claims, it said that a "law with a plainly legitimate sweep may be struck down in its entirety" "*only if* the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 723–24 (emphasis added). The argument also overlooks the many settings where the First Amendment permits viewpoint discrimination, say where the government restricts speech that encourages illegal activity but permits speech that encourages lawful activity. *Hansen*, 599 U.S. at 774–76,

783 (upholding prohibition on "'encouraging' and 'inducing' a violation of law" (emphasis deleted)).

*Chiles v. Salazar*, 146 S. Ct. 1010 (2026), does not rescue Welty and Behn's arguments for the same reason. That case dealt with a Colorado law that punished speech expressing certain viewpoints without any connection to underlying criminal conduct. *Id.* at 1024. Tennessee's Act, in contrast, proscribes recruitment for separately outlawed criminal acts—the intentional recruitment of Tennessee minors to obtain an abortion within the State or outside of it. While it's true that States may not discriminate between viewpoints when regulating protected speech, that does not prevent them from banning the solicitation of crimes, a power that the Supreme Court has recognized "many times." *Hansen*, 599 U.S. at 783.

In an effort to increase the number of purportedly unconstitutional applications of the Act, the court and the claimants turn to *Bigelow v. Virginia*, 421 U.S. 809 (1975), arguing that it shows that the First Amendment bars application of the Act to out-of-state residents. *Bigelow* dealt with a Virginia law that banned "encourag[ing] or prompt[ing] the procuring of abortion" "by publication, lecture, advertisement, or . . . in any other manner." *Id.* at 812–13. The Court held that the statute violated the First Amendment as applied to the editor of a newspaper that ran an advertisement for an abortion facility in New York.

*Bigelow* has no role to play in assessing the validity of this Tennessee law for at least three reasons. First, when the Court decided *Bigelow* in 1975, it implicated two constitutional rights, not one. The Court explained that its holding rested not only on free-speech rights but also on the substantive due process right to an abortion recognized in *Roe v. Wade*, 410 U.S. 113 (1973). *Bigelow*, 421 U.S. at 821–22. By the time the Court decided *Bigelow*, *Roe* had rendered unconstitutional all state laws, including Virginia's, that banned abortion. Virginia law thus did not—indeed, could not—prohibit the abortions described by the advertisement. The *Bigelow* Court based its reasoning on that reality, explaining that, in the wake of *Roe*, "[n]o claim has been made, nor could any be supported on this record, that the advertisement" at issue "related to a commodity or service that was then illegal in either Virginia or in New York." *Id.* at 828. But "authority to regulate abortion" has since been "returned to the people and their elected representatives," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022), and

Tennessee has exercised its prerogative to regulate abortions. This case thus concerns one constitutional right (not two), and it concerns conduct that violates the law of the affected State (unlike *Bigelow*).

Second, even on free-speech grounds alone, the *Bigelow* law covered fundamentally different speech from the Tennessee Act. The *Bigelow* law applied to newspaper advertisements and editorials—pure information for everyone, not one-on-one intentional recruiting of minors to obtain an abortion without telling their parents—and it risked chilling speech by "a wide variety of national publications or interstate newspapers" that simply provided information about abortion services. *Bigelow*, 421 U.S. at 828–29. No one claims that the Tennessee Act applies to newspaper advertisements, editorials, articles, fliers, or any other written publication directed at a general audience and designed to provide information about a service. Instead of banning any speech "encourag[ing]" abortion, *id.* at 812–13, Tennessee's Act reaches only those who "intentionally recruit[], harbor[], or transport[]" a minor for an abortion without her parents' consent, Tenn. Code Ann. § 39-15-201(a). A law that targets one-on-one efforts to induce an illegal abortion stands on distinct grounds from a law that regulates the content of newspaper articles.

Third, the Tennessee Act furthers a compelling government interest that the statute in *Bigelow* did not touch: the protection of minors and the interests of parents in looking after their children. States have a responsibility to protect minors from harm, whether that harm results from the minor's own poor decisions or the malevolent influence of others. *See Prince v. Massachusetts*, 321 U.S. 158, 168 (1944). Parental consent requirements represent one way of fulfilling that mandate. Parents, after all, "usually . . . know what's best for their children." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 475 (6th Cir. 2023); *see Ginsberg v. New York*, 390 U.S. 629, 636–37 (1968) (upholding a New York law that criminalized selling sexually explicit, but not obscene, materials to minors even though the First Amendment protected such conduct when it involved adults). Unlike the statute in *Bigelow*, the Act makes the protection of minors a priority. Recall that the Act applies only to those who recruit a minor without the consent of her parents. Tenn. Code Ann. § 39-15-201(c)(1)–(2). Recall, too, that the Act prohibits only solicitation of criminal abortion trafficking. *See Hansen*, 599 U.S. at 769, 783.

Just as the States "of course" have broad power to regulate for "[t]he well-being of [their] children" when it comes to access to sexually explicit materials, *Ginsberg*, 390 U.S. at 639, they have a weighty interest in ensuring that individuals do not solicit minors to participate in abortion trafficking without their parents' permission. In the last analysis, any analogy between *Bigelow* and this case gives comparison a bad name.

The claimants offer another variation on this theme. Acknowledging that Tennessee may ban the recruitment of minors to traffic in illegal abortions within the State's own borders, the claimants contend that the State may not prevent recruitment for abortions that occur in more permissive States. The claimants are right that some States make it easier for minors to obtain abortions there. But it is not clear what these other States would say about providing abortions for minors who were intentionally recruited in a different State. Surely such States, for example, would not knowingly permit a coerced or kidnapped child to obtain an abortion in their jurisdictions. What, then, of intentionally recruited minors? The record simply does not answer *that* question. That leaves us, again, with another problem of what goes into the numerator and the denominator when it comes to a facial challenge.

The broader problem with this argument is that the claimants are simply wrong. Tennessee "of course," *id*., has the power to regulate all manner of trafficking activities targeted at minors—whether of abortions, drugs, sex, sexually explicit materials, or gambling opportunities—that occur within its borders. While other States have the right to regulate (or not regulate) abortion as they see fit, Tennessee also has the right to protect its own citizens from solicitation of conduct it has chosen to prohibit. The claimants mistake Tennessee's defense for extra-territorial offense.

Shifting gears, the court claims that its decision protects federalism by prohibiting States from engaging in extra-territorial regulation. I don't see it. The court's approach would force all States to accept whatever regulation (or lack thereof) exists in the State embodying the lowest common denominator. Take prostitution as an example. Today, only Nevada permits prostitution. *See* Nev. Rev. Stat. §§ 201.353(1), 244.345(8). If the court's analysis is right, Tennessee would be powerless to prevent enterprising out-of-staters from canvassing the State and recruiting its citizens, minors or otherwise, to come to Nevada to sell sex. Who is

extra-territorially regulating whom in that setting? Whatever else might justify the court's decision, it's not federalism.

Other analogies abound. Consider a law that banned anyone from coming into the State to recruit minors to undergo sex-reassignment surgeries in a State that permits them. Because Tennessee has determined that "minors lack the maturity to fully understand and appreciate the life-altering consequences of such procedures," it has prohibited them. *United States v. Skrmetti*, 605 U.S. 495, 523 (2025) (quotation omitted). Having done so, it is free to ban individuals, whether from Tennessee or elsewhere, from recruiting minors to do something the State bars and still more so to do it without the parents' knowledge. *Cf. Mirabelli v. Bonta*, 607 U.S. 492, 496–97 (2026) (per curiam). Any other approach would mean that Tennessee could constitutionally ban such procedures to protect its children but could not prevent out-of-staters from intentionally recruiting those same minors to obtain the surgeries, so long as the recruiters hale from a State with more permissive laws. To explain that position is to defeat it.

What of other possibilities? One State might opt to prevent its children from having access to sports gambling or other games of chance, from having access to marijuana or certain beverages, or from having access to online pornography. Other States might take more permissive approaches to each of these police-power issues. To each its own under our federalist system. What that system does not require in general, and what the First Amendment does not demand in particular, is that States permit recruiters to lure minors through in-state conduct to sidestep these prohibitions by convincing the minors simply to leave the State. Now that would be a "shocking proposition." Op. at 45.

The court makes several references to abortion pills, implying that abortions procured in this way are more likely to be legal because several nearby States permit medication abortions. Even accepting the premise that the legality of the pills in other States matters, this argument does not show that the law has a broader sphere of invalidity. While the court's statistics may show that many Tennesseans who seek abortions do so through pregnancy-ending drugs, these statistics do not indicate *where* the individuals take those pills. When compared to medical devices in abortion facilities, pills make it easier to smuggle abortion into a State with pro-life laws. *See* Laura Ungar & Geoff Mulvihill, *8,000 Women a Month Got Abortion Pills Despite*

*Their States' Bans or Restrictions, Survey Finds*, PBS News (May 14, 2024, at 17:55 ET), https://tinyurl.com/5akjemmh. Pills are easy to hide, to conceal, to transport, and to distribute, raising the possibility that Tennesseans will use the abortion pills in Tennessee—something the court agrees the State may ban—even if they acquire them elsewhere. Yet the court fails to take these realities into account in its numerator-denominator assessment of legal applications of the law, let alone consider them as a part of the *NetChoice* fact-intensive inquiry.

The court's treatment of the Act's parental consent provision warrants a brief response. Invoking a hypothetical about a high school guidance counselor who advises a 16-year-old student that she could go to Virginia to obtain an abortion, the court suggests that the Act's requirement of parental consent represents an onerous burden on those who advise young people. What if, the majority asks, the counselor advises the child to get an abortion before the parents even know? Even if the parents later consent to the abortion in Virginia, the court worries, the guidance counselor will be on the hook for violating the Act.

I fail to see what makes this scenario troubling. Many States have already decided to require parental consent before authority figures at school speak with children about intimate topics. Several States, for example, require parental consent before providing sexual education classes. *See State Policies on Sex Education in Schools*, Nat'l Conf. of State Legislatures (Oct. 1, 2020), https://tinyurl.com/mr3fnrx4. Surely States may opt to require parental consent before school guidance counselors intentionally recruit students to obtain an abortion.

## IV.

*Due process facial vagueness challenge.* Welty and Behn turn to an "alternative ground for facial invalidation": that the Act's recruitment provision is void for vagueness under the Fourteenth Amendment. *Williams*, 553 U.S. at 304. The court does not reach this argument. Having explained why the Act does not violate the claimants' free-speech rights, I must explain why this challenge also fails to prevent Tennessee from enforcing its law.

A criminal statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* A statute falls short of this due-process minimum if

it is "unclear whether it regulates a substantial amount of protected speech." *Id.* In policing the line between sufficient clarity and unconstitutional ambiguity, we do not require "perfect clarity" or "precise guidance," even for statutes that "restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). "Close cases" and "difficult" questions exist "under virtually any statute" and do not by themselves a constitutional infirmity make. *Williams*, 553 U.S. at 306.

The Act clears this bar. As shown, "recruit" has a "widely used and well understood" meaning. *Cameron v. Johnson*, 390 U.S. 611, 616 (1968). So does the word "intentionally." *See* Tenn. Code Ann. § 39-15-201(a). And so do the words "adult," "minor," "abortion," and all others in the Act. *See id.* §§ 39-15-201(a), 39-15-213(a)(1). Taken together, the Act understandably "delineates its reach in words of common understanding." *Cameron*, 390 U.S. at 616.

Welty and Behn perceive unconstitutional vagueness in "recruiting," which they say breaks the boundaries of clarity. This argument collides with the Act's text, which not only prohibits recruiting but also requires that the recruiting be "intentional[]" and "for the purpose of" concealing or obtaining an abortion for the minor. Tenn. Code. Ann. § 39-15-201(a). A word that is already clear, plus a mental state that clarifies it still further, provides all the notice that citizens need. *See Gonzales v. Carhart*, 550 U.S. 124, 149–50 (2007).

Welty and Behn also fail to come to grips with the practice and precedent in other States and in other courts. States routinely ban "recruiting" as an element of trafficking. *See, e.g.*, Tenn. Code Ann. §§ 39-13-308, 39-13-309; Ala. Code § 13A-6-152; Ark. Code § 5-18-103; Colo. Rev. Stat. § 18-3-504. And courts have repeatedly rejected claims that those statutes are void for vagueness. *See, e.g.*, *United States v. Snead*, 2022 WL 17975015, at *4 (4th Cir. Dec. 28, 2022) (per curiam); *Alonso v. State*, 228 So. 3d 1093, 1101–02 (Ala. Crim. App. 2016); *People v. Harris*, 2015 WL 3648862, at *2 (Mich. Ct. App. June 11, 2015). Welty and Behn have not cited a single case holding otherwise. If anything, it is Welty and Behn's broadening definition of recruitment that would create fair-warning problems under the Due Process Clause.

V.

The court's affirmance of the district court's injunction suffers from an independent merits-related problem: its scope. Although Welty and Behn brought claims on behalf of themselves alone and did not seek to certify a statewide class under Civil Rule 23, the injunction applies to every individual in the State of Tennessee. That relief exceeds the district court's authority.

Federal courts have statutory authority to award "only those sorts of equitable remedies 'traditionally accorded by courts of equity.'" *CASA*, 606 U.S. at 841 (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). At the outer boundary of this statutory grant rests "complete relief *between the parties*." *Id.* at 851 (quotation omitted); *see Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Generally speaking, "universal injunctions" exceed this outer "maximum" because they "reach *anyone* affected by legislative or executive action." *CASA*, 606 U.S. at 848, 853–54. Such an award of nonparty relief "lacks a historical pedigree" and thus "falls outside the bounds of a federal court's equitable authority." *Id.* at 847. A "universal injunction," the Court reasoned, may "be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power." *Id*. at 841; *see id.* at 862 (Gorsuch, J., concurring) ("As the Court explains, the Judiciary Act of 1789—the statute that 'authorizes the federal courts to issue equitable remedies'—does not permit universal injunctions." (quoting *id.* at 841 (majority opinion))). Civil Rule 23(b), it is true, potentially could permit a statewide class in this case. But for reasons of their own, the claimants did not seek such relief.

Notwithstanding the absence of a statewide class, today's injunction bars "all enforcement of the recruitment provision" by the state defendants against anyone in the State. R.81 at 29–31. Neither the district court nor the plaintiffs assert that complete relief in this case depends on a statewide injunction. Nor could they. The judgment in this case against the state defendants already fully protects Welty and Behn. The district court's injunction thus runs afoul of the prohibition on universal injunctions that purport "to prohibit enforcement of a law or policy against *anyone*." *CASA*, 606 U.S. at 837. Even if Welty and Behn could succeed on the merits, *CASA* thus bars their request for universal relief.

Welty and Behn's efforts to distinguish *CASA* fail at each turn. They argue that their claim rests on "different statutory authority," pointing to their claim for federal-question jurisdiction under 28 U.S.C. § 1331. Second Br. 60. Yet this point does not so much distinguish *CASA* as describe it. The plaintiffs in *CASA* also invoked § 1331. *See* Complaint at 7, *CASA, Inc. v. Trump*, No. 25-cv-00201 (D. Md. Jan. 21, 2025), Dkt. No. 1. The Court still looked to traditional equity practice in rejecting the plaintiffs' claim for universal relief. That made good sense. *CASA* held that federal courts may not issue universal injunctions because the Judiciary Act of 1789 did not permit universal relief. 606 U.S. at 841. The 1789 Act, it is true, provided only for diversity jurisdiction, while Congress did not enact the precursor to 28 U.S.C. § 1331 until 1875. *See* Judiciary Act of 1875, ch. 137, § 1, 18 Stat. 470, 470. But the equitable power "conferred" by Congress in 1789 and "continued" in 1875 "is that of the English court of chancery at the time of" the Founding. *Matthews v. Rodgers*, 284 U.S. 521, 529 (1932). It follows that jurisdiction under § 1331 allows only the relief available under the 1789 Act. *Id.*

Welty and Behn, together with the court, insist that *CASA* applies only to nationwide injunctions against federal laws, claiming that it places no limits on relief against state laws or injunctions within a single state. That is a difficult sale to make—and hardly respects the federalism concerns the court invokes elsewhere in its opinion. The Supreme Court nowhere limited its holding only to "nationwide injunctions" directed against federal executive-branch orders or congressional laws. *CASA*, 606 U.S. at 837 n.1.

A universal injunction, the Supreme Court reasoned, is impermissible not because of "*where* it applies" or which government it covers but rather because of "*whom* it protects: A universal injunction prohibits the Government from enforcing the law against *anyone*, anywhere." *Id*. (quotation omitted). "Even during the deluge of constitutional litigation" against the States "that occurred in the wake of *Ex parte Young*," federal courts did not authorize universal "remedies that have no background in traditional equitable practice." *Id.* at 846 & n.9 (quotation omitted). This tradition, *CASA* recognized, "refus[ed] to grant relief to nonparties" because injunctive relief may not "directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Id.* at 844 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) (concerning a § 1983 challenge to local ordinance)).

These "party-specific principles" offer no exception for claims against state laws or state-specific injunctions, *id.*, and I see no reason to manufacture such an exception today.

When appropriate, Civil Rule 23(b) permits statewide and even nationwide injunctions. But the narrow equitable grounds for universal injunctions, nowhere satisfied here, do not permit claimants to avoid the procedural protections offered to plaintiffs and defendants by Rule 23(b).

Welty and Behn argue that *CASA* does not prevent nonparty relief when plaintiffs bring an overbreadth challenge. In doing so, they cite several pre-*CASA* cases saying that overbreadth can "invalidate all enforcement" of a statute. *Hicks*, 539 U.S. at 119; *see also NetChoice*, 603 U.S. at 723 (an overbroad law "may be struck down in its entirety"); *Hansen*, 599 U.S. at 770; *Connection Distrib.*, 557 F.3d at 335–36. But none of these cases authorized nonparty relief. They instead recognized that a party may challenge the merits of a law, even when "constitutional as applied" to that party's conduct, if that law has too many unconstitutional applications. *Broadrick*, 413 U.S. at 610–12. While this *merits* analysis implicates every application of the law, the *remedy* still must be party specific. When a court rules that a law has no constitutional applications, it does not "erase" that law from the law books. Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936, 1016–17 (2018). It instead refuses to enforce that law in a particular case, *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923), or enjoins one individual party from enforcing the law against another individual party, *CASA*, 606 U.S. at 842. The "Judiciary does not have unbridled authority" to compel the government "to follow the law," and statutory limits on our remedial authority are but one of many ways "the law prohibits the Judiciary from doing so." *Id.* at 858. As *CASA* points out, we federal judges should remind ourselves in *every* case we hear to "[o]bserv[e] the limits on judicial authority—including" how "Congress has constrained the Judiciary." *Id.* at 858–59.

The court notes that *CASA* does not say anything specifically about free-speech overbreadth challenges. The same is true, however, of lots of other statutes and constitutional provisions. This request for a free-speech exemption suggests, if not confirms, that the claimants' injunction violates *CASA*'s test: Federal courts may award "only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *Id.* at 841 (quoting *Grupo Mexicano*, 527 U.S. at 319). The court does not point to a single instance of

a court issuing a universal injunction in a free-speech case, or for that matter a free-speech overbreadth case, "at the time of the founding." *Id.* at 842. That does not comply with the Supreme Court's instruction to identify a "sufficiently analogous" form of relief in the practice of "the High Court of Chancery in England at the time of the adoption of the Constitution" if one wants to create an exception to the ban on universal injunctions. *Id.* at 841–42 (quotation omitted).

The court wonders whether we may fashion new exceptions from *CASA*'s broad mandate based on a footnote in that opinion declining to address whether litigants may seek vacatur of an invalid federal regulation under the Administrative Procedure Act. *See id.* at 847 n.10. We may not. What remedies Congress chose to supply when reviewing federal agency actions under the APA has no bearing on what remedies we have at our disposal when dealing with a state law. As the Supreme Court made clear, the former depends on what the "Administrative Procedure Act authorizes federal courts to" do, *id.*, and the latter turns on what equitable powers the Judiciary Act granted, *id.* at 841. Those "distinct question[s]" may well have different answers. *Id.* at 847 n.10.

VI.

None of the remaining permanent-injunction factors—those beyond the merits—justify this injunction. The absence of a permanent injunction should not irreparably injure Welty and Behn. They are free to advocate for abortion access and share information about abortion options whether the Act is enjoined or not. Tennessee for its part has a legitimate interest in upholding this democratically enacted law. *See New York v. Ferber*, 458 U.S. 747, 756–57 (1982); *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022). Tennessee also will benefit from state adjudication of the Act, which two years of federal litigation have prevented. "The last word on the meaning of" the Act "belongs neither to us nor to the district court but to the supreme court" of Tennessee. *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 499–500 (1941). "Few public interests" have greater weight "than the avoidance of needless friction with state policies." *Id.* at 500. That strongly disfavors a binding ruling on "the scope of a previously uninterpreted state statute which" is "of questionable constitutionality." *See La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28 (1959). The

public interest in prohibiting "abortion trafficking of a minor" surely favors the State as well, as the court must agree.

A litigation loss for Welty and Behn, it's worth adding, would amount to a "real-world win." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 859–60 (6th Cir. 2024) (Murphy, J., concurring). Such a decision, it is true, would not enjoin the Act. But such a decision, it is also true, would lead to a federal court ruling that the Act does not apply to the activities that Welty and Behn want to undertake. That is difficult to describe as a loss.

For these reasons, I respectfully dissent.